CASE NO. 14-3661

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

UNITED STATES,
*Plaintiff-Appellee,*

v.

ANTUN LEWIS,
*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

BRIEF OF APPELLANT ANTUN LEWIS

DENNIS G. TEREZ
Federal Public Defender
MELISSA M. SALINAS
Appellate Director
Office of the Federal Public Defender
for the Northern District of Ohio

JEFFREY B. LAZARUS
*Counsel of Record*
Office of the Federal Public Defender
1660 W. 2nd Street, Suite 750
Cleveland, Ohio 44113
(216) 522-4856
jeffrey_lazarus@fd.org

*Counsel for Defendant-Appellant Antun Lewis*

# TABLE OF CONTENTS

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

Request for Oral Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

Jurisdictional Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Issues Presented . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

> I.     Whether the District Court Abused its Discretion in Denying a New Trial
>
> II.    Whether Lewis's Conviction Must Be Reversed for Prosecutorial Misconduct As a Result of the Government's Improper Remarks During Closing Argument
>
> III.   The Supreme Court's Holding in <u>Bond v. United States</u>, and this Court's Holding in <u>United States v. Toviave</u> Require Lewis's Conviction to be Vacated

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

I.   The District Court Abused its Discretion in Failing to Grant the Motion for a New Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

     Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

     Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

        A.   Legal Standards for a Motion for New Trial. . . . . . . . . . . . . . . . . 35

B.    The First Motion for New Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . 36

C.    The Government's Presentation of Multiple Inconsistent and
      Unsupported Motives. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

      1.    The Bond Dispute. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

      2.    The Drug Debt. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

D.    Marion Jackson's Testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

      1.    The Alleged Party and Jackson's Location as a
            Look-out. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

      2.    No Cell Phone Records Connecting Lewis to
            Jackson. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

      3.    Jackson Alters his Time Line. . . . . . . . . . . . . . . . . . . . . . . . 47

      4.    The Recorded Conversation Between Jackson and
            Lewis.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

E.    The Jailhouse Informants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

      1.    Miller's Testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

      2.    Support for Miller's Testimony. . . . . . . . . . . . . . . . . . . . . . 54

      3.    Additional False Testimony by McKeever. . . . . . . . . . . . . . 55

F.    Samantha Collins. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

G.    George Hightower.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

      1.    The Cell Phone Records Prove Hightower's
            Testimony Incredible. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

2.    Antun Lewis' Testimony of the Events the Night of the Fire is Supported by the Cell Phone Records. . . . . . . 64

H.    The Cell Phone Records. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

1.    The Connection Between the Cell Phone Records and the Time of the Fire. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

2.    The Government's Speculative Justification For This Discrepancy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

3.    The Defense Has Presented Credible Evidence in Support of the Alarm Times and Cell Phone Records. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

I.    Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

II.    Lewis's Conviction Must Be Reversed for Prosecutorial Misconduct As a Result of the Government's Improper Remarks During Closing Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

III.   The Supreme court's Holding in Bond v. United States, and this Court's Holding in United States v. Toviave, Require Lewis' Conviction to be Vacated. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

IV.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

Certification of Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

Certification of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

Addendum: Designation of District Court Documents . . . . . . . . . . . . . . . . . . 88

## TABLE OF AUTHORITIES

**FEDERAL CASES**                                          **PAGE NO.**

Bond v. United States, __ U.S. __, 134 S. Ct. 2077 (2014). . . . . . . . . . . . . . *passim*

United States v. Arroyo, 301 F.Supp.2d 217 (D. Conn. 2004). . . . . . . . . . . . . . . 36

United States v. Ashworth, 836 F.2d 260 (6th Cir. 1988). . . . . . . . . . . . . . . . . 35

United States v. Bass, 404 U.S. 336 (1971). . . . . . . . . . . . . . . . . . . . . . . . . 84

United States v. Francis, 170 F.3d 546 (6th Cir. 1999). . . . . . . . . . . . . . . . . . . 79

United States v. Green, 305 F.3d 422 (6th Cir. 2002). . . . . . . . . . . . . . . . . . . . 78

United States v. Henry, 545 F.3d 367 (6th Cir. 2008). . . . . . . . . . . . . . . 79, 80, 81

United States v. Hughes, 505 F.3d 578 (6th Cir. 2007). . . . . . . . . . . . . . . . . . . 33

United States v. Lawrence, 555 F.3d 254 (6th Cir. 2009). . . . . . . . . . . . . . . . . . 33

United States v. Lewis, 521 F. App'x 530 (6th Cir. 2013). . . . . . . . . . . . . . . . . 4, 34

United States v. Morales, 910 F.2d 467 (7th Cir. 1990). . . . . . . . . . . . . . . . . . . 36

United States v. Munoz, 605 F.3d 359 (6th Cir. 2010). . . . . . . . . . . . . . . . . . 33, 35

United States v. Solorio, 337 F.3d 580 (6th Cir. 2003). . . . . . . . . . . . . . . . . . . 35

United States v. Toviave, 761 F.3d 623 (6th Cir. 2014). . . . . . . . . . . 32, 81, 84, 85

United States v. Wall, 389 F.3d 457 (5th Cir. 2004). . . . . . . . . . . . . . . . . . . . . 35

**STATUTES**

18 U.S.C. § 229. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81, 82

18 U.S.C. § 844. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. § 1589. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

18 U.S.C. § 3231. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 3742. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**RULES**

FED. R. CRIM. P. 33. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 28, 33, 35, 36

FED R. APP. P. 34. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

6TH CIR. R. 34. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

## REQUEST FOR ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34(a)(1) and Sixth Circuit Rule 34(a), Appellant Antun Lewis requests oral argument. This case represents the prosecution of Antun Lewis for the deadliest house fire in Cleveland's history. Lewis was found guilty by a jury in 2011, and the district court granted a new trial, finding the verdict was not supported by the weight of the evidence. This Court affirmed that decision. In 2013, the government presented the same case-in-chief at the second trial; Lewis was found guilty again and sentenced to 35 years in prison. The instant appeal presents significant legal issues regarding motions for a new trial, as well as other issues arising from the prosecution.

The trial transcripts exceed 7,000 pages and cover numerous factual issues. In fact, there are over 17,000 pages of publicly-filed documents in this case. In total, this case presents a massive record, and concerns a case lasting over nine years of procedural and factual history. As detailed herein, there are a multitude of witnesses, many of which have their own back stories and issues, all of which cannot be fully detailed in the instant brief. The briefs will aid this Court in properly assessing the legal issues, but all will benefit from an oral argument that will allow the parties to effectively discuss said issues. Therefore oral argument is respectfully requested.

## <u>JURISDICTIONAL STATEMENT</u>

The district court obtained jurisdiction under 18 U.S.C. § 3231. [R1, Indictment]. Lewis was found guilty by jury of arson under 18 U.S.C. § 844(i). [R537, Judgment, 16388[1]]. Lewis filed a timely notice of appeal. [R536, Notice of Appeal, 16387]. This Court has jurisdiction over Lewis's appeal under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

---

[1] The numbers indicated in these citation references refer to the PageID numbers.

## <u>ISSUES PRESENTED</u>

**I.**    **Whether the District Court Abused its Discretion in Denying a New Trial**

**II.**    **Whether Lewis's Conviction Must Be Reversed for Prosecutorial Misconduct As a Result of the Government's Improper Remarks During Closing Argument**

**III.**    **The Supreme Court's Holding in <u>Bond v. United States</u>, and this Court's Holding in <u>United States v. Toviave</u> Require Lewis's Conviction to be Vacated**

## STATEMENT OF THE CASE

In the early morning hours of May 21, 2005, a fire occurred at 1220 E. 87th Street in Cleveland. Medeia Carter and eight children died in the fire. Two residents, Capretta Nicole Bell and Teon Smith, survived.

### I.    The First Trial and Grant of a New Trial

Six years later, Appellant Antun Lewis went to trial. On February 14, 2011, the jury found Lewis guilty of 18 U.S.C. § 844(i). [R298, Verdict]. The defense filed for a new trial under Criminal Rule 33. [R324, Motion for New Trial]. On February 8, 2012, the district court granted the motion for a new trial based on the manifest weight of the evidence. [R359, Order]. Sitting as the thirteenth juror, the district court concluded the testimony of the "government's key witnesses" held no weight. [R359, Order, 9815].

The district court concluded the government's case-in-chief was "marked by uncertainties and discrepancies." [R359, Order, 9827]. In finding the case presented "ambiguous circumstantial evidence," the district court found "much room for reasonable doubt." [R359, Order, 9832]. The verdict rested on the testimony of witnesses who were impeached, stood to gain from their testimony, and presented a narrative undermined by other competent witnesses. [R359, Order, 9833]. Based on the unresolved questions, the district court found "this is one of those few cases

where the integrity of the system is at stake and the court is required to overturn the jury's verdict as being against the manifest weight of the evidence." [R359, Order, 9833].

The district court spent 30 pages assessing the credibility of Marion Jackson, the man who claimed to be the lookout while Lewis set the fire. [R359, Order, 9761-90]. The district court concluded Jackson "often failed to recall critical information and admitted to a number of 'miscalculations' concerning key facts . . . these inconsistencies and contradictions render Jackson's credibility dubious." [R359, Order, 9771-72]. The district court referenced Jackson's: contradictory statements; the lack of supporting phone records; miscalculations of places and events; alterations of his story; and incentives he received. [R359, Order, 9772-87].

The district court was also troubled with the testimony of Paul McKeever and the other five informants – all of whom claimed Lewis confessed to the crime. Specifically, all the informants were connected to McKeever before each offered a statement to law enforcement. [R359, Order, 9803]. Additionally, their claims were contradicted by the victims's family and friends. [R359, Order, 9804].

Therefore, the district court granted the motion for a new trial. [R359, Order, 9835]. The government appealed the decision, and this Court affirmed. United States v. Lewis, 521 F. App'x 530 (6th Cir. 2013).

4

## II.    The Second Trial – The Government's Case In Chief

In granting a new trial, the district court concluded that a second trial would provide an opportunity to answer the "unresolved questions" and to present "competent evidence to the jury." [R359, Order, 9834]. At the second trial, the government ignored the district court's mandate, choosing to present the same evidence.

### A.    Marion Jackson

Jackson testified he was recruited by Lewis to aid in him in setting the fire, by acting as lookout. [R458, Transcript, 11919]. Jackson, a 55-year old man, had spent half his life in prison. [R458, Transcript, 11874]. His prior convictions included kidnaping, robbery, grand theft, receiving stolen property, assault, and possession of counterfeit securities. [R459, Transcript, 12047]. Jackson was institutionalized from age nine to twenty-four. [R458, Transcript, 11872].

On August 3, 2005, Jackson was arrested in Cuyahoga County for kidnaping, aggravated burglary, and attempted felonious assault, with repeat violent offender specifications. [R458, Transcript, 11872]. Jackson remained in county jail on a $100,000 bond, facing over twenty years in prison. [R458, Transcript, 11997, 12066]. From August 11, 2005 through September 30, 2005, Jackson was incarcerated in the

same unit as Paul McKeever, with whom he had previously served prison time. [R458, Transcript, 11994].

In jail, Jackson and McKeever watched television reports about the fire. [R458, Transcript, 11997]. On September 27, 2005, McKeever summoned law enforcement to speak with Jackson.  [R458, Transcript, 12003-04]. After agents took Jackson out of jail, to the fire scene, Jackson gave a written statement claiming he acted as lookout. [R458, Transcript, 12010]. In his statement, Jackson claimed he was with Lewis on the night of the fire from 9:10 p.m. through 2:30 a.m. [R459, Transcript, 12046-47]. Jackson's statement provided an account of where he and Lewis went during that entire evening, noting specific times and street locations. [R459, Transcript, 12014-16].

Jackson's trial was scheduled to begin on November 29, 2005, no prosecutor and no witnesses appeared for trial and the charges were dismissed. [R459, Transcript, 12069-70]. After his release, ATF agents enlisted Jackson to investigate Lewis. On December 27, 2005, agents placed a wire on Jackson and sent him into the county jail to record a conversation with Lewis. [R459, Transcript, 12070]. The audio recording was played at trial (Exhibit O4), but the specific texts of the recording is not in the transcript. [R472, Transcript, 13208]. This meeting failed to produce any incriminating evidence against Lewis. [R459, Transcript, 12070-72].

6

Jackson also received a total of $21,000 from the government and government immunity. [R459, Transcript, 12076-77, 12083].

At trial, Jackson testified Lewis wanted to set a house on fire because "somebody owed him money" for drugs. [R458, Transcript, 11915]. Jackson was confronted with his written statement, in which he detailed his whereabouts with Lewis over a six-hour period, detailing specific times and street locations. [R458, Transcript, 11962]. Jackson maintained he joined Lewis at 9:10 p.m., and until the fire occurred Lewis never left his sight. [R459, Transcript, 12056]. Jackson was sure he and Lewis did not go to Union Avenue that night – a neighborhood four miles south of the fire. [R459, Transcript, 12055]. When confronted with direct evidence contradicting Jackson's timeline – specifically Lewis's phone records showing Lewis was at Union Avenue 75 minutes before the fire – Jackson changed his story, admitting these events did not take six hours, but only "15 or 20 minutes." [R459, Transcript, 12057, 12062].

Jackson admitted his written statement contained other mistakes, for which he had no explanation. His written statement details he and Lewis got gas at E. 79th Street and St. Clair Avenue. [R459, Transcript, 12104]. Jackson gave specific directions in his written statement going to and from this location. [R459, Transcript, 12104]. When Jackson was informed there is no gas station anywhere near that

7

location, Jackson admitted he was "wrong." [R458, Transcript, 12020-21; R459, Transcript, 12038-39].

Jackson testified there was a party occurring two houses down from the fire while Jackson acted as lookout. [R458, Transcript, 11926-27]. Jackson recalled 20 people at this party, the smell of food, and dancing. [R459, Transcript, 12037].

Jackson maintained he and Lewis were in contact by phone days before the fire and on May 20th. At trial, however, Jackson could not remember his phone number from 2005. [R458, Transcript, 12018]. On cross-examination, the defense provided Jackson with his number in 2005, a number from Jackson's arrest records (216-213-7594). [R458, Transcript, 12018]. This number offered by the defense, and the only number associated with Jackson, was not found in Lewis's cell phone records. Jackson testified Lewis "trusted [Jackson] above all others on the street." [R459, Transcript, 12070].

## B.    The Jailhouse Informants

At trial, the government presented six jailhouse informants who testified Lewis confessed to setting the fire. One of the informants, McKeever, had profound connections to the other five informants, Jackson, and Sam Collins.

### 1.    Paul McKeever

McKeever has 17 prior convictions, including: sexual battery, corruption of a minor, photographing a nude minor, and gross sexual imposition. [R442, Transcript, 10849-51]. McKeever previously cooperated with law enforcement in at least six other high-profile cases, claiming incarcerated defendants awaiting trial made inculpatory admissions. [R442, Transcript, 10861-62, 10876-86].

Prior to 2005, McKeever and Jackson served time in Ohio prisons together on three different occasions, admitting the two "were friends". [R442, Transcript, 10756]. In August 2005, Jackson and McKeever were reunited in the county jail and remained in the same pod for six weeks. [R442, Transcript, 10886]. McKeever and Jackson discussed a female named Sam Collins. [R442, Transcript, 10758, 10899-900]. In jail, the two watched news reports about the fire identifying Lewis as a "person of interest" and "investigators were desperate for new leads in the arson." [R442, Transcript, 10757, 10768, 10860, 10893-99]. On September 27, 2005, after six weeks in the same pod, McKeever contacted law enforcement on Jackson's behalf. [R442, Transcript, 10897-98]. ATF Agent Gregg visited McKeever; McKeever told them Jackson had information about the fire. [R442, Transcript, 10898].

On May 4, 2006, McKeever was moved to Grafton Correctional Institution (GCI), and was "recruited" by Agent Gregg to act as an informant. [R442, Transcript, 10909-10]. On May 23, 2006, officials placed Lewis at GCI. [R442, Transcript, 10918]. The very next day, May 24, 2006, McKeever claimed Lewis confessed to setting the fire; McKeever wrote a statement that day. [R442, Transcript, 10745, 10794].

At trial, the defense claimed McKeever and Sam Collins had conspired to frame Lewis by fabricating his confessions. McKeever denied knowing or having any contact with Collins. [R442, Transcript, 10789]. The defense confronted McKeever with several facts to contradict this. First, Collins's first husband, and father of her child, was a co-defendant of McKeever in a car theft. [R442, Transcript, 10900]. Second, McKeever's step-mother and brother lived in the downstairs of a duplex house located at 3115 W. 73rd Street. [R442, Transcript, 10900]. In 2007, the same time McKeever and Collins were providing statements to the ATF, Collins was living in the same duplex. [R442, Transcript, 10900].

### 2.    The Other Jailhouse Informants

The government presented five jailhouse additional informants all of which claimed Lewis confessed to committing the fire. Each one only came forward after being jailed with McKeever. None of the five informants wrote their own statements,

all were written by Gregg. [R359, Order, 86]. Below is a table of the other five informants, demonstrating the timing of their written statement in relation to their being jailed with McKeever:

| Name | Institution | Dates with McKeever | Date of Statement to Gregg |
| --- | --- | --- | --- |
| Daniel Id'Deen | Grafton | Same pod: 5/12/06 to 7/9/06 | 7/18/06 |
| Rick Wheeland | Grafton | Same cell: 5/12/06 to 7/9/06 | 6/4/06 |
| Anthony Collier | Grafton | Both in "the hole" 7/14/06 to 7/19/06 | 8/11/06 |
| Christopher Myers | Belmont | Same unit: 4/16/08 to 7/8/08 | 7/1/08 |
| Cyle Watson | Belmont | Same unit" 4/16/08 to 7/8/08 | 8/26/08 |

[R447, Transcript, 11251-55 (Id'Deen); R449, Transcript, 11336, 11364 (Wheeland); R469, Transcript, 12403, 12433-34 (Collier); R469, Transcript, 12482-83, 12506-07 (Myers); R469, Transcript, 12484-89 (Watson)].

### C.   Sam Collins

Six weeks after McKeever provided a statement to Gregg, Collins provided a statement to Gregg. [R452, Transcript, 11391-92]. Collins, a prostitute and crack user who lived on Cleveland's west side, claimed in 2005 Lewis cooked crack at her

house. [R452, Transcript, 11385-87]. In May 2005, Lewis was at her place "several times a day . . . every day." [R452, Transcript, 11389]. She stated Lewis was upset about someone owing him money and wanted to set a fire. [R452, Transcript, 11393, 11399].

Collins stated Lewis used his cell phone while at her house, and she called Lewis for drugs "two to three times a day." [R452, Transcript, 11418-20]. Even after the fire, Collins continued to call Lewis. [R452, Transcript, 11420]. Collins could not remember her phone number. [R452, Transcript, 11419].

### D. Cell Phone Records

Doug Smith, an employee of cell phone company Revol Wireless, testified to Lewis's cell phone records from May of 2005. These records contained no calls from Lewis to either Jackson or Collins. [R456, Transcript, 11802-03]. Using maps of the city's cell phone towers and Lewis's records, Smith confirmed Lewis was never on Cleveland's west side in May of 2005 as none of the west side towers were accessed by Lewis's phone during that time. [R456, Transcript, 11805-07].

Smith created a spreadsheet indicating the specific cell phone tower Lewis connected to for every call he made or received in May 2005. [R456, Transcript, 11793-94]. On May 21, 2005, between 2:53 a.m. and 2:57 a.m., Lewis made calls in cell tower sector 257-4, the same sector where the fire occurred. [R456, Transcript,

11768-69]. Sector 257-4 stretches nearly twenty city blocks and spans nearly 7/10

of a mile. [R456, Transcript, 11809]. Smith could only identify the sector Lewis was

in, and could not place Lewis at an exact location. [R456, Transcript, 11810-11]. On

May 21, 2005, at 1:38 a.m. and 1:39 a.m., Lewis made calls within cell tower sector

58-3, an area encompassing Union Avenue, nearly five miles south of the fire. [R456,

Transcript, 11767, 11808].

### E.     The Timing of the Fire

The cell phone records showed a call between Lewis and Janine Chisholm at

2:53:25 a.m., a 23-second phone call which the government claimed Lewis made this

call immediately before going into the house to set the fire. [R456, Transcript,

11809]. Relying on several experts, the government maintained the fire was an

"instant inferno." [R501, Transcript, 15582]. The moment the gas was ignited, the

house immediately became an inferno, blowing out the windows and destroying the

house. [R501, Transcript, 15582]. To support this thought of an "instant inferno" the

government presented two fire experts Ralph Dolence and Robert Gartner. [R485,

Transcript, 14078 (Dolence); R483, Transcript, 13778 (Gartner)]. Gartner stated when

two gallons of gasoline were poured, those two rooms would be "fully engulfed in

flames" in a matter of seconds. [R483, Transcript, 13782].

13

On the other hand, government witness Lt. Stark opined the room would be involved in flames within "30 to 60 seconds." [R485, Transcript, 14178]. This "instant inferno" theory is also contradicted by the two survivors of the fire, Teon Smith and Capretta Bell. Bell details being woken up because she "smelled smoke." [R484, Transcript, 13950]. Bell believed someone left a skillet on the stove and went downstairs to remove it. [R484, Transcript, 13950]. Bell recalls when she got downstairs "it was still real smokey," so she left the house, it wasn't until she got outside that she saw fire. [R484, Transcript, 13950]. Bell stated when she woke up "nothing made me think that the house was on fire, just the smoke." [R484, Transcript, 13953].

Teon Smith slept in the basement but was awoken and went upstairs; and did not see fire anywhere. [R494, Transcript, 14657]. He said the living room and dining room "looked normal." [R494, Transcript, 14659-60]. He then tried going upstairs but was blocked by smoke, so he went outside. [R494, Transcript, 14658].

The government's theory of the timing of the fire is called further into doubt by the emergency services records. The Fire Department reports of response times detail the "alarm time," when an emergency call is received, and the times when fire engines arrived on scene. [R485, Transcript, 14162-63 (Stark); R494, Transcript,

14

14611 (Majercak)]. Captain Majercak confirmed the "alarm time" for 1220 E. 87th was recorded at 2:54:04 a.m. [R494, Transcript, 14611].

### F.   George Hightower

That night Hightower made 32 phone calls to Lewis. [R359, Order, 72]. Around 3:04 a.m., Hightower called Lewis twice, and did not receive a response. [R432, Transcript, 10390-91]. Shortly thereafter, Lewis went to Hightower's house; Hightower went outside towards Lewis's van. [R432, Transcript, 10391]. Hightower claims he smelled gasoline in Lewis's van. [R432, Transcript, 10393]. The day after the fire, May 22, 2005, agents interviewed Hightower but Hightower did not tell agents he smelled gas in Lewis's van. [R432, Transcript, 10443-44]. Despite being interviewed dozens of times, it was nearly a year later when Hightower stated he smelled gas. [R432, Transcript, 10445].

When Lewis arrived at Hightower's home, they overheard a neighbor stating Moses Marshall's house was on fire. [R432, Transcript, 10394-95]. Lewis began making calls to learn more, later learning his "play-sister" Shauntavia Mitchell (Tay-Tay) died in the fire. [R432, Transcript, 10413]. Hightower stated Lewis began crying and he fell out of his chair screaming and yelling. [R432, Transcript, 10413].

15

**G.    ATF Agent Illig**

On May 31, 2005, Illig interrogated Lewis at the county jail. [R460, Transcript, 12113]. Illig stated Lewis gave "a general time frame" of his activities the night of the fire. [R460, Transcript, 12127]. Illig stated "around 2:30 a.m.," Lewis drove to Hightower's house to get a CD, and went to E. 86th and Kenmore. [R460, Transcript, 12128-29]. There, Lewis parked for a while, listened to music, smoked marijuana, and took ecstasy. [R460, Transcript, 12129]. He received phone calls from Sharese and Sharay Williams while there. [R460, Transcript, 12129]. Later, Lewis drove back to Hightower's. [R460, Transcript, 12130]. When Lewis arrived, Hightower came downstairs, approached Lewis's van, and they went in the home. [R460, Transcript, 12130-31]. Lewis told Illig he later received a phone call from Sharay, learning Tay-Tay was killed. [R460, Transcript, 12134]. Even though Illig used 2:30 a.m. as the central focus of his "timeline," his notes made no mention of anything occurring at "2:30 a.m." [R460, Transcript, 12181]. The only time listed in his notes was "7:00 to 8:00 a.m.," when Lewis went to his mother's home. [R460, Transcript, 12184].

Illig testified about Lewis's cell phone records from the night of the fire. [R460, Transcript, 12143]. Illig opined Lewis's phone call from Hightower – when he was in Hightower's driveway – was at 3:04:08 a.m. [R460, Transcript, 12147].

Illig stated Lewis did not receive any phone calls from either Sharese or Sharay Williams between 2:30 and 3:00 a.m. [R460, Transcript, 12146].

### H.    Sharese Williams

Sharese Williams knew Lewis since he was 15 years old. [R441, Transcript, 10649]. Since 1999, Sharese's family loved Lewis, stating "[m]y kids called him their brother," and Sharese cared for Lewis "like a son." [R441, Transcript, 10651]. Sharese's daughter, Shauntavia, and her best friend Medeia Carter were victims of the fire. Sharese testified neither Medeia nor Capretta Bell used drugs, and she never saw Lewis have a confrontation with anyone in the home. [R441, Transcript, 10648, 10654]. In May of 2005, Sharese signed a bond for Lewis, but after he skipped court, Sharese took Lewis's clothes. [R441, Transcript, 10544-47, 10580]. Sharese confirmed that Lewis was not mad about this. [R441, Transcript, 10569].

At 3:25 a.m., Sharese learned Medeia's house was on fire from a phone call from her daughter Sharay . [R441, Transcript, 10600, 10604]. At 4:02:24 a.m. and 7:04 a.m., Sharese and Lewis exchanged calls. [R441, Transcript, 10678]. That morning, Lewis went to Sharese's house to mourn the loss of Tay-Tay. [R441, Transcript, 10629].

Sharese Williams gave testimony regarding her conversations with law enforcement. When asked about Lewis's whereabouts the night of the fire, she stated,

17

"somebody told me that Antun and Poncho – Poncho said that they was doing a robbery at this time." [R441, Transcript, 10634]. Sharese explained she later learned this was untrue because "Poncho was in jail at the time of the fire." [R441, Transcript, 10635]. When Sharese confronted Lewis with this fact, Lewis said "he was not involved in any armed robbery the night of the fire." [R441, Transcript, 10636].

### I.    Sharay Williams

Sharese Williams's daughter, Sharay, cared for Lewis like a brother. [R455, Transcript, 11561]. Sharay learned about the fire at 3:24:06 a.m. through a phone call and then immediately called her mother. [R455, Transcript, 11601]. Beginning at 3:32:26 a.m., Sharay made a number of calls to Lewis; Sharay stated she and Lewis never actually conversed on these calls. [R455, Transcript, 11605]. Then, beginning at 4:58 a.m., Sharay called Lewis a dozen times over a 60-minute period. [R455, Transcript, 11606]. At 6:04:58, Lewis and Sharay had a 24-minute call in which Sharay told Lewis Tay-Tay had died; Lewis was hysterical and broke down crying. [R455, Transcript, 11567].

### J.    Capretta Bell

Bell survived the fire, but suffered significant burns to her arms, legs, and back. [R484, Transcript, 13964]. She lived at 1220 E. 87th Street in 2004 and 2005. [R484, Transcript, 13931]. Bell, a nursing student was not a drug user or involved in drug

18

sales. [R484, Transcript, 13975]. Bell insisted Medeia Carter was also not involved in drugs. [R484, Transcript, 13975]. Medeia Carter's mother, Evelyn Martin, a government witness, also stated she was not aware of any drug activity at the house. [R482, Transcript, 13586].

Bell knew Lewis from the neighborhood, describing him as always being nice to her. [R484, Transcript, 13997]. Bell had no knowledge of any bond dispute between Sharese and Lewis. [R484, Transcript, 13999].

### K.    Jurisdiction

The owner of the home at 1220 E. 87th Street rented the home to Medeia Carter. [R482, Transcript, 13682-83]. The government agency, Housing and Urban Development (H.U.D.), paid a portion of Carter's rent to the owner. [R482, Transcript, 13684].

## III.    The Defense's Case

### A.    Teon Smith

Teon Smith was the other resident who survived the fire. [R494, Transcript, 14644]. He testified neither Medeia Carter nor Capretta Bell used drugs. [R494, Transcript, 14645-46]. Smith knew Lewis from the neighborhood, stating Lewis would come to the house from "time to time." [R494, Transcript, 14647]. Smith stated

Lewis was welcome at the house and did not have problems with anyone living there. [R494, Transcript, 14660-61].

Agent Gregg questioned Smith multiple times regarding the fire. Smith stated on July 13, 2005, Gregg threatened and coerced Smith to sign a written statement regarding the fire. [R494, Transcript, 14668]. Gregg would not let Smith leave for eight hours until he signed a statement implicating Moses Marshall – the live-in boyfriend of Medeia Carter and another suspect in the case. [R494, Transcript, 14668].

### B.    Lahemma Collins

To address Jackson's claim there was a party of 20 people in the open field two houses down from 1220 E. 87th Street, the defense called Lahemma Collins. Lahemma[2] lived in the home between 1220 E. 87th Street and the open field where Jackson claims to have seen a party. [R495, Transcript, 14745]. Lahemma explained her bedroom looked right into the open field. [R495, Transcript, 14757]. She confirmed it was common for people to hang out in the field. [R495, Transcript, 14757]. She also confirmed that sometimes people would listen to music or cookout. [R495, Transcript, 14758]. Lahemma made clear she was always aware of when

---

[2] While Appellant traditionally uses last names to identify witnesses, Lahemma Collins is referred to by her first name in order to avoid confusion with Samantha Collins.

people were partying in the field; since her window overlooked the lot, she would hear any music or partying. [R495, Transcript, 14758]. In fact, there were times the partying woke her up. [R495, Transcript, 14758]. Lahemma stated there was no party the night of the fire. [R495, Transcript, 14758]. There was no cookout, no dancing or music, and there were not "20 people" in the lot. [R495, Transcript, 14758-59].

Lahemma was awoken by the fire, and her 911 call was played at trial. [R495, Transcript, 14752]. Lahemma states she was awoken by what sounded like her window being broken. [R495, Transcript, 14749]. She "took a few minutes" to get dressed and went downstairs. [R495, Transcript, 14750]. When she got downstairs, she saw the fire raging outside her window. [R495, Transcript, 14751]. She began screaming for her kids to get leave the house, then ran back upstairs to retrieve her phone and call 911. [R495, Transcript, 14751-52]. The defense's computer expert, Greg Kelley, analyzed her 911 call. [R495, Transcript, 14774]. Kelley testified the 911 call by Lahemma identified occurred at 2:54:29. [R495, Transcript, 14783].

## C.    Bruce Thomas

On May 21, 2005, Thomas and three friends left a neighborhood bar around 2:15 a.m. and went to their "usual hangout" on E. 87th Street. [R495, Transcript, 14793]. Specifically, Thomas stated they were in the middle of the street, "catty-corner" to 1220 E. 87th." [R495, Transcript, 14794]. Thomas estimated they arrived

at 2:30 a.m. [R495, Transcript, 14794]. When they noticed the fire, they went to rescue the residents. [R495, Transcript, 14798].

At trial, Thomas was shown Jackson's illustration of where Jackson supposedly stood as lookout for the fire. [R495, Transcript, 14797]. Thomas explained he stood in the exact spot where Jackson claimed to have stood. [R495, Transcript, 14797-98]. When asked if he saw anyone else when the fire began, Thomas stated the only other person he saw was a woman named Narkita. [R495, Transcript, 14795]. Thomas stated he did not see anyone matching Jackson's description and had never seen Lewis before. [R495, Transcript, 14795, 14802]. Thomas stated it would have been impossible to miss seeing someone in the street. [R495, Transcript, 14794]. Furthermore, he did not see a party of 20 people. [R495, Transcript, 14803].

### D.    Investigator Steve Gambetta

Gambetta followed the same route supposedly taken by Jackson the night of the fire. [R495, Transcript, 14935]. Gambetta determined the entire walk was approximately one and a half miles and took 34 minutes to complete. [R495, Transcript, 14938, 14941]. In contrast to Jackson's "15 to 20 minute" journey, Gambetta did not make any of the stops Jackson claims to have made on his supposed journey with Lewis. [R495, Transcript, 14942]. Gambetta was also not carrying two full gas cans while doing this 1.5 mile walk. [R495, Transcript, 14943].

22

### E.    Michael Miller

The defense was able to secure their own jailhouse informant, Michael Miller, who revealed that McKeever, Jackson, and the other jailhouse snitches conspired to frame Lewis. Miller is currently serving a fourteen year state sentence. [R468, Transcript, 12257]. During the pendency of his case, in February and March of 2010, Miller was in the Cuyahoga County jail with McKeever. [R468, Transcript, 12260-62]. Miller explained he and McKeever interacted from the beginning. [R468, Transcript, 12262]. Despite being annoyed by McKeever, Miller found comic relief in McKeever's stories, explaining he had nothing better to do while in jail. [R468, Transcript, 12264].

McKeever admitted he and friends were making up a story to frame someone in a high-profile case. [R468, Transcript, 12266]. As a result of this fabrication, McKeever and the others were hoping to reductions in their sentences. [R468, Transcript, 12266]. McKeever detailed the names those he was working with: Sam, Marion, ID, Pops, and Myers. [R468, Transcript, 12266-68, 12297].

Regarding "Pops"[3], he was on the street, gathering information for the scheme. [R468, Transcript, 12267]. Pops was in McKeever's back pocket and would do anything for crack and hookers. [R468, Transcript, 12268]. Marion was friends with

---

[3] Jackson testified "Pops" was his nickname. [R458, Transcript, 11878].

McKeever, and Marion was receiving housing and money from the state. [R468, Transcript, 12268]. McKeever explained he and Marion were working together, and Marion was being "fed information." [R468, Transcript, 12269]. Another player in the scheme was "Craig or Gregg," who was part of law enforcement and "bringing it all together." [R468, Transcript, 12270]. McKeever explained Sam Collins was a prostitute and crack addict who was either his girlfriend or ex-girlfriend. [R468, Transcript, 12270-72].

In 2011, Miller was sentenced and was transported to Lorain Correctional Institution. [R468, Transcript, 12277]. While there, Miller found a newspaper article detailing Lewis's conviction. This article enlightened Miller that McKeever's story about framing someone was actually true. [R468, Transcript, 12278-80]. Miller explained he tried to contact the prison investigator. [R468, Transcript, 12280]. Talking to the investigator failed to produced any results, so Miller talked to his attorney and later chose to seek out Lewis's defense counsel.  [R468, Transcript, 12282-83]. Miller wrote a letter to defense counsel in June of 2011. [R468, Transcript, 12285].

### F.    The Corroboration of Miller's Testimony

Miller's attorney, Jeff Richardson, confirmed discussing these topics with Miller. [R496, Transcript, 14966]. Richardson recalled meeting with Miller, before

24

Miller came to the defense. [R496, Transcript, 14966]. Miller made "specific representations" to Richardson that he had talked to individuals in prison who lied in Lewis's trial. [R496, Transcript, 14967]. Richardson confirmed Miller had not received any benefit whatsoever from the defense. [R496, Transcript, 14971].

Miller testified while in jail he let McKeever use his phone card. [R468, Transcript, 12275]. Miller's phone records from the jail were entered into evidence. [R468, Transcript, 12275; R495, Transcript, 14925]. The records showed in February and March of 2010 – when Miller and McKeever were in the same pod – multiple calls were made from Miller's phone card to the number 216-651-0770, a number which belongs to McKeever's friend, Phillip Reed. [R495, Transcript, 14928-29; R468, Transcript, 12276]. McKeever admitted to being friends with Phillip Reed. [R442, Transcript, 10843].

### G.    Antun Lewis's Testimony

Lewis testified he never met Jackson or Sam Collins, never confessed crimes to McKeever, and had absolutely nothing to do with the fire. [R472, Transcript, 13005-06]. With the aid of his cell phone records, Lewis recalled specific events, demonstrating the errors and falsehoods in the testimony of numerous government witnesses.

In the early morning hours of May 21, 2005, Lewis and Janine Chisholm were hanging out together in the Union Avenue area. [R472, Transcript, 13103]. This was confirmed by the cell phone records, as Lewis received calls at 1:38 and 1:39 a.m., accessing cell tower 58-3 – the Union Avenue area, nearly five miles south of E. 87th. [R472, Transcript,13103]. Chisholm dropped Lewis off at his grandmother's house on Union Avenue. [R472, Transcript, 13105]. After spending time with his grandmother, Lewis took the bus back to his van, parked on E. 89th Street. [R472, Transcript, 13108]. Lewis wanted to go back to his van because his cell phone had died and his charger was in his car. [R472, Transcript, 13106]. Lewis detailed walking to the bus stop, taking the #10 bus, and walking from the bus stop to his van. [R472, Transcript, 13107-09]. When he returned to his car, he plugged his phone in and got a call from Janine Chisholm – the 2:53:25 a.m. call. [R472, Transcript, 13112].

Immediately thereafter, Lewis began getting calls from Hightower. Lewis explains he went to his mother's house for a few minutes, then to Hightower's to get a CD. [R472, Transcript, 13113]. Lewis left Hightower's, parked his car on E. 86th and Kenmore to listen to music, with the aid of his phone records he estimated this occurred at 3:40 a.m. [R472, Transcript, 13114]. He remained there a little while, around 4:20 a.m. he went back to Hightower's. [R472, Transcript, 13116]. While at

26

Hightower's, Lewis learned about the fire, then made a number of calls to learn more about the fire. [R472, Transcript, 13124-27]. At 6:04 a.m., Lewis learned Tay-Tay had died, in a 24-minute phone call with Sharay. [R472, Transcript, 13127-28]. Lewis told the jury how he broke down crying because he lost a dear friend whom he considered to be his sister. [R472, Transcript, 13128-30].

## IV.    The Government's Representations of Motive and Their Closing Argument

The government presented two different and inconsistent motives at trial. The first was Lewis set the fire to get back at Sharese for taking his clothes, relating to the bond Sharese signed. The government attempted to present proof of this motive through Illig [R460, Transcript, 12124-25], Sharese Williams [R441, Transcript, 10544-47], and Hightower [R432, Transcript, 10379-81]. The second possible motive was Lewis set the fire because of a drug debt owed by someone in the home. The government attempted to establish this motive through Jackson, the jailhouse informants, and Collins. [R501, Transcript, 15495].

In opening statements, the government recognized it had "no obligation to prove" motive. [R482, Transcript, 13577]. However, in closing argument, the government presented both motives. The government admitted their case-in-chief simultaneously presented multiple motives – "clothes, drugs, jealousy, rage." [R501, Transcript, 15493]. In closing argument, the government simply told the jury "don't

27

get sidetracked" by the government offering of multiple inconsistent motives. [R501, Transcript, 15494].

In closing argument, the government maintained their case was predicated on "eight pillars of evidence." [R501, Transcript, 15498]. The "first pillar"offered was Lewis's "false alibis" to others. [R501, Transcript, 15483]. In closing argument, the government claimed Lewis gave false alibis to others, demonstrating a "consciousness of guilt" and "an innocent man" would not lie. [R501, Transcript, 15490]. The government claimed Lewis gave a false alibi to Sharese Williams, that he "was doing a robbery with Pancho." [R501, Transcript, 15502]. As this claim was not supported by the evidence, the defense objected. [R501, Transcript, 15502-12].

## V.    The Motion for New Trial

The jury found Lewis guilty. [R476, Verdict, 13466-68]. The defense filed a motion for new trial under Rule 33 as the evidence preponderates heavily against the verdict. [R506, Motion for New Trial, 15615-714]. The defense detailed that a new trial was granted after the first trial, and the government failed to redress any of these evidentiary gaps or problems at the second trial. All the reasons the district court granted a new trial still remained, justifying the grant of another new trial. [R506, Motion for New Trial].

The district court denied Lewis's motion for new trial. [R523, Order, 16161-220]. Much like the first motion for new trial, the district court recognized the problematic testimony and evidentiary pitfalls in the prosecution. In light of these credibility issues, the district court deferred to the jury. When faced with evidence of two inconsistent motives for the fire, the district court concluded, "[t]he jury could have inferred from this evidence that Lewis had a motive to set the fire." [R523, Order, 16172]. Even though neither motive was supported by the evidence, the district court stated, "[the] evidence was available for the jury to consider when assessing the credibility of the witnesses who testified to these statements." [R523, Order, 16174]. When analyzing the credibility issues and problematic testimony of Marion Jackson, the district court concluded:

> The court acknowledges that Jackson's inconsistent statements raise substantial credibility issues. Because Jackson admitted to these inconsistent statements at trial, they were properly put before the jury to consider in evaluating his testimony. The jury could have concluded from this evidence that despite Jackson's inconsistencies, the substance of his story was true.

[R523, Order, 16180]. Regarding the credibility issues of McKeever and Collins, the district court concluded, "[t]his evidence was one more factor for the jury to consider in evaluating McKeever's testimony." [R523, Order, 16191]. The fact that all the jailhouse snitches only came forward after being housed with McKeever "were relevant factors for the jury to consider in evaluating their testimony." [R523, Order,

16194]. The district court made similar findings, deferring to the jury, as it related to the testimonies of Michael Miller and George Hightower. [R523, Order, 16196, 16198, 16202].

The district court concluded by stating the evidence presented at the first trial required the grant of a new trial "to prevent a manifest injustice." [R523, Order, 16213]. The court then stated in second trial "there was clearly evidence which ran counter to the verdict." [R523, Order, 16213]. The court also detailed the credibility issues and problematic testimony found in the government's case, but concluded "the evidence does not preponderate heavily against the verdict." [R523, Order, 16213].

On June 20, 2014, the district court sentenced Lewis to 420 months. [R532, Judgment, 16271-72]. Lewis filed a notice of appeal. [R536, Notice of Appeal, 16387].

## SUMMARY OF ARGUMENT

This case concerns the deadliest house in fire in Cleveland's history, where eight children and a mother died. The crime itself is a tragedy, but the trial also represents a tragedy of justice because an innocent man stands convicted for a crime he did not commit. In 2011, Lewis stood trial and was convicted. The district court granted a new trial, discounting every aspect of the government's case-in-chief, and thoroughly scrutinizing the government's witnesses, evidence, and conclusions. The district court stated a second trial would give the government an opportunity to provide answers to the many questions that remained. This Court affirmed.

At the second trial, no part of the government's case changed; all the issues were still present and all the concerns remained unaddressed. The defense, however, presented a new witnesses and evidence. The defense relied on direct forensic evidence disproving the government's theories and severely undercutting any reliability of the government's main witnesses. The defense also presented Michael Miller, an inmate who revealed the truth: the jailhouse snitches and other government witnesses had worked together and colluded to frame Lewis. Despite these overwhelming areas presented by the defense, the jury convicted Lewis again.

The defense again moved the district court for a new trial. Even when faced with new evidence from the defense, the court made a significant departure from its

previous order. The court merely held all the inconsistencies and unanswered questions were issues for the jury to decide. The defense has not presented mundane credibility issues, but the defense has directly demonstrated, through forensic evidence, that an innocent man has been convicted. The court provided no explanation as to why the government's case-in-chief was so problematic after the first trial, but not after the second, even though the second trial contained new evidence from the defense. Therefore, the district court has committed an abuse of discretion, warranting a reversal of the denial of the motion for new trial.

There are two additional issues. First, the government committed prosecutorial misconduct, by making false and improper comments during closing argument, which prejudiced Lewis, requiring reversal.

Second, following the Supreme Court's holding in <u>Bond v. United States</u> and this Court's holding in <u>United States v. Toviave</u>, Lewis's prosecution under 18 U.S.C. § 844(i) intrudes upon state criminal jurisdiction and violates principles of federalism. Lewis seeks a remand so the district court can properly rule on this legal issue.

## ARGUMENT

**I.    The District Court Abused its Discretion in Failing to Grant the Motion for a New Trial**.

### Standard of Review

A motion for new trial under Criminal Rule 33 concerns whether the jury's verdict was against the manifest weight of the evidence. United States v. Hughes, 505 F.3d 578, 593 (6th Cir. 2007). This Court reviews a district court's denial of a new trial for abuse of discretion. United States v. Lawrence, 555 F.3d 254 (6th Cir. 2009). The district court abuses its discretion when it relies on clearly erroneous findings of fact, uses an erroneous legal standard, or improperly applies the law. United States v. Munoz, 605 F.3d 359, 366 (6th Cir. 2010).

### Analysis

On May 21, 2005, at 2:54:04 a.m., emergency services received the first call to report a fire at 1220 E. 87th Street. Eight children and a mother were killed in the fire. The deadliest fire in Cleveland's history was heavily reported by the media. From the moment the fire was extinguished, rumors began in the neighborhood. One rumors was that Antun Lewis was responsible, and he became a "person of interest." Even though no physical or forensic evidence connected Lewis to the crime, he was questioned by ATF on May 31, 2005. The ATF gave Lewis a polygraph examination,

in which he denied having any involvement in the fire; the ATF examiner found Lewis was not being deceptive. [R52, Motion in Limine].

For three and a half years, no evidence implicated Lewis, so law enforcement relied on jailhouse snitches, prostitutes, drug users, and career criminals to build a case. In 2011, Lewis was tried for setting the fire at 1220 E. 87th Street. After a four-week trial, a jury found him guilty. [R298, Verdict]. The district court granted a new trial, finding the verdict could not be supported based on the manifest weight of the evidence. [R359, Order]. The government appealed the decision, and this Court affirmed. United States v. Lewis, 521 F. App'x 530 (6th Cir. 2013).

At the second trial, the government presented the exact same evidence, failing to address any of the court's concerns. The government failed to clear up any of the uncertainties or discrepancies in the testimony and failed to answer any of the pitfalls in the evidence. Lewis was once again found guilty. [R476, Verdict, 13466-68]. Even though the government presented the exact same case, the district court denied the defense's motion for new trial. [R523, Order]. The district court failed to explain why a new trial was warranted in 2011, but in 2014 the same exact prosecution did not warrant a new trial. By failing to provide any explanation, the district court abused its discretion by failing to properly apply the law. Lewis asks this Court to vacate the denial of the motion for a new trial and remand the case to the district court.

34

## A.    Legal Standards for a Motion for New Trial

Rule 33 of the Federal Rules of Criminal Procedure provides "the court may grant a new trial if the interest of justice so requires." Though the rule does not define "interest of justice . . . a Rule 33 motion is to seek a new trial on the ground that the [jury's] verdict was against the manifest weight of the evidence." United States v. Munoz, 605 F.3d 359, 373 (6th Cir. 2010). In Munoz, this Court held the "interest of justice" standard "allows the grant of a new trial where substantial legal error has occurred." Munoz, 605 F.3d at 373 (citing United States v. Wall, 389 F.3d 457, 474 (5th Cir. 2004)). Lewis's motion for new trial challenges the weight and competency of the evidence.

Under the "manifest weight of the evidence" standard, a district court can consider both the credibility of the witnesses and the weight of the evidence to ensure there was no miscarriage of justice. United States v. Ashworth, 836 F.2d 260, 266 (6th Cir. 1988). "Unlike a motion for judgment of acquittal under Rule 29, the district court may weigh the evidence and assess the credibility of the witnesses, sitting as a thirteenth juror." United States v. Solorio, 337 F.3d 580, 589 n.6 (6th Cir. 2003) (citing Ashworth, 836 F.2d at 266).

A jury verdict may be vacated "only in the extraordinary circumstance where the evidence preponderates heavily against the verdict." Ashworth, 836 F.2d at 266;

35

see also United States v. Morales, 910 F.2d 467, 468 (7th Cir.1990) ("If the complete record, testimonial and physical, leaves a strong doubt as to the defendant's guilt, even though not so strong a doubt as to require a judgment of acquittal, the district judge may be obliged to grant a new trial."); United States v. Arroyo, 301 F.Supp.2d 217, 225 (D. Conn. 2004) (a new trial should be given when there is real concern that an innocent person may have been convicted).

This case represents a miscarriage of justice as a guilty verdict is contrary to the weight of the evidence. Numerous instances of the government's evidence are: dubious, uncorroborated, incredible, improbable, and defying physical realities. This problematic testimony is the exact type of "exceptional circumstance" referred to in the cases above. Viewing the totality of the evidence offered by both the government and the defense, the evidence preponderates heavily against the verdict, and an innocent person has been wrongly convicted. No court can be satisfied that competent, satisfactory and sufficient evidence in the record supports guilt beyond a reasonable doubt.

### B.    The First Motion for New Trial

The first trial, in 2011, lasted a month. The jury returned a verdict, finding Mr. Lewis guilty of this crime. [R298, Verdict]. On March 31, 2011, Mr. Lewis filed a Motion for New Trial under Rule 33. [R324, Motion for New Trial]. On February 8,

2012, the district court granted a new trial finding the manifest weight of the evidence did not support the verdict. [R359, Order].

Sitting as the thirteenth juror, this Court evaluated the testimony of the government's key witnesses – Jackson, the jailhouse informants, Collins, and Hightower – concluding their testimony held no weight. [R359, Order, 9761-9815]. The district court concluded this was not a straightforward case, but the government's case was "marked by uncertainties and discrepancies." [R359, Order, 9827]. The district court concluded the verdict rested on the testimony of witnesses who were impeached, stood to gain from their testimony, and presented a narrative undermined by other competent witnesses. [R359, Order, 9833]. In assessing "red flags" and "ambiguous circumstantial evidence," the district court found there was "much room for reasonable doubt." [R359, Order, 9832]. The court found "this is one of those few cases where the integrity of the system is at stake and the court is required to overturn the jury's verdict as being against the manifest weight of the evidence." [R359, Order, 9833].

The Court stated, "[a] new trial would provide an incentive for both sides to better develop the facts in this case and present competent evidence to the jury." [R359, Order, 9834]. The defense took this Court's directive to heart and bolstered their case-in-chief significantly. As further detailed herein, the defense presented new

37

witnesses (witnesses not present at the first trial) exposing the connections between government witnesses, and exposing the collusion and lies of government witnesses. The defense also presented significant forensic evidence by way of the cell phone records and 911 records, contradicting the government's hypothesis about Lewis's involvement.

In contrast, the government disregarded the district court's order, and presented the same witnesses and theories. At the second trial, the government failed to solve any of the puzzles or answer any questions regarding the problematic testimony, the problematic inconsistencies, or the problematic connections among the witnesses. The government made no attempt to address the court's concern regarding the lack of evidence. Most importantly, the government failed to establish Mr. Lewis was guilty beyond a reasonable doubt. Cf. R359, Order, 9832 ("the rest of the evidence is ambiguous circumstantial evidence that leaves much room for reasonable doubt.").

The government's inability to address any of these court's concerns at the second trial, coupled with defense witnesses presented at the second trial illustrates the manifest weight of the evidence is insufficient to support the verdict, warranting a new trial. Below are six areas, which independently and collectively demonstrate an innocent man has been convicted, thereby warranting a new trial.

### C.    The Government's Presentation of Multiple Inconsistent and Unsupported Motives

The government's presentation of two inconsistent and unsupported motives demonstrates how the manifest weight of the evidence does not support the verdict. Title 18 U.S.C. § 844(i) does not require the government to prove motive for the crime. In fact, the jury instructions clearly explains the "Proof of motive is not a necessary element of the crime . . . but the presence or absence of motive is a circumstance which [the jury] may consider as bearing on the intent of the Defendant." [R501, Transcript, 15462-63].

The government, however, chose to present testimony bearing on potential motives, and as a result, the question of why Lewis would commit the crime became a main theme of the case. In fact, the government presented two possible and contradictory motives. For the sake of brevity, these motives shall be referred to as: 1) "the bond dispute," relating to the government's belief Lewis was angry at Sharese Williams for confiscating his clothes in retaliation for Lewis forfeiting his bond by failing to appear in state court; and 2) "the drug debt," related to the government's belief someone in the home owed Lewis money for drugs.

### 1.    The Bond Dispute

Consistent with the first trial, the government relied on Sharese Williams to establish this bond dispute as a possible  motive. While Sharese specifically denies

any connection between the clothes and the fire, the government relied on testimony for this supposed motive in closing argument. [R501, Transcript, 15492-95, 15500, 15525]. The government, however, distorts her testimony, as Sharese gives no support to the idea Lewis set the fire because of the bond. According to Sharese, Lewis never once threatened Sharese or said anything foul to her. [R441, Transcript, 10666]. Not a single person testified Lewis was upset at Sharese. There is not a shred of evidence supporting the government's theory Lewis set this fire because of this bond dispute.

### 2.    The Drug Debt

Mirroring the first trial, the government also attempted to establish the motive was a drug debt owed to Lewis. In support of this motive, the government relied on the testimony of Marion Jackson, Sam Collins, and the six jailhouse informants – McKeever, Id'Deen, Collier, Wheeland, Myers, and Watson.

After the first trial, the court found "serious concerns were raised regarding the credibility of all of the witnesses who testified regarding this drug debt motive." [R359, Order, 9761]. This was because the "testimony regarding a possible drug debt was greatly undermined by the testimony of the witnesses actually connected to . . . the victims of the fire." [R359, Order, 9758]. The testimonies of Evelyn Martin, Capretta Bell, Sharese Williams, and Moses Marshall all confirmed Medeia Carter

40

was not a drug user and neither Carter nor Bell owed Lewis money. [R359, Order, 9758-59]. Capretta Bell denied any drug activity in the home, denied there was any debt between her and Lewis, and Lewis cared deeply for the children in the home. [R359, Order, 9759-60].

At the second trial, these same witnesses gave the exact same testimony, proving once again no drug debt was owed to Lewis. Despite these undeniable facts from the first trial, the government once again presented the testimonies of Jackson, Collins, and the six jailhouse informants. These same eight witnesses gave the same exact testimony from the first trial. Once again, these eight witnesses, all connected through McKeever, are the only people on the planet who state a drug debt was owed to Mr. Lewis. These eight witnesses are still contradicted by the testimonies of other witnesses: Evelyn Martin, Capretta Bell, Sharese Williams, Moses Marshall, and Teon Smith.

To conclusively erase any possibility of a drug debt, the defense has brought forth a witness who exposes the lies and collusion of the jailhouse informants. Michael Miller testified while he was in Cuyahoga County jail, McKeever admitted he and others were making up a story to frame someone in a high-profile case. [R468, Transcript, 12266]. As a result of this fabrication, McKeever and the others (Sam, Marion, ID, Pops, and Myers) were hoping to get time knocked off their sentences.

41

[R468, Transcript, 12266-68]. While Miller thought McKeever's story was all a lie, after the newspaper reported Lewis's conviction, Miller contacted defense counsel. [R468, Transcript, 12285]. Miller's testimony devastates the government's theory of a drug debt and exposes the lies of the jailhouse informants, Jackson, and Sam Collins. Miller reveals McKeever and the others lied to frame Lewis.

In total, neither motive has any evidentiary support. The government had no duty to prove or establish a motive [R475, Transcript, 13441], but the government did offer two motives. Given these inconsistent and unsupported motives, Lewis moved for a new trial; claiming the government's inability to prove either motive preponderates heavily against the verdict and demonstrating a miscarriage of justice. [R506, Motion for New Trial]. In addressing this argument, the district court merely concluded "this evidence was available to the jury to consider when assessing the credibility of the witnesses who testified to these statements." [R523, Order, 16174].

The district court's ruling was a significant departure from the first order granting a new trial, in which the court held,

> serious concerns were raised regarding the credibility of all of the witnesses who testified regarding this drug debt motive. . . . No other evidence was presented to tie Lewis to the arson. In light of the fact that it was the Government's key witnesses who testified to a possible drug debt motive, the court finds it difficult to fully divorce the question of Lewis's motive from the necessary elements of the Government's case-in-chief. Following these legal standards, the government's

> unsupported theories of motive present a salient credibility question as to the strength of the government's case-in-chief.

[R359, Order, 9761]. The district court failed to provide any reason or justification as to why motive was so significant after the first trial, but not after the second. This constituted an abuse of discretion.

### D.     Marion Jackson's Testimony

Jackson, the supposed lookout and the only person claiming to have seen Lewis at the scene of the crime, was a key witness. [R359, Order, 9761-62]. After the first trial, the court found "several factors undermine Jackson's credibility" as he presented memory lapses, miscalculations, problems with dates and times, and a nebulous picture of his relationship with Lewis. [R359, Order, 9787]. Jackson's material alteration of the timeline for his involvement with Lewis on the night of the fire presented a significant concern. [R359, Order, 9788]. Furthermore, the inability to corroborate any details relayed by Jackson was noteworthy. [R359, Order, 9788-89]. The court delineated eight areas of concerns in Jackson's testimony, concluding Jackson's "credibility was significantly undermined." [R359, Order, 9790].

At the second trial, Marion Jackson gave identical testimony as the first trial. Jackson's testimony included the same memory lapses, miscalculations, problems with dates and times, inability to recall numbers, contradictions, and inconsistencies. The government failed to present a single witness to corroborate Jackson, or address

43

the concerns in his testimony. The defense presented new witnesses to further erode Jackson's credibility, further illustrating the physical impossibilities in Jackson's testimony. There are four areas.

### 1.    The Alleged Party and Jackson's Location as a Look-out

Jackson's credibility is severely hampered as he testified about a "party" taking place when Lewis supposedly set the fire. Jackson's testimony details where he and Lewis walked that night, giving street locations, directions, and times. According to Jackson, he and Lewis stopped at the home next to 1220 E. 87th. A diagram of the area is seen below. [R495, Transcript, 14745].[4]



---

[4] Appellant requests the instant brief be printed in color to properly view this diagram.

The home at 1220 E. 87th is marked by the red pin. Two houses to the right is the open field. Jackson claims while he was standing in front of this house, there was a party in the open field. [R458, Transcript, 11927]. Jackson could smell food, describing it as "a cookout." [R458, Transcript, 11927]. Jackson admitted there were "about 20 people" and "they were dancing." [R459, Transcript, 12037]. At this point Lewis picked up the two gas cans and went in the home to set the fire. [R458, Transcript, 11935].

In granting a new trial, the court challenged the parties to answer the "unresolved questions" like this alleged party. [R359, Order, 9834]. The court implored the parties to "better develop the facts in this case and present competent evidence to the jury." [R359, Order, 9834].The government chose not to answer the court's call; not a single witness testified this party existed.

At the second trial, the defense called Bruce Thomas, who contradicted Jackson's testimony. Thomas was hanging out with three friends in the street across from the empty lot at the time of the fire. [R495, Transcript, 14793-94]. He estimated they arrived around 2:30 a.m., and remained there until they saw the fire. Thomas stated he did not "see anything resembling a party." [R495, Transcript, 14803]. In fact, the only person he saw that night was a woman named Narkita, and did not see Jackson or Lewis. [R495, Transcript, 14795, 14802]. Thomas details he and his

friends were in the exact same spot where Jackson claims to have been the lookout. [R495, Transcript, 14797].

To further contradict Jackson's testimony, the defense presented Lahemma Collins. Lahemma lived in the home in between 1220 E. 87th Street and the field. [R495, Transcript, 14745]. Lahemma states she always knew when people were partying in the field, since her bedroom window overlooked the lot she would hear any music or partying. [R495, Transcript, 14758]. In fact, there were times the partying woke her up. [R495, Transcript, 14758].

Regarding the night of the fire, Lahemma stated there was no party. [R495, Transcript, 14758]. There was no cookout, no dancing or music, and there were not "20 people." [R495, Transcript, 14758-59]. If any of these events had occurred, Lahemma would have been aware of it. Lahemma's testimony calls Jackson's credibility into extreme doubt.

## 2.    No Cell Phone Records Connecting Lewis to Jackson

Both parties heavily relied on Lewis's cell phone records, and neither disputed their accuracy. Jackson claimed he and Lewis exchanged numerous calls in the days leading to the fire, the night of the fire, and days after the fire. After the first trial, the court found "the lack of cell phone records connecting Lewis to Jackson makes the issue of Jackson's credibility even more salient." [R359, Order, 9781].

46

At the second trial, Lewis's cell phone records contained no calls to or from Jackson. [R456, Transcript, 11802]. On cross-examination, the defense revealed Jackson's phone number from 2005. On August 3, 2005, two months after the fire, and six weeks before coming forward to law enforcement, Jackson was arrested on multiple felony offenses. [R458, Transcript, 12018]. When arrested, Jackson provided a phone number to authorities, 216-213-7594. [R458, Transcript, 12018]. This number, offered by the defense, was not found in Lewis's phone records. Thus, the phone records continue to contradict all of Jackson's claims as to his relationship with Lewis.

### 3.    Jackson Alters his Time Line

In granting a new trial, the district court found Jackson's testimony regarding the timing of events raised the most concern. [R359, Order, 9783]. In granting a new trial, the court focused on how Jackson's written statement, which detailed a series of events with Lewis in the area of E. 87th Street, from 9:30 p.m. on May 20, 2005 until 3:30 a.m. [R359, Order, 9783]. Lewis's cell phone records contradict Jackson's "time line," by showing Lewis was at E. 106th Street and Union Avenue (four miles south of E. 87th Street) at 1:38 and 1:39 a.m. [R359, Order, 9784]. Jackson also claimed Lewis's only phone call during their time together was the call by Lewis at

2:53 a.m., immediately before the fire, even though the cell phone records shows Lewis made dozens calls during this time period. [R359, Order, 9784].

Given these multiple contradictions in Jackson's written statement, Jackson "dramatically altered" his testimony for his whereabouts that night. [R359, Order, 9784]. Jackson changed his time line from six hours (9:30 p.m. to 3:30 a.m.) to "15-20 minutes." [R359, Order, 9784]. Jackson simply stated he was "not good at times." [R359, Order, 9785]. In granting a new trial, the court found Jackson's alteration of the timing of events to be "troubling." [R359, Order, 9785].

At the second trial, Jackson vacillated between these events lasting six hours and fifteen minutes. [R458, Transcript, 11962; R459, Transcript, 12060]. Jackson's material alteration, to truncate his time line, was a critical fact. [R459, Transcript, 9788]. At the second trial, the government put forth zero evidence to corroborate either of Jackson's time lines. The government chose to do nothing to address this concern, but merely let Jackson's incredulous story hang out there. The defense could not let this stand. The defense presented two witnesses to demonstrate Jackson's testimony holds no weight.

First, the defense called Janine Chisholm who testified she was with Lewis the night of the fire. Her cell phone records also confirmed she was with Lewis at Union Avenue. Chisholm's own cell phone records impeached Jackson's claim. [R498,

Transcript, 15206]. These records confirm Chisholm made numerous phone calls while in the Union Avenue area, cell phone tower sector 58-3. [R498, Transcript, 15197-98]. Specifically, her records confirm she remained in this area from 1:31:28 a.m. through 2:34:22 a.m. [R498, Transcript, 15197-98]. This time period overlaps with Lewis's cell phone records when he was at Union Avenue (1:38 and 1:39 a.m.). [R456, Transcript, 11767 (Doug Smith)]. These records conclusively demonstrate Lewis and Chisholm were together at Union Avenue 75 minutes before the fire, dispelling any credence to Jackson's testimony.

The second witness undercutting Jackson was Steve Gambetta. Gambetta, an investigator for the defense, followed the same route taken by Jackson the night of the fire. [R495, Transcript, 14935]. Gambetta mirrored the walk as described by Jackson, finding the distance to be one and a half miles. [R495, Transcript, 14941]. The walk took 34 minutes, much longer than Jackson's claim of 15-20 minutes. While the walk alone took Gambetta twice as long as Jackson, the real astounding part is the details. Specifically, Jackson's supposed "15 to 20 minute" journey included three stops, which Gambetta did not make. These are:

1)    Jackson and Lewis stopped to have a beer and talk;

2)    Jackson and Lewis went behind a building to retrieve empty gas cans; and

3) They stopped at the gas station, Lewis went inside to purchase gas then filled both cans.

[R458, Transcript, 11923, 11929, 11930]. Gambetta did not make any of these stops, but continuously walked the route. [R495, Transcript, 14942]. Without any stops, Gambetta still took 34 minutes, as compared to Jackson's 15-20 minute route. Gambetta was also not carrying two full gas cans while doing this 1.5 mile journey. [R495, Transcript, 14943]. Gambetta did not have the physical ailments plaguing Jackson: a bad heart, diabetes, and the need to sleep with a breathing machine. [R459, Transcript, 12041; R495, Transcript 14942].

While Jackson claims he is simply not "good with times," the truth is his story is impossible. Such dubious and patently incredible testimony demonstrates the evidence preponderates heavily against the verdict and shows a miscarriage of justice has occurred.

### 4. The Recorded Conversation Between Jackson and Lewis

Jackson testified Lewis "trusted [Jackson] above all others on the street." [R459, Transcript, 12070]. There is no evidence supporting such trust or any relationship between them. At the second trial an audio recording was played for the jury. This recording was from December 27, 2005, when Lewis in jail. [R472, Transcript, 13208]. Jackson visited Lewis, at the direction of ATF, wearing a recording device, to secure Lewis's confession. This recording confirmed Jackson

50

and Lewis had no relationship. Lewis had no idea who Jackson was, stating "I don't even know your name sir." In total, Jackson's statements during the December 27, 2005, demonstrate Jackson's lack of credibility. Jackson's fails to show he and Lewis had any type of a relationship whatsoever, especially one of "trust."

When viewing the totality of Jackson's testimony, from both the first and second trial, Jackson's testimony has zero credibility. There is no corroboration of Jackson. Numerous inconsistencies, both material and ancillary, are present. These are not simple "miscalculations," as Jackson describes them, but are drastic concerns. Every part of Jackson's testimony is contradicted by the facts. Jackson's testimony is patently incredible, consisting of material contradictions, facts defying physical realities, and testimony that makes no sense. The government's own witnesses, forensic evidence, and defense witnesses contradict Jackson's testimony.

In granting a new trial in 2011, the district court devoted 30 pages to Jackson's credibility. [R359, Order, 9761-90]. The court concluded Jackson "often failed to recall critical information and admitted to a number of 'miscalculations' concerning key facts . . . the Court finds that collectively, however, these inconsistencies and contradictions render Jackson's credibility dubious." [R359, Order, 9771-72].

As detailed above, the second trial provided additional areas, calling Jackson's testimony further into doubt. The district court, in denying a new trial, concluded,

"[t]he jury could have concluded from this evidence that despite Jackson's inconsistencies, the substance of his story was true." [R523, Motion for New Trial, 16180]. The court failed to explain why Jackson's credibility was so suspect after the first trial to warrant a new trial, but not so after a second trial. This constituted an abuse of discretion.

### E.    The Jailhouse Informants

At the first trial, six jailhouse informants were called to detail the manner in which Lewis supposedly confessed. The court concluded several aspects of their testimony call their credibility into question. [R359, Order, 9803]. One concern was "each witness was somehow connected to Paul McKeever when he offered a statement to law enforcement." [R359, Order, 9803]. The accounts of the informants regarding the "drug debt" was also noteworthy, both in terms of the generic nature of their stories, and were contradicted by the victims's friends and family. [R359, Order, 9804]. The court granted a new trial based on these concerns.

At the second trial, the government presented all six jailhouse informants again. The government refused to answer the court's questions, and the salient credibility concerns of these informants remained unaddressed. The defense provided an answer. Michael Miller provided significant answers, revealing the jailhouse informants were framing Lewis in order to receive sentence reductions. Miller

exposed the informants's lies. Furthermore, the defense bolstered Miller's testimony with records and testimony through other witnesses. The defense demonstrated the collusion to frame Lewis, which explains why their stories are only supported by each other. This renders the verdict a miscarriage of justice.

### 1.    Miller's Testimony

At the second trial, Miller provided the jury with a detailed account of his interactions with Paul McKeever in 2010 in Cuyahoga County jail. Miller explained he and McKeever, both charged with sex crimes, interacted from the beginning. [R468, Transcript, 12262]. McKeever admitted he and some friends were making up a story to frame someone in a high-profile case. [R468, Transcript, 12266]. As a result of this fabrication, they were hoping to get sentence reductions. [R468, Transcript, 12266]. McKeever detailed the names of his co-conspirators: Sam, Marion, ID, Pops, and Myers. [R468, Transcript, 12266-68, 97].

Pops – a nickname Jackson went by – was on the street gathering information. [R468, Transcript, 12267]. Pops was in McKeever's back pocket and would do anything for crack and hookers. [R468, Transcript, 12268]. McKeever and "Marion" were working together, and Marion was being "fed information regarding the case." [R468, Transcript, 12269]. Another player in the scheme was "Craig or Gregg," who was with law enforcement and "bringing it all together." [R468, Transcript, 12270].

53

Sam was revealed to be Sam Collins, the girlfriend or ex-girlfriend of McKeever. [R468, Transcript, 12270-71]. McKeever also explained that Sam was a prostitute and crack addict. [R468, Transcript, 12272].

In April of 2010, Miller posted bond and left jail. [R468, Transcript, 12277]. In 2011, he was sentenced to prison; Miller found a newspaper article detailing Lewis's conviction. The article enlightened him that McKeever's story about framing someone was true. [R468, Transcript, 12278-80]. Miller explained he tried contacting the prison investigator. [R468, Transcript, 12280]. Talking to the investigator failed to produced any results, so Miller talked to his attorney, and later contacted Lewis's defense counsel. [R468, Transcript, 12282, 12285].

### 2.    Support for Miller's Testimony

In contrast to the six jailhouse informants, witnesses were presented to corroborate Miller's testimony. Miller's attorney, Jeff Richardson, confirmed discussing these issues with Miller. [R496, Transcript, 14966]. Richardson recalled meeting with Miller and discussing Lewis's case before he approached Lewis's counsel. [R496, Transcript, 14966]. Miller made "specific representations" to Richardson regarding inmates who lied in Lewis's trial. [R496, Transcript, 14967].

Other witnesses corroborated Miller's testimony regarding McKeever's use of Miller's phone card. Miller testified he let McKeever use his phone card in jail.

[R468, Transcript, 12275]. Miller's phone records from jail showed during the time when Miller and McKeever were in the same pod, multiple calls were made from Miller's phone card to Phillip Reed. [R495, Transcript, 14928-29; R468, Transcript, 12276]. McKeever admitted Phillip Reed was his friend. [R442, Transcript, 10843]. Collectively, Miller's testimony and the accompanying evidence expose the lies orchestrated by McKeever.

The second trial gave the defense the opportunity to present evidence of McKeever's collusion with the other informants, Jackson, and Collins. The defense, through Miller and other witnesses, presented direct evidence of the conspiracy to frame Lewis. The six informants, Jackson, and Collins all worked together to convict an innocent man in the hopes of receiving sentence reductions.

### 3.    Additional False Testimony by McKeever

The connection between McKeever and Collins was a significant point. At the first trial, McKeever denied knowing Sam, [R359, Order, 9793], and Sam denied knowing McKeever. [R359, Order, 9807]. At the first trial, the defense revealed in 1992 Collins was married to Jeff Janosek; that same year Janosek and McKeever were co-defendants in stealing a car. [R359, Order, 9796, 9807]. After the first trial, the court concluded this connection between Sam and McKeever was troublesome. [R359, Order, 9813].

At the second trial, McKeever maintained not knowing Sam. [R442, Transcript, 10789, 10844]. Collins also continued to deny knowing McKeever. [R452, Transcript, 11384, 11426]. She did, however, reveal in 2007, she was married to Frank Williams, and the two lived at 3115 W. 73rd Street. [R452, Transcript, 11379-80]. They lived in the upstairs of the duplex. [R452, Transcript, 11380]. Joanna McKeever, Paul McKeever's step-mother, lived in the same duplex at the same time. [R493, Transcript, 14464]. Joanna McKeever testified she lived downstairs in March of 2006, and knew Collins. [R493, Transcript, 14466].

Collins's ex-husband Frank Williams also testified. Williams stated he knew Paul McKeever through Joanna McKeever. [R493, Transcript, 14482-83]. Williams agreed when he was married to Collins, Joanne McKeever lived downstairs. [R493, Transcript, 14487].

It is undisputed Paul McKeever's step-mother lived in the same home as Sam Collins during investigation of this case, months after law enforcement miraculously found Collins and secured her statement in July of 2006. [R452, Transcript, 11392]. This second connection is significant, and casts further doubt on the credibility of Collins and McKeever.

This connection between Collins and McKeever, coupled with the testimony of Michael Miller, was a large part of Lewis's motion for a new trial. [R506, Motion

for New Trial]. The district court, however, held this evidence "was one more factor for the jury to consider in evaluating McKeever's testimony." [R523, Order, 16191]. As it related to the testimony of Collins, the court held "the jurors were presented with sufficient evidence to properly evaluate Collins's credibility in this regard as well." [R523, Order, 16198]. The district court provided no explanation how these "troublesome" connections and testimony by McKeever and Collins were extinguished after a second trial, in which the defense provided substantial evidence further demonstrating their connections. The district court's failure to provide any such explanation was an abuse of discretion.

### F.    Samantha Collins

While Collins's connections to McKeever are problematic, her testimony itself raises additional concerns. At the first trial, Collins admitted to being a crack user and prostitute, who bought drugs from Lewis in 2005. [R452, Transcript, 11391-92]. After the first trial, the court found her inconsistencies raised "serious credibility issues." [R359, Order, 9812].

At the second trial, the government's case-in-chief failed to address the credibility concerns and failed to corroborate Collins's testimony. The evidence still showed a complete conflict between the drug debt motive as told by Collins and the testimony of the residents of 1220 E. 87th Street. Multiple government witnesses

confirmed no one in the home used drugs, or owed Lewis a debt. [R484, Transcript, 13975, 13996 (Capretta Bell); R482, Transcript, 13586, 13593 (Evelyn Martin); R443, Transcript, 11004, 11010 (Moses Marshall); R441, Transcript, 10647-48 (Sharese Williams)]. Additionally, the witness testimony confirm Lewis never threatened or had conflict with any of the residents. Thus, Sam Collins remains in conflict with every person connected to the house.

Equally concerning is Collins's testimony regarding how much time she spent with Lewis in the weeks leading up to the fire. Exactly like the first trial, no evidence corroborates Collins's story that Lewis spent time at her house on the west side, or that she called Lewis on the phone. Collins testified she called Lewis's cell phone to purchase crack. [R452, Transcript, 11418].Collins explained she called "two to three times a day" to purchase drugs. [R452, Transcript, 11420]. Even after the fire, Collins continued to call Lewis. [R452, Transcript, 11420]. This cannot be proven, because Collins cannot remember her number. [R452, Transcript, 11419]. While Collins's convenient lack of memory makes it impossible to check her phone records, Lewis's cell phone records are in evidence and show every call made or received by Lewis in May 2005. [R456, Transcript, 11795]. As detailed by Doug Smith, Lewis made or received 2,168 calls during in May of 2005, averaging 86 calls per day. [R456, Transcript, 11796]. Not a single call belonged to Sam Collins. [R456, Transcript,

11803]. Therefore, Collins's testimony she called Lewis every day for drugs is not supported by the phone records.

At the second trial, Collins testified for months leading up to the fire, Lewis was at her place "several times a day . . . every day." [R452, Transcript, 11389]. Collins lived on W. 82nd Street, where Lewis would cook crack every week. [R452, Transcript, 11413]. She claimed Lewis showered there and had sex with girls at her apartment. [R452, Transcript, 11413, 11435]. Lewis would sleep at her apartment until the afternoon, and would leave when his cell phone woke him. [R452, Transcript, 11417]. There is no support for Collins's story.

Doug Smith gave detailed testimony as to the cell phone towers in the Cleveland area. Using the cell phone tower maps and Lewis's cell phone records, Smith confirmed Lewis was <u>never</u> on the west side of Cleveland at any time in May of 2005. [R456, Transcript, 11806-07]. Smith was directed to each and every tower on the west side of Cleveland, and not a single one was accessed by Lewis's cell phone that entire month. [R456, Transcript, 11805-07]. This is direct and indisputable forensic evidence that Collins's claims are false.

The district court provided no explanation why, after the first trial, Sam Collins's problematic testimony warranted the grant of a new trial, but after the second trial, "the jurors were presented with sufficient evidence to properly evaluate

Collins's credibility in this regard as well." [R523, Order, 16198]. This holding was once again a significant departure from the first order granting a new trial, and with no explanation for this departure, the court committed an abuse of discretion.

### G.    George Hightower

After the first trial, the Court found the testimony of George Hightower raised serious credibility issues. [R359, Order, 9812]. At the second trial, Hightower's testimony raised additional issues. Hightower's testimony is also contradicted by Lewis's cell phone records.

### 1.    The Cell Phone Records Prove Hightower's Testimony Incredible

Hightower's testimony detailing of the events of the night of the fire are in conflict with the cell phone records. A significant part of the government's case-in-chief is trying to conform Hightower's testimony regarding the night of the fire to Lewis's cell phone records. In fact, a good portion of the government's closing argument focused on Hightower's testimony and how it revolved around the cell phone records, even calling Hightower one of their "eight pillars of evidence." [R501, Transcript, 14584-90, 15527].

The cell phone records prove Hightower's testimony is wrong. Moments after the fire was reported to emergency services, there are calls between Lewis and Hightower. Hightower is the only witness who testifies to seeing or conversing with

Lewis moments after the fire was reported to emergency services. Hightower attempts to prove Lewis's whereabouts moments after the fire by relying on the phone records. Hightower states moments after the fire Lewis called him, and relying on the cell phone records, Hightower concludes this was the call with Lewis at 2:56:04 a.m. on May 21, 2005. [R432, Transcript, 10429]. The purpose of Lewis's call was to say he was on his way to Hightower's and Hightower told him to keep the music down. [R432, Transcript, 10429]. Hightower maintains that eight minutes later, at 3:04 a.m., Lewis was in the driveway, and the two conversed; Lewis was in the van and Hightower was looking out the window.[R432, Transcript, 10430]. Hightower then states Lewis entered the house, and remained there until the morning. [R432, Transcript, 10434].

Thus, according to Hightower, Lewis arrived at Hightower's house in his van shortly after 3:00 a.m., went inside Hightower's house, and did not leave until the morning. The cell phone records prove otherwise. While the records show Lewis was in the sector encompassing Hightower's house – Sector 57-4 – Lewis only remained there for a half hour. A picture of the map is depicted below. Doug Smith confirmed Lewis was in this sector at 3:04:08 a.m., but left this sector at 3:37 a.m. [R456, Transcript,11821, 11824].



That from 3:37 a.m. until about 4:17 a.m., Lewis's records show him in two different

sectors, 257-3 and 57-4. [R456, Transcript, 11824, 11826]. At 4:20 a.m., Lewis

returned to sector 57-4, and remained there until noon. [R456, Transcript, 11827].

Therefore, Hightower is incorrect that Lewis remained in the home from 3:04 a.m.

until the morning, as the records show Lewis was in another sector (257-3) from 3:37

to 4:17 a.m.

This is a significant point, not just to show Hightower was incorrect as to this

set of events, but as to other events that night. In fact, Hightower's reliance on this

2:56 a.m. and 3:04 a.m. call, in relation to the night's events, creates a domino-effect regarding his testimony. After Hightower insisted Lewis remained in the house from 3:04 a.m. until the morning, [R432, Transcript, 10434], a discussion was had regarding a CD. [R432, Transcript, 10437]. Beginning at 11:17 p.m., through 12:26 a.m., there are 23 calls from Hightower's phone to Lewis; Hightower claims Lewis came over to get a CD and continued to call his cell phone so a song from the CD would play as his ringtone. [R432, Transcript, 10437-38].

Hightower's testimony is contradicted on this exact point by the testimony of Doug Smith. Smith was specifically asked about the possibility of Hightower's story – that from 11:17 a.m. to 12:26 a.m. Lewis was in Hightower's house calling his own phone. [R432, Transcript, 11820]. Mr. Smith stated the cell tower records show Lewis could not have been in Hightower's house calling his own cell phone. [R432, Transcript, 11821]. This is because Hightower's house is located in sector 57-4 and during this time period Lewis's records show he was in sector 257-4. [R432, Transcript, 11821].

These gross inaccuracies continue to bring Hightower's credibility into doubt. More importantly, however, where Hightower is wrong about the sequence of events that night, Lewis is right, as demonstrated by this testimony.

## 2.     Antun Lewis's Testimony of the Events the Night of the Fire is Supported by the Cell Phone Records

With the aid of his cell phone records, Lewis recalled specific events, which contradict the testimony of Hightower. Lewis confirmed in the early morning hours of May 21, 2005, he and Janine Chisholm were together in the Union Avenue area. [R472, Transcript, 13103]. This was confirmed by the cell records, as Lewis received a calls at 1:38 and 1:39 a.m., accessing cell tower 58-3. [R456, Transcript, 11767]. Chisholm dropped Lewis off at his father and grandmother's house in the Union Avenue area. [R472, Transcript, 13105]. After talking to his grandmother, Lewis took the bus back to his car, parked at E. 89th Street. [R472, Transcript, 13108]. Lewis wanted to go back to his van because his cell phone had died and his charger was in his car. [R472, Transcript, 13106]. Lewis detailed walking to the bus stop, taking the #10 bus, and then walking from the bus stop to his van. [R472, Transcript, 13107-09]. When he returned to his car, he plugged his phone in and got a call with Janine Chisholm – the 2:53:25 a.m. call. [R472, Transcript, 13112]. Immediately thereafter, Lewis began getting calls from Hightower. Lewis explains he went to his mother's house for a few minutes, then to Hightower's house to pick up a CD. [R472, Transcript, 13113].

This sequence of events is all corroborated by the phone records. Lewis receiving Chisholm's call at 2:53, while at his van at E. 89th and Superior, is

confirmed by the phone records indicating he was in sector 257-4. [R456, Transcript, 11850 (testimony of Smith)]. Lewis then got a call from Hightower, indicated by the 2:56:04 call, showing that Lewis remained in sector 257-4. [R456, Transcript, 11850 (testimony of Doug Smith)]. Then, Lewis goes to his mother's house, which is located at E. 84th and Wade Park, in sector 57-4 (the same sector as Hightower's house). [R456, Transcript, 11835]. The call at 3:04:04 confirms Lewis was in the 57-4 sector at this time. [R456, Transcript, 11821]. Then, Lewis left his mother's and went to Hightower's to get the CD, remaining in the 57-4 sector until 3:37 a.m.; the cell phone records confirm this as well. [R456, Transcript, 11833].

In total, Lewis's testimony regarding his whereabouts preceding the fire, around the time of the fire, and for the next 45 minutes afterwards matches exactly to the cell phone records. Everything he details regarding his whereabouts is confirmed, and ensures he did not set the fire, and was not walking the streets with Jackson carrying two gas cans. Relevant to the issue at bar, however, is that Lewis's testimony and the accompanying phone records devastate the testimony of Hightower. The government used Hightower's testimony in conjunction with the phone records in an attempt to inculpate Lewis, calling Hightower one of the "pillars of evidence." [R501, Transcript, 15498].

As demonstrated above, however, Hightower is wrong. Hightower claimed Lewis was at his house getting a CD around 11:00 p.m. and 12:00 a.m.; but as seen above, the cell phone records confirm Lewis was not at Hightower's house. Furthermore, Hightower claimed at 3:04 a.m., Lewis came to Hightower's house and went inside, and never left the home until morning; but as seen above, the cell phone records confirm Lewis did leave the area.

Proven by the cell phone records, Hightower's testimony is undeniably wrong. With the aid of these cell phone records and the testimony of Lewis on these issues, Hightower's testimony has no credibility. Hightower's testimony is full of contradictions, and the second trial has only further exposed the incredible nature of his testimony. The district court, however, merely held "Hightower's uncertainty about those phone calls was made known to the jury, and the jury could evaluate that testimony accordingly." [R523, Order, 16202]. The court provided no explanation or reasoning why Hightower's problematic testimony warranted a new trial in 2011, but not after the second trial, despite the overwhelming areas of impeachment. The failure to provide any such justification constituted an abuse of discretion.

## H.    The Cell Phone Records

The cell phone records were an integral part of the government's case-in-chief. [R359, Order, 9815]. The court concluded the evidence that Lewis was in the "fire

66

sector" is merely "circumstantial evidence that Lewis was in the general vicinity of the 1220 House just before and just after the first 911 call regarding the fire." [R359, Order, 9816].

In granting a new trial, the court stated both sides would be given the ability "to better develop the facts in this case and present competent evidence to the jury." [R359, Order, 9834]. The second trial provided an opportunity to further explore the nature of these cell phone records. The government's case-in-chief, however, failed to further develop any evidence. On the other hand, the defense made significant strides in developing the evidence of these records, showing the phone records are clear evidence of Lewis's innocence.

### 1.    The Connection Between the Cell Phone Records and the Time of the Fire

The first sentence of the government's opening statement was that this fire occurred "on May 21, 2005, at approximately 2:53 in the morning." [R482, Transcript, 13545]. The government relied on this "2:53 a.m." time as the linchpin of their case-in-chief. In opening, the government focused on Jackson's testimony on this 2:53 a.m. time, as the time Lewis got a call immediately before going into the house and setting the fire. [R482, Transcript, 13561]. At this time Lewis was in the "fire sector," the 16 block area including 1220 E. 87th Street.  [R482, Transcript, 13575]. In closing the government went back to this time as "pillar number two,"

67

Jackson's reliance on this time. [R501, Transcript, 15518-19]. In total, this single phone call with Janine Chisholm, at 2:53:25, is the foundation of the government's entire case-in-chief.

The government's reliance on this time is misplaced, and as a result, the government's case-in-chief comes tumbling down. Everyone agrees that at 2:53:25 a.m. Janine Chisholm called Lewis, a call lasting 23 seconds. [R456, Transcript, 11812]. The evidence shows the fire was started <u>before</u> that call took place. The government's attempts to prove this call occurred, and then Lewis set the fire, is not supported by the facts.

In closing, the government maintained the fire was an "instant inferno, " claiming the house burst into flames the moment the gas was ignited. [R501, Transcript, 15582]. To support this thought of an "instant inferno" the government presented two fire experts Ralph Dolence and Robert Gartner. [R485, Transcript, 14078 (Dolence); R483, Transcript, 13778 (Gartner)]. Gartner stated when two gallons of gasoline were poured, those two rooms would be "fully engulfed in flames" in a matter of seconds. [R483, Transcript, 13782]. Their opinions, however, are not supported by the evidence.[5]

---

[5] To be clear, no one will deny that the house eventually became a terrible inferno, and this inferno engulfed the entire house, as detailed by the firefighters who arrived on scene. [R482, Transcript, 13640 (Mangan); R482, Transcript, 13667

The two survivors of this fire confirm this was <u>not</u> an instant inferno. Capretta Bell details being woken up because she "smelled smoke." [R484, Transcript, 13950]. Bell's first reaction was a skillet was left on, so Bell went downstairs to remove it. [R484, Transcript, 13950]. Bell recalls when she got downstairs to the landing "it was real smokey," so she left the house; it wasn't until she got outside that she saw the fire. [R484, Transcript, 13950]. She recalled it was the smell of the smoke that woke her up. [R484, Transcript, 13952]. In fact, she stated, "nothing made me think that the house was on fire, just the smoke." [R484, Transcript, 13953].

Teon Smith gave similar testimony. Teon slept in the basement; when he was awoke he went upstairs and looked in the kitchen and other rooms and did not see a fire. [R494, Transcript, 14657-58]. When asked specifically about the living room and dining room, he said he looked into those rooms and they "looked normal." [R494, Transcript, 14659-60].There were no flames and no smoke at that time. [R494, Transcript, 14659-60]. He then tried going upstairs but was blocked by smoke, so he went outside to grab some air. [R494, Transcript, 14658].

The testimony of the only two people who survived this fire is critical and confirms this was not an "instant inferno." Both saw smoke, but no fire, and certainly

-------------

(Marrero); R482, Transcript, 13640 (Piazza). The issue raised herein relates to how long the fire took to reach that magnitude.

not the "inferno" the government theorizes to have occurred. This testimony is of the utmost importance because of how it falls in line with the emergency services records and the cell phone records. A key document is Defense exhibit A, a report created by the City of Cleveland Fire Department. This document reports response times of Fire Department personnel, recording the "alarm time" and the times in which various fire engines arrived on scene. [R485, Transcript, 14162-63 (testimony of Lt. Stark)]. This document conclusively reported the first alarm came in at 2:54:04. [R485, Transcript, 14163]. Engines were dispatched at 2:55:38, and the first engine was on scene at 2:57:38. [R485, Transcript, 14163].

Focusing on alarm time, 2:54:04 a.m., a number of witness agreed this "alarm time" was when an emergency call was received reporting a fire. [R494, Transcript, 14611 (Majercak)]. Captain Majercak explained when a caller calls 911 to report a fire, the dispatch center (central communications or "CCOM") determines where the call is to be routed. [R494, Transcript, 14611-12]. Once the dispatch center determines fire engines are needed, the CAD system records the time the call comes in as the "alarm time." [R494, Transcript, 14611]. Captain Majercak confirmed the fire at 1220 E. 87th was recorded at 2:54:04 a.m. [R494, Transcript, 14611].

We must now juxtapose this 2:54:04 a.m. alarm time against Lewis's cell phone records. Janine Chisholm made a phone call to Lewis at 2:53:25 a.m., which

70

lasted 23 seconds. [R456, Transcript, 11811-12]. This means the call would have ended at 2:53:48. [R456, Transcript, 11812]. Thus, after Lewis ended his call with Janine Chisholm, there would only be 16 seconds until the alarm time – when the fire was reported to 911 (2:53:48 to 2:54:04). This is impossible, and as seen below, Marion Jackson's own testimony disproves any such possibility. In total, at the time Lewis got the 2:53:25 a.m. call, the fire had already been set, proving Jackson to be a liar and exonerating Lewis.

If we are to believe Marion Jackson, in conjunction with the cell phone records, at 2:53:25, Lewis got a call from Janine Chisholm. During this call, Lewis asked the caller "is the bitch Nicole there?" [R458, Transcript, 11934]. The records confirm this call ended 23 seconds later – 2:53:48. [R456, Transcript, 11812]. According to Jackson, the following occurred:

1) Jackson and Lewis are standing across the street from the house. [R458, Transcript, 11935];

2) Lewis then picks up the two gas cans and walks across the street to the house. [R458, Transcript, 11934];

3) Lewis then "disappears behind the house" going around the side by the driveway. [R458, Transcript, 11937-38];

4) Lewis then, somehow gained access to the house by the side door and entered the home;

5) Lewis must have then made his way into the front room, and done so stealthily in order to avoid detection;

71

6)    Lewis poured the two gas cans out in "serpentine pattern" in the living room and dining room. [R485, Transcript, 14047-48 (testimony of Dolence)];

7)    Lewis then had to ignite the gasoline in a way to avoid being harmed, and left the home;

8)    Then, the fire had to reach such volatility that someone noticed the fire – in the middle of the night – and called 911 to report the fire.

To believe the government's evidence, all these eight events would have had to happen between the time Lewis hung up the call with Janine Chisholm, at 2:53:48, and when the alarm time occurred at 2:54:04. There is no conceivable way these eight events occurred in 16 seconds. Accordingly, the evidence shows when Janine Chisholm called Lewis, the fire had already been set, and as a result, Marion Jackson's story is a complete fabrication.

This entire argument was presented to the court in support of the motion for new trial. [R506, Motion for New Trial]. The court concluded "the jury was presented with sufficient testimony to evaluate the accuracy of the Government's time line." [R523, Order, 16209].

## 2.    The Government's Speculative Justification For This Discrepancy

Through the fire fighters, fire experts, and cell phone expert Doug Smith, the defense laid the ground work for bringing together this impossibility, and that the fire had already been set when Chisholm called Lewis at 2:53:25. At the end of the their

case-in-chief, the government called Captain Majercak. The government did so to speculate that, maybe, these alarm times are off, and this possibility explains the discrepancy. The government's speculation, however, is not evidence, and does not resurrect the impossibility of Lewis starting this fire given the actual evidence.

Captain Majercak details the system used to record these "alarm times" was only meant to record emergency response times. [R494, Transcript, 14591]. Captain Majercark explained the system being used was not synched to GPS. [R494, Transcript, 14608]. He explained that at times, the clock had been off, even up to a few minutes. [R494, Transcript, 14608]. Despite the fact the clock occasionally is "off," Majercak explained he has reset the clock, even stating he "re-synch[ed] it." [R494, Transcript, 14612]. Captain Majercak did not keep a record or log of when he re-synched the clock, but he did go to "great effort to make sure these records are in synch." [R494, Transcript, 14613].

In contrast, Lewis's cell phone records are GPS-synched. [R456, Transcript, 11812]. This GPS-synching means the times in Lewis's cell phone records were consistent with all other GPS-synched phone records. Majercak, however, explained the "alarm times" recorded by Cleveland Fire were not GPS-synched. The government took this to its most ridiculous conclusion, a conclusion not supported by the evidence. The government concluded because the times were not synched, the

73

timing of these calls was not an issue, and therefore the cell phone records amount to proof beyond a reasonable doubt. [R501, Transcript, 15483-84]. The government's conclusion, is nothing more than speculation, and cannot save the fact the alarm times and cell phone records exonerate Lewis. <u>Cf.</u> [R359, Order, 9833 (in granting a new trial, this Court found the first trial "often required one to enter the realm of speculation.")].

To be clear, the government uses Majercak's testimony to undercut <u>their own</u> evidence. The government presented the "alarm times" through their own witnesses, Lt. Stark and Captain Majerak. [R485, Transcript, 14159]. The government then tried to undercut the reliability of these law enforcement records because it demonstrates Lewis's innocence and the fact the fire had already been set when Janine Chisholm called Lewis. In essence, the government has <u>created</u> reasonable doubt within the evidence. In the absence of any physical evidence, the government presented cell phone records and law enforcement records, such as this "alarm time" report. Taken together, the cell phone records and alarm time report created a concrete time line. When the defense relied on the government's own evidence to show Lewis's innocence, the government responded by speculating the "alarm times" were unreliable. The government's choice of contradicting their own timeline, and

undercutting the reliability of their own evidence, is at the very least reasonable doubt.

The truth of the matter is that the government's theory is entirely speculative and proves nothing. Despite these possibilities, the records, on their face, establish the fire had already been set when Janine Chisholm called Lewis. The government has failed to present any evidence to disbelieve this fact, only presenting rank speculation and hypothesis. Without credible evidence, the verdict is not supported by the evidence, and a miscarriage of justice has occurred, warranting a new trial.

### 3.   The Defense Has Presented Credible Evidence in Support of the Alarm Times and Cell Phone Records

In the preceding section, Mr. Lewis has demonstrated why the cell phone records and alarm time records support his innocence and why the fire had already been set when Janine Chisholm called Lewis at 2:53:25 a.m. The government failed to present evidence to counter this fact. The defense, however, presented two witnesses in support of this claim: Lahemma Collins and computer expert Greg Kelley. Taken together, they corroborate the reliability of the alarm times and support the exculpatory nature of the cell phone records.

Lahemma Collins was awoken by what sounded like her window being broken. [R495, Transcript, 14749]. Lahemma explained she "took a few minutes" to get dressed, then went downstairs. [R495, Transcript, 14750]. Lahemma estimates it took

about three to four minutes before she came downstairs. [R495, Transcript, 14750, 14759]. When she got downstairs, she saw the fire and began screaming for her kids to get out of the house. [R495, Transcript, 14751]. She ran back upstairs to get her phone, and called 911. [R495, Transcript, 14752]. Lahemma identified an audio recording of her 911 call in court. [R495, Transcript, 14752].

The flames coming from 1220 E. 87th Street caught her car on fire, and eventually reached her home. This means the fire raged to a point to engulf her car and then catch her home on fire before she was awoken. Once awoken, she took the time to get dressed and go downstairs before she called 911. Computer expert Greg Kelley analyzed a CD of 911 calls relating to the fire. [R495, Transcript, 14774]. This CD contained audio files of the dispatch calls recorded by emergency services. [R495, Transcript, 14775]. The 911 call Lahemma identified occurred at 2:54:29. [R495, Transcript, 14783].

This testimony confirms the reliability of the Cleveland Fire Department's "alarm time" being at 2:54:04. Coupled with the 911 call from Lahemma reported at 2:54:29, this testimony supports Lewis's innocence. Lahemma's 911 call, at 2:54:29, is 41 seconds after Lewis ended his call with Janine Chisholm at 2:53:48. Furthermore, Lahemma made her 911 call minutes after being awoken by the fire. This testimony proves the fire was set before the 2:53:25 phone call between Lewis

and Chisholm. This disproves the government's belief the occurred immediately before Lewis set the fire. This clear exculpatory forensic evidence and testimony preponderates heavily against the verdict and supports a new trial.

In evaluating this argument, the district court once again stated "the jury was presented with sufficient testimony to evaluate the accuracy of the Government's time line." [R523, Motion for New Trial, 16209]. Despite this overwhelming evidence, all of which was newly presented arguments by the defense, to support Lewis's innocence, the court provided no justification why the jury verdict should stand. This constituted an abuse of discretion by the court in failing to properly apply the law.

## I.    Conclusion

As detailed above, there are significant areas in which the evidence preponderates heavily against the verdict. After the first trial, the district court discounted every aspect of the government's case-in-chief, thoroughly scrutinizing the government's witnesses, evidence, and conclusions. A new trial was ordered. After a second trial, no part of the government's case changed, all the issues were still present and all the concerns remained unaddressed. As detailed above, the defense presented additional witnesses and evidence; direct forensic evidence disproving the government's theories and severely undercutting any reliability of the government's witnesses. Furthermore, the defense presented additional witnesses to

further erode the government's case-in-chief. These areas are not mere credibility concerns, but the defense has directly demonstrated a innocent man has been convicted. The district court, however, denied the motion for new trial. Even when faced with all this new evidence from the defense, the court made a significant departure from its previous order. The court merely held that all these inconsistencies and unanswered questions were an issue for the jury to decide. The court provided no explanation as to why the government's case-in-case was fraught with peril after the first trial, but not after the second, even though the second trial contained significant additional evidence from the defense. This constituted an abuse of discretion, warranting a reversal of the denial of the motion for new trial.

## II.    Lewis's Conviction Must Be Reversed for Prosecutorial Misconduct As a Result of the Government's Improper Remarks During Closing Argument

### Standard of Review

Allegations of prosecutorial misconduct contain mixed questions of law and fact this Court reviews de novo. United States v. Green, 305 F.3d 422, 429 (6th Cir.2002).

### Analysis

In closing argument, the government maintained their case was predicated on "eight pillars of evidence." [R501, Transcript, 15498]. The "first pillar" the government offered to the jury was Lewis's "false alibis" – characterized as false

statements Lewis made to others. [R501, Transcript, 15498-99]. The government claimed Lewis made a false alibi that he "was doing a robbery with Pancho." [R501, Transcript, 15502]. The defense immediately objected as no such testimony was made, and a sidebar was held. [R501, Transcript, 15502-13]. The government's closing remarks were patently false and constitute prosecutorial misconduct, requiring reversal.

This Court employs a two-step inquiry to determine whether prosecutorial misconduct has occurred. United States v. Henry, 545 F.3d 367, 376 (6th Cir. 2008); United States v. Francis, 170 F.3d 546, 549 (6th Cir. 1999). First, this Court asks whether a statement was improper. Id. If it was improper, this Court examines whether the statement was so "flagrant" to warrant reversal. Id.

The prosecutor's statement was improper. The government claimed Lewis made a false alibi that he was "doing a robbery with Pancho." [R501, Transcript, 15502]. There was no testimony Lewis made any such statement. The government claimed Sharese Williams testified regarding Lewis's "false alibi." [R501, Transcript, 15503]. The government's contention is false and not supported by Sharese's testimony. Sharese gave testimony regarding her conversations with law enforcement. When asked about Lewis's whereabouts the night of the fire, she stated, "somebody told me that Antun and Poncho – Poncho said that they was doing a robbery at this

time." [R441, Transcript, 10634 (emphasis added)]. Sharese explained she later learned this was untrue because "Poncho was in jail at the time of the fire." [R441, Transcript, 10635]. When Sharese confronted Lewis with this fact, Lewis said "he was not involved in any armed robbery the night of the fire." [R441, Transcript, 10636].

Sharese's testimony shows Lewis did not give a false alibi. By Sharese's own words, she heard about this robbery from "somebody," not from Lewis. [R441, Transcript, 10634]. This story of a robbery was not told by Lewis and cannot be attributed to him; therefore, it is not an "alibi." Second, when Sharese asked Lewis about the robbery, he denied any involvement, meaning it is not a false alibi. Therefore, the government's statements were improper.

Since the statement was improper, we must next examine whether the statement was so "flagrant" as to warrant reversal. Henry, 545 F.3d at 376. This Court considers four factors in such a determination: (1) whether the prosecutor's remarks or conduct tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were accidentally or deliberately made; and (4) the overall strength of the evidence against the accused. Id.

As to these, the government told the jury Lewis gave "false alibis" as his "consciousness of guilt." [R501, Transcript, 15499]. The government was trying to

portray Lewis as a liar and guilty of the crime. These remarks were not isolated, but were part of the government's "eight pillars of evidence," the linchpin of their entire argument. [R501, Transcript, 15498-99]. These remarks were not ancillary to the prosecution, but were the foundation of their entire case. As there was no direct evidence of Lewis's guilt, but a prosecution based solely on circumstantial evidence (in fact, mostly rumor and speculation), Lewis's credibility was of the utmost importance. The government's false and improper claim he created "false alibis" had an unjustifiable poisonous effect on the jury and therefore amounts to the "flagrant" of conduct warranting reversal. Henry, 545 F.3d at 376. Therefore, Lewis requests this Court vacate his conviction and remand the case due to the government's prosecutorial misconduct.

**III.    The Supreme Court's Holding in Bond v. United States, and this Court's Holding in United States v. Toviave Require Lewis's Conviction to be Vacated**

On June 2, 2014, the Supreme Court decided Bond v. United States, __ U.S. __, 134 S. Ct. 2077 (2014), holding the criminal statute passed to implement the Chemical Weapons Convention, 18 U.S.C. § 229, does not reach local criminal activity based upon principles of federalism inherent in our constitutional structure. This Court followed Bond a few months later, in United States v. Toviave, 761 F.3d 623 (6th Cir. 2014). Applying the holdings of Bond and Toviave to the instant case,

the arson of a single-family home is purely local, and not within the scope of 18 U.S.C. § 844(i). Because these cases were not issued until months after the verdict, Lewis had no opportunity to present this argument to the district court. Lewis requests this Court remand the case to the district court so the court can rule on this legal issue.

Bond involved "an amateur attempt by a jilted wife to injure her husband's lover." Bond, 134 S.Ct. at 2083. The wife obtained two different chemicals that can be lethal in high enough doses. Id. at 2085. She spread the chemicals on the lover's "car door, mailbox, and door knob." Id. Because the chemicals were easy to see, the lover avoided serious harm. Id. Postal service investigators caught the wife and despite the unwarlike nature of her conduct, the government charged her with possessing chemical weapons in violation of 18 U.S.C. § 229. The government believed the wife's conduct fell within the broad scope of the chemical weapon statute, which defines a chemical weapon as any "toxic chemical." Bond, 134 S.Ct. at 2085.

The Supreme Court asked: could the statute, § 229, with origins arising out of trench warfare from World War I really apply to a vindictive prank? The Court held it could not, reasoning § 229 was ambiguous due in part to the "improbably broad reach of" the definition of chemical weapon and the "deeply serious consequences of

adopting such a boundless reading." <u>Bond</u>, 134 S.Ct. at 2090. The Court held Congress had not clearly indicated the statute was intended to criminalize "purely local crimes." <u>Id.</u> While the federal government might have "a substantial interest in enforcing criminal laws against assassination, terrorism, and acts with the potential to cause mass suffering," Congress does not typically criminalize purely local conduct like a garden-variety assault. <u>Id.</u> at 2092.

Much like <u>Bond</u>, Lewis's conviction is for a purely local crime. Just like the statute in <u>Bond</u>, the drafters of the federal arson statute, 18 U.S.C. § 844(i), were not concerned with regulating purely local conduct. The statute does not reflect a clear expression of Congressional intent to upset the traditional balance of federalism by intruding upon state criminal jurisdiction. While the arson at 1220 E. 87th Street is a tragedy, there is no federal interest in this purely local crime. While a federal agency, Housing and Urban Development (H.U.D.), paid a portion of Medeia Carter's rent obligation to the owner, [R482, Transcript, 13683-84], this fact alone is not enough to transform the arson of a single-family home into a federal crime.

For the federal government to maintain Lewis's conviction is not consistent with principles of federalism inherent in our constitutional structure, and intrudes upon state criminal jurisdiction in the absence of a clear expression from Congress. <u>Cf.</u> <u>Bond</u>, 134 S. Ct. at 2088-94. Like <u>Bond</u>, the ambiguity in the statute must be

resolved in favor of maintaining the balance of state and federal powers. Id. Even if we accept for a moment the government's theories of prosecution – Lewis burned the house because of drug debt – he should have been prosecuted by state authorities. See id. at 2093 ("Congress has been traditionally reluctant to define as a federal crime conduct readily denounced as criminal by the state.") (quoting United States v. Bass, 404 U.S. 336, 349 (1971)).

Lewis asks this Court to consider its own holding in United States v. Toviave, 761 F.3d 623 (6th Cir. 2014). On August 4, 2014, this Court applied the holding in Bond, to a federal prosecution under 18 U.S.C. § 1589, vacating the conviction. In Toviave, the allegations related to the defendant's treatment of children in his home; the defendant hit the children with his hands and other items and put the children to work in the home. Toviave, 761 F.3d at 624. The defendant was ultimately convicted of forced labor. This Court concluded the conviction could not be supported:

> First, forcing children to do household chores cannot be forced labor without reading the statute as making most responsible American parents and guardians into federal criminals. Second, requiring a child to perform those same chores by means of child abuse does not change the nature of the work. And third, if it did, the forced labor statute would federalize the traditionally state-regulated area of child abuse.

Id. at 625. This Court was concerned with the government's reach of the federal forced labor statute, and the intrusion into state law. See id. at 627 ("[o]ne may ask what harm is done if child abuse without forced labor is deemed to be a federal crime.

84

The harm is the federalization of state law."). Citing to <u>Bond</u>, this Court stated "we should be cautious in inferring Congressional intent to criminalize activity traditionally regulated by the states." <u>Id.</u>

This Court makes clear in <u>Toviave</u> that <u>Bond</u> is not limited to its facts. Following <u>Toviave</u> and <u>Bond</u>, Lewis's prosecution under 18 U.S.C. § 844(i), the arson of a single-family home, intrudes upon state criminal jurisdiction and violates federalism. As this issue was not ripe until after Lewis's conviction became final, the district court has not had an opportunity to rule on this issue. Lewis seeks a remand so the district court can properly rule on this issue.

## IV.  CONCLUSION

Based on the foregoing, Lewis seeks a remand to the district court.

Respectfully submitted,
*/s/ Jeffrey B. Lazarus*
JEFFREY B. LAZARUS
Assistant Federal Public Defender
Office of the Federal Public Defender
1660 W. 2nd Street, Suite 750
Cleveland, Ohio 44113
Phone: 216-522-4856
Facsimile: 216-522-4321
jeffrey_lazarus@fd.org

Attorney for Appellant Antun Lewis

## **CERTIFICATION OF COMPLIANCE**

I hereby certify that the above brief is comprised of 17,974 words and therefore complies with this Court's word limitation, as extended by order of this Court on December 18, 2014.

/s/ Jeffrey B. Lazarus

JEFFREY B. LAZARUS
Attorney at Law

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that on January 23, 2015, a copy of the foregoing Appellant's Brief was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's system.

*/s/ Jeffrey B. Lazarus*
JEFFREY B. LAZARUS
Attorney at Law

## DESIGNATION OF DISTRICT COURT DOCUMENTS

Pursuant to Sixth Circuit Rules 28(c) and 30(b), Appellant Antun Lewis designates the following relevant district court documents:

| Record No. | Document Description | Page ID #s |
|---|---|---|
| 1 | Indictment | 1 - 5 |
| 298 | Verdict | 5673 - 5675 |
| 324 | Motion for New Trial | 8925 - 9022 |
| 359 | Order | 9741 - 9835 |
| 432 | Transcript | 10363 - 10482 |
| 441 | Transcript | 10525 - 10722 |
| 442 | Transcript | 10723 - 10941 |
| 447 | Transcript | 11131 - 11267 |
| 449 | Transcript | 11325 - 11367 |
| 452 | Transcript | 11372 - 11447 |
| 455 | Transcript | 11506 - 11717 |
| 456 | Transcript | 11718 - 11856 |
| 458 | Transcript | 11864 - 12025 |
| 459 | Transcript | 12026 - 12109 |
| 460 | Transcript | 12110 - 12232 |
| 468 | Transcript | 12254 - 12390 |
| 469 | Transcript | 12391 - 12546 |
| 472 | Transcript | 13000 - 13406 |
| 476 | Verdict | 13466 - 13468 |
| 482 | Transcript | 13484 - 13695 |

| 483 | Transcript | 13696 - 13866 |
|-----|------------|---------------|
| 484 | Transcript | 13867 - 14005 |
| 485 | Transcript | 14006 - 14183 |
| 494 | Transcript | 14514 - 14696 |
| 495 | Transcript | 14697 - 14957 |
| 496 | Transcript | 14958 - 15016 |
| 501 | Transcript | 15430 - 15606 |
| 506 | Motion for New Trial | 15615 - 15714 |
| 523 | Order | 16161 - 16220 |
| 532 | Judgment | 16271 - 16276 |
| 536 | Notice of Appeal | 16387 |
| 537 | Amended Judgment | 16388 - 16393 |