IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

_____

CASE NO. 14-3661
_____

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

ANTUN LEWIS,
Defendant-Appellant.
_____

On Appeal from the United States District Court
for the Northern District of Ohio
Eastern Division
_____

BRIEF OF PLAINTIFF-APPELLEE
_____

DENNIS G. TEREZ
JEFFREY B. LAZARUS
Office of the Federal Public Defender
for the Northern District of Ohio
1660 W. 2nd Street, Suite 750
Cleveland, OH  44113
Telephone No: 216-522-4856
E-mail: Jeffrey_lazarus@fd.org


Attorney for Defendant-Appellant

STEVEN M. DETTELBACH
United States Attorney

Michael L. Collyer
Assistant United States Attorney
801 West Superior Avenue, Suite 400
Cleveland, Ohio 44113
Telephone No: 216-622-3744
Facsimile No: 216-520-2403
E-mail: michael.collyer@usdoj.gov


Counsel for Plaintiff-Appellee

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iii

STATEMENT REGARDING ORAL ARGUMENT ................................................ iv

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION ..... 1

STATEMENT OF THE ISSUES ................................................................ 2

STATEMENT OF THE CASE ................................................................... 3

SUMMARY OF THE ARGUMENT ................................................... 27

ARGUMENT ................................................................................... 29

**I.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN
        DENYING LEWIS' MOTION FOR A NEW TRIAL BASED ON THE
        MANIFEST WEIGHT OF THE EVIDENCE** ......................................... 29

**II.   THE PROSECUTOR'S COMMENT ABOUT A FALSE ALIBI IS NOT
        REVERSIBLE PROSECUTORIAL MISCONDUCT.** ............................. 64

**III.  LEWIS' ARGUMENT THAT ARSON OF A RENTAL HOUSE
        SUBSIDIZED WITH FEDERAL FUNDS IS A PURELY LOCAL
        CRIME IS FORFEITED AND MERITLESS.** ....................................... 69

CONCLUSION ................................................................................... 74

CERTIFICATION OF COMPLIANCE WITH WORD LIMITATION ................. 75

CERTIFICATE OF SERVICE ................................................................ 76

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS ............. 77

# <u>TABLE OF AUTHORITIES</u>

**<u>Federal Cases</u>**

<u>Bond v. United States</u>, 134 S. Ct. 2077 (2014)................................ 28, 69, 70, 71, 72

<u>Moore v. Sims</u>, 442 U.S. 415 (1979) ........................................................................73

<u>Russell v. United States</u>, 471 U.S. 858, 105 S. Ct. 2455 (1985) .......... 70, 71, 72, 73

<u>United States v. Carter</u>, 236 F.3d 777 (6th Cir. 2001).............................................64

<u>United States v. Hughes</u>, 505 F.3d 578 (6th Cir. 2007).................................... 27, 29

<u>United States v. Kuehne</u>, 547 F.3d 667 (6th Cir. 2008) .................................. 64, 67

<u>United States v. Lewis</u>, 521 F. App'x 530 (6th Cir. 2013).........................................3

<u>United States v. Olano</u>, 507 U.S. 725 (1993) ..........................................................69

<u>United States v. Stover</u>, 474 F.3d 904 (6th Cir. 2007) .............................................64

<u>United States v. Toviave</u>, 761 F.3d 623 (6th Cir. 2014).........................................72

**<u>Federal Statutes</u>**

18 U.S.C. § 229 ........................................................................................................70

18 U.S.C. § 844(i) ................................................................. 1, 3, 69, 70, 71, 72, 73

18 U.S.C. § 1589......................................................................................................72

18 U.S.C. § 3231 .......................................................................................................1

18 U.S.C. § 3742(a) ..................................................................................................1

28 U.S.C. § 1291 .......................................................................................................1

## **STATEMENT REGARDING ORAL ARGUMENT**

Plaintiff-Appellee the United States of America requests oral argument. The trial transcript exceeds 3,000 pages, and the lower court's 60-page opinion includes many details that are difficult to cover completely on appeal. Oral argument will enable the parties to address questions the panel may have about the record and how certain facts fit into the overall context.

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

The district court had jurisdiction under 18 U.S.C. § 3231 (2012).  After the jury found Lewis guilty of arson under 18 U.S.C. § 844(i) and the district court entered judgment, Lewis filed a timely notice of appeal.  (R. 536: Notice of Appeal, PageID 16387).  This Court has jurisdiction over the appeal under 28 U.S.C. § 1291.

## <u>STATEMENT OF THE ISSUES</u>

I.    Whether the district court abused its discretion in granting Lewis' motion for

new trial because the jury's verdict was against the manifest weight of the

evidence?

II.    Whether the prosecutor's comment about a false alibi was reversible error?

III.    Whether Lewis' argument that arson of a rental house subsidized with

federal funds is a purely local crime is forfeited and/or meritless?

## STATEMENT OF THE CASE

### I.     FIRST TRIAL

On October 1, 2008, Antun Lewis was charged, in the Northern District of Ohio, in a one-count indictment with arson resulting in death, in violation of 18 U.S.C. § 844(i).  (R. 1: Indictment, PageID 1).  The jury returned a guilty verdict on February 14, 2011.

On March 31, 2011, Lewis filed a motion for a new trial, claiming that the jury's verdict was against the manifest weight of the evidence.  (R. 324: Motion for New Trial, PageID 8925).  The USAO opposed it.  (R. 327: Response, PageID 9028).  Lewis later filed a second motion for new trial based on newly discovered evidence.  (R. 332: Second Motion for New Trial, PageID 9177).  The USAO opposed that motion.  (R. 338: Response, PageID 9208).  On February 8, 2012, the court granted the first motion for new trial and dismissed the second as moot. (R. 359: Opinion, PageID 9741).

The Government appealed, but this Court affirmed.  United States v. Lewis, 521 F. App'x 530 (6th Cir. 2013).

### II.    SECOND TRIAL

The second trial began on November 1, 2013.  The jury returned a guilty verdict on December 13, 2013.

Several facts concerning the arson were undisputed in both trials.  On May 21, 2005, the deadliest arson in Cleveland's history killed eight children and one adult at a home located at 1220 East 87th Street, Cleveland, Ohio ("1220 House"); two other occupants, Capritta "Nicole" Bell and Teon Smith, escaped, though Bell sustained severe burns.  Experts determined that the fire was arson, caused by igniting gasoline poured in the first floor.  (R. 485: Trial Tr., Dolence, PageID 14074).  The cause of death for all nine victims was asphyxia by carbon monoxide. (R. 483: Trial Tr., Gilson, PageID 13715).   The 1220 House was a rental property subsidized entirely by HUD.  (R. 482: Trial Tr.,  Dawson, PageID 13683).  The renter, Medeia Carter, perished in the fire.  The only contested issue was whether Lewis set the fire.

There were several different categories of evidence demonstrating Lewis' guilt: (1) the testimony of his lookout; (2) the cell tower and phone records placing Lewis in the sector of the fire at 3:00 a.m.; (3) the testimony of George Hightower that moments after the fire Lewis sped into his driveway, smelled of gasoline and made incriminating statements; (4) Lewis' demonstrably false alibi to law enforcement; and (5) Lewis' admissions in various forms to a wide array of witnesses.  Each will be briefly addressed below.

A.    **Lewis Sought Marion Jackson's Assistance in Setting the Fire; on May 21, 2005, Lewis Bought $5 of Gasoline, Poured It in the First Floor, and Ignited It.**

Marion Jackson, aka "Pops," gave detailed eyewitness and accomplice testimony at trial directly implicating Lewis. The two met through Samantha Collins. (R. 458: Trial Tr., Jackson, PageID 11884). Several times the week before the fire, Lewis contacted Jackson to persuade him to set fire to a residence designated by Lewis. (Id., PageID 11915). Lewis told Jackson that a "bitch" owed him money for dope. (Id., PageID 11967). After Jackson refused an offer of $1,500 to set the fire, Lewis threatened that Jackson would be blamed anyway because of his criminal record. (Id., PageID 11918, 12044).

On the night of the fire, Lewis called Jackson, instructing him to meet Lewis at East 83rd and Superior in dark clothing. (Id., PageID 11921). Lewis wanted Jackson to set the fire, but Jackson again refused, though he agreed to be a lookout. Lewis walked Jackson past the residence he wanted to burn; Jackson then accompanied Lewis to a building on East 83rd and Superior where Lewis had placed two gas containers. Jackson walked with Lewis to a gas station at the northeast corner of East 76th and Superior where Lewis purchased $5 of gas. (Id., PageID 11921-30).

Lewis and Jackson then returned to the target house. As they walked, Lewis received a cell call in which Lewis asked if the "bitch" was in the house. (Id.,

5

PageID 11932).  Lewis closed the phone, took the gas containers, entered the house and set it afire.  (Id., PageID 11937-38).  Jackson stood across the street as a lookout.  (Id., PageID 11936).  Ultimately Jackson left and took a bus home.  (Id., PageID 11939).

Minutes after the arson, Lewis drove at high speed into George Hightower's driveway, a short distance from the fire. (R. 432: Trial Tr., Hightower, PageID 10384).

Hightower called Lewis on his cell phone at 3:04 a.m. and then went to talk to him.  (Id., PageID 10385-91).  When Hightower leaned through the driver's side window to speak with Lewis, Hightower immediately smelled a gasoline odor coming from the inside of Lewis' van.  (Id., PageID 10393).  As Hightower talked to Lewis, a neighbor yelled that "Mo-Mo's" (i.e., Moses Marshall) house was on fire.  (Id., PageID 10395).

Hightower told Lewis that Mo's house on Decker was ablaze. (Id., PageID 10398).  Lewis corrected Hightower, stating that the house on fire was on E. 87th Street, not on Decker.  (Id.).  Hightower insisted that he just heard from the neighbor that it was the house on Decker, and Lewis replied, "I told you, 87th. You don't know shit about it."  (Id.).

6

**B.      Marion Jackson Volunteered to Investigators that He Was Present When the Fire Started.**

On September 30, 2005, investigators interviewed inmates at Cuyahoga County jail who had allegedly heard Lewis make statements about the fire. One of the inmates was Marion Jackson. (R. 458: Trial Tr., Jackson, PageID 11946). After initially relating what he had purportedly overheard Lewis say in the jail, Jackson broke down and volunteered that he was Lewis' lookout. (Id., PageID 11946-47).

Jackson's admissions, which were against his own penal interest, were given voluntarily and without any proffer protection, immunity, or offer of assistance from law enforcement. Indeed, the only reason that he was not separately prosecuted based on these admissions was that they were not Mirandized. (R. 494: Trial Tr., Serrat, PageID 14583).

**C.      Cell Phone Records Place Lewis in the Fire Zone During the Arson Around 3:00 a.m.**

Doug Smith, a network engineer with Revol Wireless (the provider for Lewis' cell phone), testified about the location of Lewis' phone during the night of the fire. His testimony was based on Lewis' cell phone records and the cell tower sites with which Lewis' phone communicated during the night and early morning hours of May 20-21, 2005.

7

In contrast to Lewis' statement to ATF regarding his whereabouts just before the fire (section D, infra), the Revol records showed that Lewis had lied and that he was not in the "Browns" housing project sector before the fire. (R. 456: Trial Tr., Douglas Smith, PageID 11773).

For the calls Lewis received just before and immediately after the fire started – one from his girlfriend Janine Chisholm and one from George Hightower at 2:53 and 2:56 a.m. respectively – Lewis was in the same cell site and sector as the fire. (Id., PageID 11774, 11776-77). Lewis remained in the fire sector when he called Chisholm at 2:57 a.m. (Id.).

Lewis' phone records also corroborated Hightower's testimony. They support that immediately after the fire, Hightower called Lewis from Hightower's driveway, as a call at 3:04 a.m. from Hightower to Lewis registered in the same sector as Hightower's home. (Id., PageID 11770-71).

### D.    Lewis Made Numerous Inculpatory Statements

1.    *Statement on the Night of the Fire to George Hightower*

Within minutes of the fire, Hightower remarked that the fire was at "Mo-Mo's" house on Decker, and Lewis immediately corrected Hightower, stating that the fire was on E. 87th Street. (R. 432: Trial Tr., Hightower, PageID 10398). Lewis knew the location of the fire before anyone could have told him that information.

8

2.    *May 2005 Conversation with Charise Frazier and Carmella Smith*

Shortly after the fire, Carmella Smith and Charise Frazier approached Lewis to buy marijuana.  (R. 455: Trial Tr., Carmella Smith, PageID 11617).  He sold them the marijuana and agreed to share extra with them if they would all smoke it together.  They sat in his parked van, smoking the marijuana.  (Id., PageID 11620).  During this encounter, which both Frazier and Smith stated was either the day of, or the day before Lewis was arrested, Lewis made incriminating statements showing he had firsthand knowledge of the fire.  He told the women that he had been using "wet," also known as "woo," and was "f---ed up about the fire." (Id., PageID 11623-24; Charise Frazier, PageID 11676).

He told the women all he wanted was his "dope and clothes[1] and stuff."  (R. 455: Trial Tr., Carmella Smith, PageID 11626).  He also gave the women odd information about the fire, including statements that "one was dead on the side of the bed already," and that used condoms were at the scene.  (Id., PageID 11626).

---

[1]    The reference to "clothes" concerned a possible motive.  Sharese Williams, who spent considerable time at Carter's house, had paid bail money for Lewis on an unrelated offense. (R. 460: Trial Tr., Illig, PageID 12231). Lewis skipped and Williams forfeited the money.  As a result, Williams stole all of Lewis' clothes. (R. 441: Trial Tr., Sharese Williams, PageID 10580). Although Williams was at work when the fire occurred, her daughter Shauntavia died in the blaze.

ATF interviewed Frazier and Smith for the first time on October 6, 2008, 3½ years after the fire. (R. 455: Trial Tr., Frazier, PageID 11674). After the defense knew that Frazier had been interviewed and might be a witness, Lewis sent her a letter on July 14, 2009, which was unusual because Frazier did not know Lewis well. (Id., Frazier, PageID 11686-89); (R. 550-3: Trial Exhibit 28, PageID 17243). In the letter, Lewis referred to their post-fire meeting in the van. (R. 455: Trial Tr. Frazier, PageID 11691-92); (R. 550-3: Trial Exhibit 28, PageID 17244). Lewis implored Frazier to support him in connection with the arson investigation:

> The reason I'm writing you is, because as far as I know we always been cool plus . . . I know you ain't going for that bull shit these white people tryin to put out there bout the kid and I just need a good friend in my life right now. Somebody that's go keep it one-million with a real nigga no matter what. I know I'm askin for a lot, but if you a "G" like I think you is then it ain't go be shit for you to fuck with a nigga of my caliber.

(R. 550-3: Trial Exhibit 28, PageID 17243).

Frazier was concerned that Lewis had learned where she lived, which was not where she was when she last saw him; she interpreted the letter to be an attempt to "pretty much" keep her mouth shut and take Lewis' side in the investigation. (R. 455: Trial Tr., Frazier, PageID 11692-93).

### 3.    *Lewis' False Alibi to James Stokes*

In the second trial, the Government introduced an additional false alibi that was not presented in the first trial. James Stokes testified that approximately two

to three days after the fire, he and Sharese Williams met with Lewis in his van to confront him about the rumors that Lewis set the fire. (R. 446: Trial Tr., Stokes, PageID 11118-19). Lewis responded that he did not set the fire, but was at the "fiend house all night." (Id., PageID 11119). Lewis added that it was the "fiend" (understood to be a reference to George Hightower) who informed him of the fire. (Id., PageID 11120). As stated, Hightower testified that Lewis did not arrive until after 3:00 a.m.

### 4.    *Lewis' False Alibi to Investigators*

On May 25, 2005, Lewis surrendered on pending warrants in an unrelated case. (R. 460: Trial Tr., Illig, PageID 12172). Investigators interviewed him about the fire on May 31, 2005. (Id., PageID 12163).

Lewis admitted that he had been to the 1220 House because of his "play mother" Sharese Williams' relationship with Carter. (R. 460: Trial Tr., Illig, PageID 12120). Sharese spent much time at Carter's house because her daughter, Shauntavia, was living there while finishing school. Lewis explained that, before the fire, he had a dispute with Williams because she had taken his clothes after Lewis failed to appear for a scheduled court date, which resulted in Williams forfeiting a bond she had posted. (Id., PageID 12124).

Concerning his whereabouts the night of the fire, Lewis admitted that he bought $5 of gasoline from the Citgo at East 79th and Superior, but then he

corrected himself, saying it might have been the Citgo on Chester; then he paused,

saying that the gas purchase may have been on a different night.  (Id., PageID

12131-32).  At some point Lewis retrieved a CD from Hightower's house and went

directly to the "Browns" housing project, parked, listened to music, had phone

calls with Williams and her daughter Sharay, during which Lewis never spoke but

only played music for them, smoked marijuana, and did ecstasy.  (Id., PageID

12131).

While he was at the Browns, two cars entered the lot, which made Lewis

nervous, so he backed onto Kenmore and drove directly to Hightower's house.  (Id.,

PageID 12130).  Lewis claimed he first learned about the fire from Hightower,

though Lewis admitted he corrected him about the fire location.  (Id., PageID

12133).  As noted, the cell phone records showed that Lewis was not at the Browns

housing project before the fire.

### 5.    *Statements to Prison Inmates*

Lewis also made a series of corroborating, incriminating statements to

inmates while he was incarcerated, some of which were introduced at trial.

### a.    Paul McKeever

Lewis told fellow Grafton Correctional inmate Paul McKeever that he set

the fire; "Pops" (Jackson) was supposed to set the fire until he "backed out." (R.

442: Trial Tr., McKeever, PageID 10821).  Lewis told McKeever that "Pops" was

12

standing across the street and was the one person about whom Lewis was worried.
(Id., PageID 10795).  Additionally, Lewis said he was not worried about "Sam"
(Collins) because she had never called the police on him. (Id., PageID 10820).

McKeever testified that after Lewis became suspicious of him, Lewis "said
he could have someone burn my family like he did theirs."  (Id., PageID 10834).
Lewis said it would be easy to find them because McKeever, a sexual offender,
would have to "register."  (Id.).  McKeever also heard Lewis shout to another
inmate to "find Pops" upon his release.  (Id., PageID 10835).

McKeever testified again at the second trial and again received no benefit
from the government.  In fact, he was worse off for having testified in the first trial
as he confirmed that his first trial testimony resulted in concerns for his safety.  (R.
442: Trial Tr., McKeever, PageID 10817-18).

b.   Rick Wheeland

On June 4, 2006, Grafton Correctional inmate Rick Wheeland sent a letter to
his girlfriend outlining conversations he overheard between his cell mate,
McKeever, and Lewis:

> Lewis and Paul were mentioning a "Sam" and a "Pops" and
> Paul said he knew Sam. Lewis said, "there is only one person that can
> hurt me and it's not Sam I'm worried about, it's Pops." Then Paul
> asked Lewis, "well what about all those kids?" and Lewis responded,
> "it wasn't meant for the kids, it was meant for Nicole." I sat down
> with my back to them around 5 feet away and heard Lewis in the
> middle of a sentence saying, "Sam didn't know the whole story and

13

> that 'they' owed him (or something) and that it was either that or
> shoot the bitch." He then said, "that's why they don't have nothing on
> me, fire covers everything up." Then McKeever said, "yeah, but what
> about those kids?"  Lewis then told Paul that he didn't know they
> were there nor did he intend to kill them.

(R. 550-4: Trial Exhibit 34, PageID 17247); (R. 448: Trial Tr., Wheeland, PageID

11312-13).

Although unable to hear the entire conversation, Wheeland also heard Lewis

say that he entered the house through the side door and that when he came out, his

lookout "bitch was gone."  (Id., PageID 11314).

In the second trial, the Government presented Wheeland's girlfriend,

Madelon Kominic, who corroborated that Wheeland was reluctant to be involved,

but she ultimately found Special Agent Gregg on his behalf.  (R. 490: Trial Tr.,

Kominic, PageID 14336).

Wheeland testified again at the second trial and again received no benefit

from the government.

### c.    Daniel Id'Deen

Id'Deen overheard a conversation between Lewis and McKeever at Grafton

Correctional. Lewis and McKeever were talking about a girl they knew named

"Sam." (R. 447: Trial Tr., Id'Deen, PageID 11221-22).  Lewis said that he wasn't

worried about "Sam" but that "Pops could" hurt him.  (Id.).  Id'Deen heard

McKeever ask, "what about those kids?"  (Id., PageID 11222).  Lewis said it

14

wasn't meant for the kids; it "was meant for that bitch Nicole." (Id.). Id'Deen also heard Lewis say that fire covers everything up and that he set the fire because they owed him money. (Id., PageID 11231). Lewis described "Pops" as the lookout across the street. (Id.).

Id'Deen testified again at the second trial and again received no benefit from the government, as he had already completed his sentence.

### d.    Anthony Collier

While in the segregation unit in July 2006, Anthony Collier heard an inmate ask Lewis, "why did you do it?" (R. 469: Trial Tr., Collier, PageID 12409). Lewis responded that he "was wetted out and he was on that jealousy shit." (Id.). Lewis said that he was worried that someone had "snitched on him." (Id., PageID 12459). Collier heard Lewis tell a second floor inmate about a plan to give information to that inmate that only the person who had set the fire could know. (Id., PageID 12410-11). The inmate was to report the information to the police but falsely claim that he learned it from Nicole's boyfriend. (Id.). Collier also overheard the conversation in which Lewis threatened McKeever if McKeever talked to investigators. (Id., PageID 12413).

ATF Special Agent Gregg wrote a letter to the Ohio Parole Board on July 20, 2008, nearly two years after Collier's statement to law enforcement. (Id., PageID 12421-23). The letter noted his cooperation in a federal investigation but

did not advocate for a specific result.  (<u>Id.</u>, PageID 12422).  Collier was paroled in February 2009, and approximately one year later he was convicted of three counts of robbery and sentenced to two years in state prison on each count.  (<u>Id.</u>, PageID 12423-24).

Collier testified again at the second trial and received no benefit from the government in connection with his post-parole offenses.  In fact, by the time of the second trial, Collier had suffered additional detriment, for he had received additional prison time as a result of committing the robbery offenses while on supervision.  (<u>Id.</u>, PageID 12425-28).  At the supervised release violation hearing, the government did not recommend any consideration for Collier's substantial assistance rendered in connection with Lewis' arson case; in fact, the Government recommended that Collier be sentenced to the maximum term recommended by the Sentencing Guidelines.  (<u>Id.</u>, PageID 12427).  The court sentenced him to an additional eight months of imprisonment to run consecutively to his state time.  (<u>Id.</u>, PageID 12428).

Collier also testified that after he testified in the first trial against another inmate, he was transferred to a different penal institution for security reasons.  (<u>Id.</u>, PageID 12428-29).

e.    Chris Myers

Belmont Correctional Institution inmate Chris Myers stated that in 2007 he talked to Lewis in the prison workout area.  (R. 469: Trial Tr., Myers, PageID 12507).  Once, the topic of conversation was "snitches."  (Id., PageID 12508).  Lewis asked Myers if he wanted to make money or if anybody he knew wanted to make money.  (Id., PageID 12511).  Lewis said that he had someone in Cleveland named "Pops" who he wanted "shut up."  (Id., PageID 12510-11).  Myers declined.

Lewis explained that a woman had ripped him off for dope or money for dope.  (Id., PageID 12512).  Myers testified, "He said that Pops was the one who was with him when the fire started, that Pops didn't want to do it, so he blazed that bitch up."  (Id., PageID 12512).  Lewis said that "Pops" stayed outside because he "bitched out" of setting the fire himself.  (Id.).

Myers testified again at the second trial and again received no benefit from the government, as he had already completed his sentence and was testifying at the second trial as a civilian.

f.    Cyle Watson

Belmont Correctional Institution inmate Cyle Watson stated that after September 2006 he talked with Lewis; they were both members of the Crips gang.  (R. 469: Trial Tr., Watson, PageID 12467).  Once, they each bragged about killing people.  (Id., PageID 12472).  Lewis recounted that he set the fire because a

17

"bitch" had ripped him off for "some money, some dope."  (Id., PageID 12473).

Lewis said he killed multiple people, though he said he felt bad about kids dying.

(Id.).  Lewis told Watson that the only person he had to worry about was an "old

man."  (Id., PageID 12474).

Watson testified again at the second trial and again received no benefit from

the government.  In fact, he was returned to prison after the first trial and the

government did not assist him.  (Id., PageID 12478).  He continues to have safety

concerns because he testified against a fellow gang member.  (Id., PageID 12478-

79).

### E.    The Defense Case

The defense called several witnesses in an effort to impeach parts of Marion

Jackson's testimony, witnesses to impeach Paul McKeever, a witness to claim that

one of the agents pressured him to implicate a different suspect, and Lewis himself

testified in the second trial.  Many of these small areas are addressed below in the

first issue, but some are not, including Teon Smith and Lewis himself.  We also

explain Michael Miller's testimony.

Teon Smith testified that he was "busted," intoxicated and high the night of

the fire.  (R. 495: Trial Tr., Smith, PageID 14718).  Smith was asleep in the

basement when he awoke to someone saying "fire."  (Id.).  Smith testified that

ATF Special Agent Gregg allegedly threatened Smith in an attempt to have Smith

implicate Moses Marshall, then-boyfriend of Medeia Carter.  (Id., PageID 14668).

Smith neither implicated Lewis, nor did he testify that anyone pressured him to

implicate Lewis.

Antun Lewis did not testify in the first trial, but did in the second.  He

testified that he disagreed with the testimony of most of the government witnesses,

at least as to all inculpatory information.  See (R. 472: Trial Tr., Antun Lewis,

PageID 13389-92).  He provided an alibi for his whereabouts during the early

morning hours of May 21, 2005, claiming that he parked his van in the fire sector,

had Janine Chisholm drive him to his father's house, and he later took the bus back

to his van and drove it to George Hightower's house, and then went to a parking lot

in the Browns housing projects.  (Id., PageID 13102-14).

The defense called Michael Miller to testify that McKeever admitted that he

conspired to frame Lewis.  There were many defects in that story.

1.    *Miller's core story had numerous inconsistencies*

**Members of McKeever's Conspiracy**. Miller's story about the members of

McKeever's conspiracy changed with each telling.  In his written statement, Miller

said that McKeever worked with ID, Twin, Myers, Pops, Sam and Marion. (R.

497: Trial Tr., Miller, PageID 15052).  In the new trial hearing, he first identified

the group members as ID, Sam and "Craig" (Id., PageID 15053), and then he

added Myers, Marion, Pops and Twin when defense counsel prompted him with

19

his written statement. <u>Id</u>.  At the second trial, Miller first claimed that the group only included ID, Pops, Sam, Marion and "Greg."  (R. 468: Trial Tr., PageID 12267-69).  Then, when prompted by defense counsel to review his statement, he added Myers.  (<u>Id.</u>, PageID 12297).  He did not include Twin until specifically asked on cross-examination.  (<u>Id.</u>, PageID 12321, 12336, 12341).

Miller did not mention Special Agent Gregg at all in his first meeting with the Lewis defense team, so the name did not appear in his Declaration.  Then, at the new trial hearing, Miller identified a new member of the conspiracy, "Craig."  (R. 468: Trial Tr., PageID 12331-33).  In the second trial, he finally got it "right" and claimed that it was someone named "Greg."  (R. 497: Trial Tr., PageID 15053).  Moreover, Craig/Greg's role changed.  At the second trial, Miller alleged that Greg provided law enforcement information that only the state could have known, but in his new trial hearing testimony he said Craig provided "legal logistics."  (R. 468: PageID 12335-36).

Miller consistently and incorrectly described "Marion" and "Pops" as two different people.  (<u>Id.</u>, PageID 12339).  McKeever said Marion liked crack and hookers, and Pops lived off the government's money.  (<u>Id.</u>, PageID 12339-40).

**McKeever's Relationship with Pops**. In his Declaration, Miller did not mention how McKeever knew Pops; in the new trial hearing, Miller testified that McKeever knew Pops from the "streets" (R. 497: Trial Tr., PageID 15057); and in

20

the second trial Miller did not mention how McKeever knew Pops until cross-examination.  (Id., PageID 15057).  But McKeever knew Pops from prison, not the streets.  (R. 458: Trial Tr., Jackson, PageID 11981; R. 442: Trial Tr., McKeever, PageID 10755-56).

### 2.    *Plausibility*

Miller's testimony required the jury to believe that McKeever, a "seasoned jailhouse informant" (R. 442: Trial Tr., Lonardo, PageID 10895), was bragging to inmates in the Cuyahoga County jail that not only was he a snitch, but he was a snitch providing false testimony about another inmate.

### 3.    *Two prior convictions for providing false information to law enforcement*

In stark contrast to all of the Government's witnesses, Miller had two separate convictions for providing false information to law enforcement.  (R. 468: Trial Tr., PageID 12257).

### 4.    *Kite/Melissa Cantoni claim false*

Miller attempted to buttress his story with a false claim that, upon realizing that McKeever had testified in United States v. Lewis, he notified prison investigator Melissa Cantoni at Lorain Correctional Institution both in person and through a written "kite."  In the new trial hearing, he claimed that he wrote a kite to Melissa Cantoni and talked to her about what McKeever said.  (R. 468: Trial Tr.,

Miller, PageID 12346).  At the second trial, he changed his story significantly: he claimed that he made oral contact with the prison investigator through a corrections officer (as opposed to the written kite), and the investigator with whom he met was named "Donna" or "Lisa" with a last name ending in a vowel.  (Id., PageID 12281, 12343).

In any event, Melissa Cantoni testified for the Government that not only was there no kite, but she denied having any conversation with Miller, and if she had had such a conversation, she would have documented it and given the information to law enforcement.  (R. 498: Trial Tr. Cantoni, PageID 15347-49).

5.    *Phone card claim false*

Miller claimed that McKeever had once asked him to borrow a phone card to call "Sam."  (R. 497: Trial Tr., Miller, PageID 15048).  In his new trial hearing testimony, Miller added that he agreed to the request and in fact overheard McKeever speak to "Sam" on one occasion so that McKeever and Sam could "get their stories straight."  (Id., PageID 15048-49).  Then at the second trial, Miller did not mention the subject on direct examination, and on cross it appeared that he was retreating from the claim that he actually overheard a conversation between McKeever and Collins.  (Id., PageID 15049).  Like the kite claim, there was a logical reason he retreated from this claim – he then knew that it was unsupported.

22

The record fairly supports the proposition that McKeever used Miller's phone card to attempt to make five phone calls, all of them to Phillip Reed, not Samantha Collins.  (R. 495: Trial Tr., Christopher, PageID 14930-32). It is also equally established that none of those five calls actually were completed, as the phone records showed that the calls were not successful.  Id.  The defense did not assert that any other calls could be attributed to McKeever on that phone card.

### 6.    *"Joe" claim false*

In his first attempt to contact the Lewis defense team, Miller wrote a letter in late May 2011 to Timothy Ivey.  (R. 468: Trial Tr., Miller, PageID 12306).  After he informed the defense that he had finally "made sense" of matters that McKeever had allegedly told him while they were confined together, Miller stated that he also had corroboration for his story: "Also I know of one other inmate that was locked up with McKeever and I, who can confirm some of the things McKeever told us." (Id., PageID 12318).  Miller's statement did not identify the inmate who could corroborate "some of the things McKeever told [them]."  At the second trial, Miller again claimed that such an inmate existed, named Joe Nemitz. Miller claimed that Nemitz heard some of what McKeever allegedly told Miller about his conspiracy. (R. 468: Trial Tr., Miller, PageID 12320).  This would have included McKeever admitting to being a snitch who was using false information.  (Id., PageID 12325). The Government called Joe Nemitz, who testified that he heard from Miller at

23

some unspecified time that McKeever was a snitch, but he did not hear that from

McKeever as Miller claimed.  (R. 498: Trial Tr., Nemitz, PageID 15369-70).

7.    *Primary motive false*

In his Declaration, Miller stated that his motive for providing his story was

that he "did not want Mr. Lewis to spend the rest of his life in jail for a crime he

did not commit."  (R. 468: Trial Tr., Miller, PageID 12352).  At the second trial,

Miller revealed that when he initially came forward he had another motive – he

wanted to help himself, and asked his attorney to explore the idea of having his

sentence reduced in exchange for his "information."  (R. 468: Trial Tr., Miller,

PageID 12293-94).  Miller admitted this early in his testimony because he had

learned at the new trial hearing that the Government had recordings of him telling

family members that he expected to obtain a reduced sentence for his McKeever

story.  (Id., PageID 12365).  Miller therefore conceded that he was initially

motivated to come forward to obtain a sentence reduction.  He admitted that is

what he told his family and a close friend, by both letter and in a telephone call.

(Id., PageID 12361-64).

Miller also admitted that after June 7, 2011, when he first met with the

Lewis defense team and was allegedly informed that they could do nothing for

him, he nevertheless told his mother that if the government offered him a sentence

reduction in return for keeping silent about the framing of an innocent man, he would have gone with the government.  (Id., PageID 12364).

        8.    *No corroboration of any details*

Miller's story and the general storyline that McKeever orchestrated a conspiracy to frame Lewis were revealed only *after* two key events: (1) the publication of all Cleveland Plain Dealer articles containing numerous witness names and defense themes; and (2) defense attorney Lazarus' June 2, 2011 phone call in which he told Miller what the Lewis defense team believed that McKeever had done.

Almost every name and defense theme in Miller's testimony appeared in a series of Cleveland Plain Dealer articles.  While Miller denied reading more than just half of the February 14, 2011 article, he admitted he read all of the articles his cellmate had.  (R. 468: Trial Tr., Miller, PageID 12304).  When counsel asked Miller on direct examination about the source of his information, Miller answered, "From Paul McKeever and the newspaper article."  (Id., PageID 12295).

### F.    Motion for New Trial

After the jury found Lewis guilty, he filed a motion for a new trial on February 6, 2014.  The government opposed the motion on March 5, 2014.  (R. 510: Government Response in Opposition, PageID 15855).  The district court

denied relief on June 5, 2014.  (R. 523: Order Denying Motion for New Trial,

PageID 16161).

## SUMMARY OF THE ARGUMENT

The district court did not abuse its discretion in denying Lewis' request for a third trial.  The court found that Lewis failed to show the evidence in the second trial preponderated heavily against the guilty verdict.  United States v. Hughes, 505 F.3d 578, 593 (6th Cir. 2007).  The second trial was not identical to the first.  The trial took nearly twice as long as the first, including 71 witnesses (as opposed to 47 in the first trial).  For the government's part, its case included new evidence in the form of an additional false alibi, additional corroboration of crucial testimony regarding government witnesses Marion Jackson, George Hightower, and the inmate informants, and additional evidence refuting the defense's attempted impeachment of Marion Jackson.  The second trial also removed two key facts upon which the district court had relied in granting the second trial, facts that had formed the basis for a possible benign explanation regarding two highly inculpatory facts.  And the second trial also included for the first time Lewis' testimony, thus completing the full picture for the district court's weighing of the evidence.

On appeal, Lewis focuses on six areas that he claims show that a new trial is warranted based on the weight of the evidence.  But considering all of the facts in each of those topics, as well as considering additional areas of inculpatory evidence, the district court properly denied relief.

27

In his second argument, Lewis claims that the prosecutor's reference to a false alibi involving Lewis committing a robbery at the time of the fire was flagrant misconduct that should result in a third trial. But the prosecutor never said that *Lewis* claimed he committed a robbery, so the comment was not improper. And even if it were, it was isolated, it related to one of four issues contained in one of the eight "pillars" of inculpatory evidence, and the district court cured any potential for prejudice with two instructions.

Lewis argues in the third issue on appeal that his arson conviction is a purely local issue and <u>Bond v. United States</u>, 134 S. Ct. 2077 (2014), compels the Court to vacate the conviction. Lewis never raised this claim below, so it is forfeited. And even if he could raise it now for the first time, it is meritless because the Supreme Court has already held that the conduct at issue – arson of a commercial rental property subsidized with federal funds – may be prosecuted federally.

# ARGUMENT

**I.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN
DENYING LEWIS' MOTION FOR A NEW TRIAL BASED ON THE
MANIFEST WEIGHT OF THE EVIDENCE**

### A.    Standard of Review

Because a jury verdict is presumptively valid, Lewis must show that the trial
"evidence preponderates heavily against the verdict."  Hughes, 505 F.3d at 593.
This Court reviews a district court's decision to deny a motion for a new trial for
abuse of discretion.  Id.

### B.    Discussion

After almost three weeks of trial testimony in which 47 witnesses testified,
the first jury took almost 11 hours to reach a unanimous guilty verdict.  The second
trial lasted almost twice as long, involved the testimony of 71 witnesses –
including the defendant and his "eyewitness" supporting his government
conspiracy claim – and the second jury took approximately 5 hours to reach its
unanimous guilty verdict.  Thus, 24 jurors have now found Lewis guilty beyond a
reasonable doubt.  Lewis fails to show the district court abused its discretion in
finding that the evidence did not preponderate heavily against the verdict.  Hughes,
505 F.3d at 593.

Lewis uses hyperbole.  He argues that the government presented the
identical case in the second trial, and thus he is entitled to a third trial.  (Lewis'

Brief, p. 34) ("exact same evidence;" "exact same case;" "same exact prosecution"). This claim is false. In the second trial, the government introduced new or additional:

- false alibis, including a demonstrably false alibi Lewis provided to James Stokes just two days after the fire;

- corroboration for Lewis arriving at Hightower's house driving at a high rate of speed at 3:04 a.m.;

- evidence refuting the defense argument that Lewis learned about the fire much later in the morning;

- testimony that Lewis carried a second "drug" phone – which directly contradicted Lewis' trial testimony – thus explaining the absence of calls definitively traceable to Jackson and Collins from Lewis' personal phone;

- details from George Hightower that corroborated his testimony and confirmed that he was reluctant to incriminate Lewis;

- corroboration for the inmate testimony;

- testimony on the insignificance of the lack of an RTA vomit report for Marion Jackson's bus; and

- impeachment of Bruce Thomas' testimony regarding two aspects of Jackson's testimony (in the form of new witness Michael Spates).

There were also several examples of testimony not admitted during the second trial upon which the district court had relied in its order granting the second trial:

- the basis for speculating that Carmella Smith may have been biased for the Government was absent from the second trial; and

- the testimony that allowed a speculative benign explanation for the gas smell emanating from Lewis' van is absent from this record.

Another contrast to the first trial is that Lewis testified in the second. He offered a never-before-revealed alibi, which the jury and the district court rejected.

Lewis' appeal is another attempt to re-characterize the evidence and omit much of it to receive another windfall, a third trial, hoping that the Government will tire of re-trying Lewis. The district court properly exercised its discretion in declining the invitation; this Court should do likewise.

We now address the six categories of evidence Lewis claims preponderates heavily against the verdict: (1) motive; (2) Marion Jackson; (3) inmate testimony; (4) Samantha Collins; (5) George Hightower; and (6) the cell phone records. We do not repeat the inculpatory evidence Lewis ignores, which is summarized in the Statement of the Case.

### 1. **Motives**

Lewis spends over four pages claiming that the government failed to prove motive. But he does not address the distinction between true motive and *Lewis'* stated motive. That the Government could not prove that someone in the 1220

House owed a drug debt is immaterial – several witnesses confirmed that *Lewis* spoke about a drug connection as a reason for starting the fire.

While Lewis tacitly concedes that the Government had no duty to prove motive, he nevertheless claims it was legally relevant because the district court gave a pattern instruction that "the presence or absence of motive is a circumstance which you may consider as bearing on the intent of the Defendant." (Lewis' Brief, p. 39) (quoting R. 501: Jury Instructions, PageID 15462-63). Lewis omits the rest of the instruction that confirms its irrelevance: "proof of motive is not a necessary element of the crime with which the defendant is charged. Proof of motive does not establish guilt, nor does lack of proof of motive establish the defendant's innocence." (Id., PageID 115461). Lewis also omits the first clause of the sentence he did quote, which indicates that its relevance is predicated on the jury first finding the defendant guilty: "If the guilt of the defendant is shown beyond a reasonable doubt, it is immaterial what the motive for the crime may be or whether any motive . . . be shown, but the presence or absence of motive is a circumstance which you may consider as bearing on the intent of the defendant." Id. Motive was only legally relevant to a limited issue concerning Lewis' intent; it was not an element in proving guilt.

Lewis attempts to cloud the facts concerning one possible motive, his anger at Sharese Williams for stealing his clothes, proclaiming, "not a single person

testified Lewis was upset at Sharese [taking his clothes]." (Lewis' Brief, p. 40).

That statement is wrong.  George Hightower (R. 432: Trial Tr., PageID 10379-81),

Don Illig (R. 460: Trial Tr., PageID 12124, 12213), Charise Frazier (R. 455: Trial

Tr., PageID 11677, 11684) and Carmella Smith (R. 455: Trial Tr., PageID 11626,

11633) all testified about Lewis being angry that his clothes were taken.  The

district court therefore properly concluded that "the Government presented

evidence from which one could conclude that [Lewis] was angry with [Sharese

Williams] for taking his clothes."  (R. 523: Order, PageID 16172).

On the issue of the "drug debt motive," Lewis continues to confuse actual

motive with Lewis' stated motive.  The Government never claimed that it could

prove what was in Lewis' mind when he set the fire, and legally it had no

obligation to do so.  The district court correctly noted that the jury "need not

necessarily believe that the fire was set over a drug debt."  (Id., PageID 16174).

The Government could only present witnesses to testify about what *Lewis said* his

motive was.  It is possible that Lewis told different audiences, like the inmates,

different motives.  A drug debt motive may sound more defensible than stolen

clothes.

Moreover, Lewis incorrectly advances his conspiracy theory by claiming

that Jackson, Collins and all six of the inmate informants testified to a drug debt

motive.  (Lewis' Brief, p. 40).  Instead of citing to the trial transcript, he just

33

asserts "these same witnesses gave the exact same testimony" from the first trial. Id. at 41. Neither the district court's order granting the second trial, nor the first trial transcript, nor the second trial transcript supports this assertion. For example, Id'Deen, Wheeland and Collier said nothing about a *drug* debt motive. (R. 447: Trial Tr., PageID 11253) (Id'Deen's testimony that Lewis said the fire was set because somebody owed him money); (R. 448: Trial Tr., PageID 11312) (Wheeland's testimony that "Lewis said that they, plural, owed him or something"); (R. 469: Trial Tr., PageID 12445) (Collier's testimony that Lewis claimed to set the fire because he was "wetted out and [he] was on that jealousy shit").

As for Lewis' argument that Michael Miller's testimony refuted the drug debt motive and proved the conspiracy-to-frame (Lewis' Brief, pp. 41-42), we address Miller in the Paul McKeever section below.

### 2. **Marion Jackson**

Lewis claims Jackson's credibility suffered in four areas. (Lewis' Brief, p. 44). Before addressing those claims, we note areas that Lewis omits.

Lewis claims "the government failed to put on a single witness to corroborate Jackson, or address the concerns in his testimony." (Lewis' Brief, pp. 43-44). But Lewis failed to mention, much less address, several key facts in Jackson's testimony that were independently corroborated.

**$5 of gas**. Jackson testified, consistent with his written statement, that he obtained $5 of gas with Lewis the night of the fire, which mirrored Lewis' admission to SA Illig that he bought $5 of gas that night.  (R. 460: Trial Tr., Illig, PageID 12131).  Indeed, Lewis himself admitted under oath that he told this to SA Illig.  (R. 472: Trial Tr., Lewis, PageID 13340).  This is a remarkable consistency that cannot be dismissed as a mere coincidence or Jackson's guess.

**Cell site corroboration of call**. Jackson always claimed that Lewis received a brief incoming call just before he set the fire.  (R. 458: Trial Tr., Jackson, PageID 11933-34).  Cell phone records obtained after Jackson's statement corroborated this assertion as to time, direction, duration of the call, and Lewis' location during the call.  (R. 550-2: Trial Exhibit 27B, PageID 17229) (cell phone records showing a 23 second incoming call from Janine Chisholm at 2:53 a.m. with Lewis' phone located within the fire sector).  The chances are remote that Jackson could guess correctly on all four particulars of this event.

**Point of Entry and Fire location**. Jackson testified that Lewis approached the south side of the house where there was a side door.  (R. 458: Trial Tr., Jackson, PageID 11937-38).  This was the likeliest point of entry as that side door was unlocked when the last visitor in the house left and everyone was upstairs.  (R. 440: Trial Tr., Richardson, PageID 10512) (testimony of Shawnta Richardson that

35

she left both side doors unlocked when she left at approximately 1:00 – 1:15 and that the remaining occupants had gone upstairs to bed).

Jackson described where the fire initially started in the house, the north side window and the front door (R. 458: Trial Tr., Jackson, PageID 11938), which was a non-public fact corroborated by the firefighters (R. 485: Trial Tr., Stark, PageID 14157) (testimony of Lt. Stark regarding his depiction of the point of origin in the dining room and living room) and Michael Spates.  (R. 498: Trial Tr., Spates, PageID 15418-19).

a.      **Party in open lot and Jackson's position as lookout**

Jackson testified that he recalled the smell of food in an open lot on the same side of the street and several houses down from 1220 E. 87th St. when he and Lewis made the first pass by the 1220 House.  (R. 458: Trial Tr., Jackson, PageID 11927) ("It was either a cookout or a party.  All I know is that I could smell the food").  Jackson also testified that he was diagonally across the street from the 1220 House and past the open lot acting as a lookout while Lewis set the fire the second time they went down East 87th Street.  (Id., PageID 11936).

Lewis alleges that Jackson's testimony on both points is unreliable because Bruce Thomas contradicted him.  Lewis then makes a series of diametrically opposed statements.  First, he claims, after reciting the district court's desire for a better developed exploration of the facts when granting the second trial, that "[t]he

36

government chose not to answer the court's call. . . . not a single witness testified the party existed."  (Lewis' Brief, p. 45).

The record confirms that in the second trial the Government introduced new evidence on both points, the party in the lot and the feasibility that Jackson could have been across the street when Thomas claimed that he was there.  That new evidence directly contradicted Thomas on both points.

Bruce Thomas gave similar, though not identical, testimony in the second trial about the party in the open lot.  He did verify the accuracy of Jackson's drawing about the layout of the neighborhood and the position of the open lot.  (R. 495: Trial Tr., Thomas, PageID 14802-03).  He again disputed that a party occurred at the time of the fire.  (Id., PageID 14803).  But he conceded in the second trial that before he went to the bars, there was a party with barbecuing in that open lot (id., PageID 14809-10), which was different from his testimony in the first trial when he denied that there was "anything resembling a party" that night. (R. 320: First Trial Tr., Thomas, PageID 8415).  Thomas also testified that when he returned to the lot from the bars, he had been there only about five minutes before his friend Michael Spates noticed the fire, and thus he did not have any knowledge of what happened before he returned to E. 87th Street. (R. 495: Trial Tr., Thomas, PageID 14836-37).

Unlike the first trial, two witnesses testified that there was a party in the open lot that night. Shawnta Richardson testified that a group of people were partying and barbecuing in the open lot described by Jackson. (R. 440: Trial Tr., Richardson, PageID 10505). Michael Spates testified that he and three friends were in the lot earlier that night and there was a total of 10-15 people. (R. 498: Trial Tr., Spates, PageID 15394). When Spates, Thomas and two other friends returned to East 87th Street, Spates said they all went directly to the field – not in the street as Thomas claimed. (Id., PageID 15402). Spates also contradicted Thomas on who was there; Spates claimed that there were women present as well. (Id., PageID 15402). Spates then related that while he and his friends were in the field, Spates went to his car to get some beer, when he noticed smoke coming from the 1220 House; Spates then alerted his friends. (Id., PageID 15405).

On the issue of whether the lot often featured barbecuing, other witnesses generally corroborated that it was common for people to congregate in the open lot late at night and party. (R. 495: Trial Tr., Teon Smith, PageID 14732); (R. 443: Trial Tr., Marshall, PageID 10991); (R. 495: Trial Tr., Lahemma Collins, PageID 14757, 14766).

The district court correctly found that the Government introduced new evidence that corroborated Jackson on both points. (R. 523: Order, PageID 16182).

b.     **Jackson and the cell phone records**

It is true that there are no definitive cell phone connections between Jackson and Lewis.  But two other facts mitigate this lack of corroboration.  First, there were a number of calls in Lewis' recovered cell phone records that lacked subscriber information, raising the possibility that Jackson's number was in the records but could not be definitively tied to him.  (See R. 456: Trial Tr., Doug Smith, PageID 11840-42) (testimony of Smith about 20 pages of calls with unavailable subscribers and the possibility that Jackson or others could use a phone subscribed in another person's name, just as Lewis' own phone was subscribed in another person's name).  Second, the evidence in the second trial record is even stronger on the point that Lewis carried two phones, and thus Jackson could have been communicating with Lewis over the second phone, which was never identified or recovered.  (R. 498: Trial Tr., Davis, PageID 15314); (R. 498: Trial Tr., Chisholm, PageID 15242); (R. 441: Trial Tr., Sharese Williams, PageID 10538); (R. 455: Trial Tr., Sharay Williams, PageID 11552).

c.     **Jackson's Timeline**

There is no question that Jackson's time sequence in his written statement concerning the early morning hours of May 21, 2005, was wrong.  The Government never tried to hide this fact in either the first or second trial.  The

events that Jackson described could not have taken nearly as long, given what happened. But his inaccuracy about the time was fully disclosed to both juries.

In the first trial, on direct examination, Jackson did not testify about the time sequence or duration of the actions he took before or after the fire. At one point, he estimated sipping beer with Lewis for between five and ten minutes, but he otherwise did not testify about the time in relation to his activities. Instead of clinging to a timeline until re-direct examination, Jackson readily admitted when cross-examined that his estimation of time was unsteady. Defense counsel asked Jackson if he told ATF that he was with Lewis from 9:15 on May 20th until 2:30 a.m. on May 21, 2005. (R. 319: First Trial Tr., Jackson, PageID 8205). Jackson responded, "The timing may have been off, because I don't know exactly what time it was I caught the bus." Id. As defense counsel pursued the timing further, Jackson reiterated several times that he was unsure of the time: "Sir, again, my timing, I may be wrong about my timing. I could have caught the bus later. I do not recall exactly how long I was there." (Id., PageID 8205-06). Defense counsel again attempted to force Jackson to commit to the broad time frame outlined in his original written statement, but Jackson again refused: "And, again, sir, I'm telling you that I do not remember the exact time length." (Id., PageID 8206). The re-direct examination merely confirmed what the jury heard Jackson say on cross-examination.

40

At the second trial, Jackson did not "vascillate[] between these events lasting six hours and fifteen minutes." (Lewis' Brief, p. 48). Lewis' citation instead shows only that Jackson once again acknowledged that his written statement described a nearly six hour event. (R. 458: Trial Tr., Jackson, PageID 11962, 12060) (cross-examination regarding written statement).

Lewis claims that two witnesses undermined Jackson's timeline. Those witnesses did not undermine his *trial* testimony; they were only relevant to his earlier written statement. And they did not undermine anything.

Lewis produced Janine Chisholm, but her testimony that she left Lewis in the area of Union Avenue 90 minutes before the fire was completely inconsistent with her ATF interview and an interview with defense investigators in which she affirmatively denied being with Lewis the night of the fire. (R. 321: First Trial Tr., Chisholm, PageID 8609-12). Her miraculous recollection of being with Lewis – first revealed at trial – was simply incredible.

As for Lewis' second witness, Steve Gambetta did not contradict Jackson's account. He corroborated Jackson's best guess about how much time he spent with Lewis that night, testifying that the route described by Jackson covered[2] one and a

_____

[2]     Lewis implies that Jackson would have taken longer than Gambetta's 34 minutes because Gambetta was not carrying two full gas cans during the walk. (Lewis' Brief, p. 50). But Jackson never claimed that he was carrying the gas cans, and he never claimed that Lewis carried the gas cans the whole route, only the

half miles and took approximately 34 minutes to walk, well within the time that Lewis' phone went inactive until just before the fire.  (R. 495: Trial Tr., Gambetta, PageID 14941, 14942, 14946).

### d.    Recorded Conversation Between Jackson and Lewis

Lewis claims that the introduction of the December 27, 2005 recording of the meeting between Jackson and Lewis in the Cuyahoga County Jail is inconsistent with Jackson's account that he knew Lewis.  (Lewis' Brief, pp. 50-51).  But there is one striking fact about that recording that contradicts Lewis' conclusion – Lewis waited more than three minutes into the conversation to claim that he did not know Jackson.  (R. 472-1: Trial Tr., Lewis and Jackson, PageID 13002).  What person would wait three minutes into a conversation about a deadly arson to state that he does not even know the other person?  This is exactly the point to which the district court referred when ruling that the defense could play the recording: "I have read this transcript, and obviously as I read it there's a lot of things said, people can read things different ways."  (R. 472: Trial Tr., Chief Judge Oliver, PageID 13197); see also (R. 523: Order, PageID 16185) ("the contents of the recording were open to interpretation").  Lewis' reaction to Jackson was particularly odd because Lewis otherwise portrayed himself as someone so

---

second time they walked the route.  (R. 459: Trial Tr., Jackson, PageID 12016, 12093-95).

resistant to people he did not know that he would have punched Paul McKeever just for asserting that he claimed previously to have met him at the County Jail. (R. 472: Trial Tr., Lewis, PageID 13382). Here, Jackson was not just suggesting that he knew Lewis; he was talking about Lewis having set the fire that killed nine people. This conversation should have provoked an even more violent response from Lewis, but instead he calmly continued talking to Jackson.

Instead of demonstrating that the two did not know each other, the tape revealed that Lewis was keenly aware that it was odd that his lookout could arrange to meet Lewis in jail and that there was a high likelihood that it was being recorded. The evidence in support of this conclusion is Lewis' question within the first minute of the recording when he asked Jackson how he was able to enter the jail to see Lewis, which Jackson clumsily handled by saying, "I don't know, but I got in." (R. 472-1: Trial Tr., Jackson, PageID 13001). Unfortunately for Lewis, he did not think to completely disclaim any familiarity with Jackson until three minutes into the meeting.

### 3.    **Jailhouse Informants**

Lewis attacks the inmate testimony with a conspiracy theory that Paul McKeever somehow arranged for Jackson, Samantha Collins, and the other five inmate witnesses to give false testimony against Lewis. He claims that Michael Miller proved that McKeever admitted leading the conspiracy that resulted in the

43

witnesses receiving reduced sentences.  (Lewis' Brief, pp. 52-53).  And he asserts

that McKeever had other credibility problems.  Both criticisms lack merit.

### a.  **Michael Miller**

Miller's testimony was weak, unsupported and directly contradicted by other

evidence. The district court focused on two particular defects that "were damaging

to Miller's credibility and provided the jury with a sufficient basis to disbelieve

Miller's testimony."  (R. 523: Order, PageID 16216).  In addition, Lewis' claimed

corroboration for Miller was ineffective.

### i.  **Will Elliott revealed that Miller's entire story was a lie designed to help himself.**

Will Elliott testified in rebuttal that he used to work for Miller and then

became very close to him; Elliott had known him for four or five years.  (R. 498:

Trial Tr., Elliott, PageID 15375).  Elliott testified that between March and July

2011, he received a letter from Miller in which Miller admitted that he was

fabricating a story about an arson fire in order to benefit himself and reduce his

sentence.  (Id., PageID 15377).  Elliott offered this testimony against his own

interest – he was living in housing owned by George Kaschak, Miller's life partner,

which could be removed at Miller's direction.  (Id., PageID 15378-79).  Lewis

could not suggest a reason why Elliott would lie.

### ii.   **Kite/Melissa Cantoni claim false**

Miller attempted to buttress his story with a false claim that, upon realizing that McKeever had testified in United States v. Lewis, he notified prison investigator Melissa Cantoni at Lorain Correctional Institution both in person and through a written "kite."  He never mentioned this "kite" in his letter to the defense, and the written Declaration indicated only that it was an investigator.  (R. 468: Trial Tr., Miller, PageID 12342).  In the new trial hearing, he claimed that he wrote a kite to Melissa Cantoni and talked to her about what McKeever said.  (R. 468: Trial Tr., Miller, PageID 12346).  At the second trial, he changed his story significantly: he claimed that he made oral contact with the prison investigator through a corrections officer (as opposed to the written kite), and the investigator he met with was named "Donna" or "Lisa" with a last name ending in a vowel. (Id., PageID 12281, 12343).

The "oral contact through a corrections officer" was a significant change.  At the second trial, Miller obviously knew that the prison maintained all of its kites and the kite did not exist (R. 468: Trial Tr., Miller, PageID 12347), so he accounted for that fact by now speculating that the written kite was not processed in the normal channels and was never delivered.  In any event, Cantoni testified for the Government that not only was there no kite, but she denied having any conversation with Miller, and if she had such a conversation, she would have

45

documented it and given the information to law enforcement. (R. 498: Trial Tr., Cantoni, PageID 15347-49). The Government proved that Miller's claim about the kite and telling prison investigator Cantoni about McKeever was false.

### iii.   Miller's own attorney did not believe him

Instead of corroborating Miller, his attorney undermined his credibility. The record fairly supports the conclusion that Miller's attorney Jeff Richardson did not believe him. (R. 496: Trial Tr., Richardson, PageID 14988, 14992). And while Richardson tried to waffle on this point, that is the only logical explanation for why he did not report this alleged frame-up to law enforcement or even to Lewis' counsel.

Miller told his attorney that he allegedly had information about perjury in a high profile case. Richardson unquestionably did nothing with the information. He did not contact law enforcement. He did not contact Lewis' counsel. He did not ask Miller for more information to enable either of those options to occur. He only informed Miller, in response to Miller's question, that the state was unlikely to reduce his sentence in exchange for the alleged information. (Id., PageID 14987).

### iv.   Phone card claim false

Lewis claimed that records regarding Miller's phone card corroborated his story about McKeever. They did not.

46

In Miller's Declaration, he claimed only that McKeever had once asked him to borrow a phone card to call "Sam."  (R. 497: Trial Tr., Miller, PageID 15048). In his new trial hearing testimony, Miller added that he agreed to the request and in fact overheard McKeever speak to "Sam" on one occasion so that McKeever and Sam could "get their stories straight."  (Id., PageID 15048-49).  Then at the second trial, Miller did not mention the subject on direct examination, and on cross it appeared that he was retreating from the claim that he actually overheard a conversation between McKeever and Collins.  (Id., PageID 15049).  Like the kite claim, there was a logical reason he retreated from this claim – he then knew that it was unsupported.

The record shows that McKeever used Miller's phone card to attempt to make five phone calls, all of them to Phillip Reed, not Samantha Collins.  (R. 495: Trial Tr., Christopher, PageID 14930-32).  It is also equally established that none of those five calls were completed, as the phone records showed that the calls were not successful.  Id.  The defense did not assert that any other calls could be attributed to McKeever on that phone card.

b.    **Other McKeever criticism**

Lewis claims that McKeever lied about not knowing Samantha Collins and furthermore that she and McKeever were associated in a conspiracy to unlawfully frame Lewis.  Lewis failed to present direct evidence to substantiate this claim,

47

which is why the district court found that "the jury could have concluded that no such connection [between McKeever and Collins] existed." (R. 523: Order, PageID 16191).

Lewis claims that McKeever and Collins must have had a relationship because McKeever's relative and another husband of Collins lived in the same residence in 2007. But the complete picture painted by all of the witnesses on the topic showed this was a coincidence involving McKeever knowing someone who he had not seen in decades, once living in a duplex where Collins briefly lived.

The jury learned that McKeever's stepmother, Joanne McKeever, who had lost contact with McKeever when he was 18, almost 22 years prior to her testimony in court, lived in the same duplex with Collins and her husband in 2007. The year is important because it came two years <u>after</u> McKeever had first cooperated and given significant statements and evidence to the government, and a year after Collins' statement. Joanne McKeever testified that when she lived at that residence, she never had contact with Paul, nor had she ever spoken to or seen or invited him to the residence. (R. 493: Trial Tr. Joanne McKeever, PageID 14465). She added that she had not seen him with Collins and had not discussed him with her. (<u>Id.</u>, PageID 14467). In fact, the only discussions she had with Collins were to say hello. (<u>Id.</u>, PageID 14467). Paul McKeever testified that he had had no contact with Joanne since he was a child (R. 442: Trial Tr., Paul

McKeever, PageID 10901) and Joanne McKeever stated she had not had any contact with Paul McKeever since he was 18.  (R. 493: Trial Tr., Joanne McKeever, PageID 14463).

Frank Williams testified that he knew of no connection between Collins and Paul McKeever.  He testified that in April 2007 he married Collins and the marriage lasted for approximately one month.  (R. 493: Trial Tr., Williams, PageID 14482).  Williams testified that he had not seen or heard from Paul since Paul was nine or ten years old.  (Id., PageID 14483, 14494).  Frank testified he never saw or heard Paul and Collins together.  (Id., PageID 14494).

Cecilia Williams testified consistently with Joanne McKeever and Frank Williams, stating that she never saw nor did she have any information that Paul and Collins knew each other or were in any contact with each other.  (R. 493: Trial Tr., Cecilia Williams, PageID 14491).

The testimony of these three witnesses provided *no* evidence that Collins and McKeever were connected in any way, knew each other or were seen together as the defense now claims.

4.     **Samantha Collins**[3]

Samantha Collins' testimony further corroborated the evidence of Lewis' guilt and came from neither a law enforcement nor jailhouse source.

Lewis questions the lack of cell phone corroboration for Collins' testimony that Lewis spent a significant amount of time at her west side apartment. But several points mitigate this criticism. First, Collins testified that Lewis stopped coming to her apartment a week before the May 21, 2005 fire. (R. 452: Trial Tr., Collins, PageID 11435). The Government only had Lewis' records for one cell phone for the month of May, and thus the total amount of time that could possibly have been at issue is the first two weeks of May. Second, Collins was testifying about Lewis' habits over eight years ago, and given the subject matter, the inherent lack of specificity for such details, and her crack usage, it is understandable that her account of the timing and frequency of Lewis' visits may have been off.

---

[3]     Samantha was using the last name Taylor at the time of the second trial, but the parties and the district court have always referred to her as Collins.

5. **George Hightower**

a. **Hightower again provided incriminating testimony with additional corroboration in the second trial**

Like the first trial, George Hightower testified that he still considered himself like family to Lewis.  (R. 432: Trial Tr., Hightower, PageID 10371, 10372).  Despite this close relationship, Hightower reluctantly incriminated Lewis.

He testified that he was with Lewis the Friday morning before the fire and overheard him arguing with his mother over the phone about why she allowed Sharese Williams to take his clothes.  (Id., PageID 10379).  Similar to the first trial, Hightower stated that he believed Lewis was angry about that situation, so much so that he told Lewis to stop disrespecting his mother.  (Id., PageID 10380).  He testified in both trials that it was at that point that he told Lewis that if he were in Lewis' position, he would "burn her goddamn house down."  (Id., PageID 10381).  Hightower again testified that he had a phone call with Lewis at 2:56 a.m. and Lewis was not then in the driveway (id., PageID 10389, 10390), and had another call with Lewis at 3:04 a.m., at which time Lewis had just sped into the driveway from Kenmore Avenue.  (Id., PageID 10390, 10391); (R. 550-2: Trial Exhibit 27B, PageID 17229) (cell site records confirming Lewis' phone was in a sector consistent with Hightower's house).  Hightower testified in both trials that it was just after this 3:04 a.m. phone call with Lewis when Hightower came downstairs, approached the van and smelled gas inside of it.  (Id., PageID 10393, 10394).

51

Hightower stated that it "couldn't have been more than 30, 40 seconds" after

smelling the gasoline that somebody came on a bike to the neighbor's house, the

Marshalls, and began banging on the door.  (Id., PageID 10394).  Hightower said

that he then saw them "running out of the house one by one, that's Phillip, Willie,

Rosetta (sic Mosetta) which is his sister . . . everybody left but James." Id.

> b. **The Government introduced additional corroboration for the fact that Lewis sped down Kenmore into Hightower's driveway and corrected Hightower about where the fire was at approximately 3:04 a.m.**

Hightower again described that after Lewis sped into his driveway, Lewis

corrected him when he suggested the fire was on Decker Avenue.  But

Hightower's description was more detailed in the second trial:

> After all the commotion and all the banging on the door, I was like, yeah, Little Mo-Mo's house is on fire on Decker, because that's where Mo-Mo's grandmother was staying. So this was the house that I knew of, you know. This is where Mo-Mo would go and play the video games and play the Madden bullshit all day long and do what they do.
>
> So I look at him and I say, "Yeah, you know, I guess them fire trucks, that's where they're going, to the house on Decker. Mo-Mo's house is on fire on Decker."
>
> He says, "87th." I'm like, "Nah, nah, nah, I just finished talking to his father. It's on Decker."
>
> He said, "I told you, 87th. You don't know shit about it." And I go, "Okay. Cool."

(R. 432: Trial Tr., Hightower, PageID 10398).

The extra detail concerns the timing of Lewis' correction about the fire location, and it is significant.  Hightower said the correction was just after the banging on the door at Hightower's neighbor, and he said that the correction coincided with fire trucks heading to the fire.  Both of these facts are consistent with a 3:04 a.m. arrival at Hightower's, and both are inconsistent with Lewis' defense that the conversation occurred after Lewis's 4:50 a.m. call with Myesha Glass.  The trial testimony supports no other reading.

First, several witnesses provided unimpeached testimony that the "banging on the door" occurred at approximately 3:00 a.m., just after the fire.  There is no plausible scenario where the banging on the door occurred after 4:50 a.m., and that only then did Stephanie Mitchell, Phillip Marshall and Mossetta Evans leave their house and go to the fire scene.

In the second trial, the Government called two witnesses who had not testified in the first trial, and both corroborated Hightower's testimony that Lewis' correction occurred around the 3:04 a.m. call, and not later in the morning as Lewis now contends.  Phillip Marshall testified that he was in the house next to Hightower the morning of the fire, and between 2:55 and 3:00 a.m. he heard loud banging at his door.  (R. 454: Trial Tr., Phillip Marshall, PageID 11495).  Phillip answered the door and his friend Carlos Anderson informed him that his brother's house was on fire.  (Id., PageID 11496).  Phillip told his family members, and he,

his mother Stephanie Mitchell and his sister Mossetta dressed and drove in Stephanie's truck to the scene. (Id., PageID 11496-97). As they were getting into the truck, Phillip noticed that a van was parked in Hightower's driveway, though he did not know whose van it was. (Id., PageID 11499).

Mossetta Evans was also living next door to Hightower the morning of the fire. She testified that at approximately 3:00 a.m., she was in the living room walking while holding her baby, and noticed through her window that a van sped down Kenmore past the guardrail directly into Hightower's driveway. (R. 488: Trial Tr., Evans, PageID 14252-53). She recognized the van to be Lewis', who she knew by his nickname, "Cornmeal." (Id., PageID 14253). Moments later, she heard Carlos Anderson knock at the door, and after she, Stephanie and Phillip left the house, Lewis' van was still in the driveway. Mossetta recalled the smell of gas as she was getting into her mother's truck. (Id., PageID 14255-56).

Phillip and Mossetta's recollections were consistent with their mother, Stephanie Mitchell, who testified again in the second trial that she was awakened right around 3:00 a.m. (R. 487: Trial Tr., Stephanie Mitchell, PageID 14196). All three witnesses' testimony was consistent with Moses Marshall. Phillip, Mossetta, and Stephanie testified that they went directly to E. 87th Street and ran up to the 1220 House. All three testified that they were there a short amount of time before Moses Marshall arrived. (R. 488: Trial Tr., Evans, PageID 14261-62; R. 454:

54

Phillip Marshall, PageID 11497; R. 487: Stephanie Mitchell, PageID 14198).

Moses separately identified a 3:08 a.m. call from Narkita Summers as the call that

alerted him to the fire; he testified that he arrived on scene within five or six

minutes where he saw Stephanie Mitchell and Mossetta Evans, who were already

there.  (R. 443: Trial Tr., Moses Marshall, PageID 10976).

    Hightower's testimony that Lewis' correction occurred in the context of

hearing fire trucks heading to the scene is also only consistent with a 3:04 a.m.

timeframe.  There is no plausible scenario for the fire trucks heading to the scene at

4:20 a.m.  See (R. 550-1: Trial Exhibit 3d, PageID 17172) (Fire Department

Response Times Sheet, which indicates that the last fire truck arrived at

approximately 3:02:09).

    Lewis also corroborated Hightower on this point.  Special Agent Illig

testified that when Lewis accounted for his actions between 2:30 and 3:00 a.m., he

admitted that he drove down Kenmore directly to Hightower's, saw three people

on the porch next door, and after he entered Hightower's house, he corrected him

about the fire location.  (R. 460: Trial Tr., Illig, PageID 12131-33, 12193).  Lewis

also testified that he corrected Hightower about the fire location.  (R. 472: Trial

Tr., Lewis, PageID 13331).  Lewis also indirectly and inadvertently admitted the

same timeframe in his trial testimony. While Lewis had rehearsed a story that was

as consistent as he could make it with the cell phone records, he slipped about

details that he did not realize actually confirmed Hightower's testimony.  Lewis claimed that he did not arrive at Hightower's until 4:20 a.m., but he said that when he arrived he looked up E. 86th in the direction of Superior Avenue and observed a fire truck heading to the fire on E. 87th Street.  (R. 472: Trial Tr., Lewis, PageID 13330).  But all of the fire trucks had clearly arrived at the scene more than an hour before, shortly after 3:00 a.m., as stated above.

### c.    Hightower provided more incriminating details in the second trial.

In both trials, Hightower stated that at some point in the early morning hours after the above noted occurrences, he left his house and encountered an individual who told him that Lewis was involved with the fire. (R. 432: Trial Tr. Hightower, PageID 10418).  In the second trial, Hightower provided more detail about this incident.  Hightower stated that he confronted Lewis about hearing that he was involved in the fire.  Hightower stated that he told Lewis that the streets were saying he was involved.  (Id., PageID 10420-22).  Hightower described that when he basically accused Lewis of setting the fire, Lewis did not respond.  Hightower had known Lewis for a long time and on other occasions when Hightower had confronted him, Lewis defended himself and sometimes would become irate after being confronted.  (Id., PageID 10420-22).  Hightower admitted he was surprised that Lewis did not strike him for accusing him.  (Id.).

In the second trial, Hightower also provided additional testimony about Lewis' belief that Sharese Williams would be at the 1220 House that evening for a birthday party. Hightower agreed that he had told police that Lewis communicated to him that Sharay told him that he could find Sharese at Medeia's house for the birthday party. (R. 432: Trial Tr., Hightower, PageID 10426).

### d.    The Cell Phone Records Are Consistent with Hightower's Testimony

The cell phone records match Hightower's testimony perfectly. The 2:56 a.m. call is consistent with Lewis telling Hightower that he would return soon, and the 3:04 a.m. call matches exactly with Hightower's testimony that Lewis sped into his driveway; the cell phone records also corroborate Phillip Marshall and Mossetta Evans on this same point. The motive section alone addresses why Hightower's testimony about Lewis' conversation with his mother regarding the stolen clothes was accurate, as Lewis admitted the call and the cell phone records were actually not inconsistent with Hightower's account. Lewis adds in this section two other points that he claims demonstrate Hightower was incorrect about where Lewis was on May 21, 2005. Lewis stretches the facts, and ultimately both arguments fail.

The first example he cites is Hightower's statement that after Lewis arrived at his house at approximately 3:04 a.m., Lewis stayed there until later in the morning. (Lewis' Brief, p. 61). This is an overstatement. Hightower admitted that

57

after Lewis arrived at 3:04 a.m., Hightower left his house "to make a run," and thus he had no knowledge of whether Lewis left the house at any point while he was gone. (R. 432: Trial Tr., Hightower, PageID 10403, 10405). Hightower said that when he returned at one point he fell asleep, and thus again he could not account for where Lewis was during that time. (Id., PageID 10410). Hightower testified that he left the house a second time; when he returned he confronted Lewis about the fact that people on the street were saying that Lewis set the fire, so Hightower said he commanded Lewis to leave his house. (Id., PageID 10414, 10418-20). Thus, Hightower admitted there were at least three periods of time during which he could not possibly account for Lewis' location. (See R. 523: Order, PageID 16201).

The second example upon which Lewis relies is Hightower's testimony that Lewis must have been calling his own cell phone from Hightower's house phone late in the evening of May 20, 2005, which was inconsistent with the cell phone location records. (Lewis' Brief, p. 63). Lewis sought to impeach Hightower on the calls from his home phone to Lewis' cell phone with the suggestion that Hightower must have been calling Lewis to obtain crack cocaine. (Id., PageID 10441). Hightower conceded that there were times that he called Lewis for that reason, but he said on that occasion Lewis did not have any. Id. So Hightower conceded the relevant point of impeachment and when asked for the first time

more than eight years after the event, Hightower stated his belief that some of the calls in fact were Lewis calling his own phone to record a ringtone and some were Hightower calling Lewis to see if he was going to return his CD.  (Id., PageID 10437-38).  Hightower conceded that he could not identify the subject of each of the calls in the series of calls between his phone and Lewis' phone.  (Id., PageID 10468).  Unlike Lewis, Hightower had neither the opportunity nor the motivation to study Lewis' phone records and concoct an explanation for each call.  (Compare with R. 472: Trial Tr., Lewis, PageID 13271) (Lewis agreed that he had reviewed his cell phone records "many, many times")).

      e.      **Lewis Tailored an Alibi Five-Years-in-the-Making to Fit the Cell Phone Records (Lewis' Brief, pp. 64-66).**

Lewis retells his latest alibi and proclaims it consistent with the cell phone records.  The Government has already demonstrated above that the crux of his alibi – that he stopped at Hightower's house to obtain a CD and went to the Browns at approximately 3:40 a.m. (R. 472: Trial Tr., Lewis, PageID 13112-14) – is inconsistent with all of the evidence, including the testimony of at least five witnesses (Hightower, Phillip Marshall, Mossetta Evans, Stephanie Mitchell and Don Illig) and his own testimony about what happened in that timeframe.  In this section, Lewis claims that the other parts of his alibi are consistent with the phone records.  At least part of this claim is incorrect.

Lewis' story that he was in his van charging his phone and driving around the neighborhood near where he says he parked on E. 89th Street is possible during the 2:53, 2:56 and 2:57 phone calls; that is, the tower and sector records are consistent with where he now claims his van was parked.  If one only examines the phone records, (1) it is possible that Lewis could have been at his mother's and then Hightower's between 3:04 and 3:40 a.m. and (2) it is possible that he could have then been at the Browns between 3:40 and 4:20 a.m. when he then claimed to return to Hightower's house.  He had approximately five years to study the phone records and craft a story that was consistent with the cell tower maps.

When the Government asked him where he parked his van before meeting Janine Chisholm, Lewis answered, "At the 257-4 sector." (R. 472: Trial Tr., Lewis, PageID 13294).  That answer revealed the lie.  He was not testifying from his memory of what happened; he was testifying from his study of the cell tower maps.  He even added that the sector where he parked the van was 15 streets long.  Id.  That he could craft a story superficially consistent with the cell phone maps after five years of studying them proves nothing.  The inconsistencies with all of the other evidence are what undermined the alibi.

### 6. The Cell Phone Records Are Not Inconsistent With Jackson's Testimony That Lewis Received A Phone Call Just Before Setting The Fire.

Lewis argues that the phone records combined with the response and alarm time records contradicted Jackson's testimony that Lewis received a short phone call just before the fire started. Lewis retained one expert witness and consulted another (who he did not use because the testimony was contrary to his theory)[4] and called a lay witness to support his theory. But the entire theory hinged on one critical fact: in order to make Jackson's testimony implausible, the times recorded in Revol Wireless' cell phone records had to correspond or "synch" with the times recorded within the Cleveland Fire Department's response and alarm time records. Unfortunately for Lewis, the two systems did not synch to each other or to a common time, like GPS time. Even worse for Lewis, the Cleveland Fire Department official who created the record upon which Lewis relied testified that the response and alarm time records frequently ran out of synch and had to be recalibrated every month and there was no way to tell how the times actually

---

[4]    Lewis' counsel admitted that the defense interviewed a witness with knowledge of how the computer systems were maintained, and counsel admitted that they did not intend to use that witness. As Government counsel explained, the defense learned from the witness that the Cleveland Fire and Police Department systems did not synch to GPS. (R. 494: Trial Tr., Collyer, PageID 14600-01). Thus, Lewis was not surprised to learn that the system did not synch to GPS; he was unpleasantly surprised to learn that the Government also knew of its unreliability.

corresponded with GPS time: CFD's times could have been as much as ten minutes off GPS time.  (R. 494: Trial Tr., Capt. Majercak, PageID 14608).  Captain Majercak explained that the alarm and response time system had one purpose: to measure the response time.  (Id., PageID 14618).  As to that one purpose, the system was reliable, but it was unreliable about the exact alarm time because that time was irrelevant to its purpose.

Lewis attempts to confuse two different "synchronicity" issues.  He cites Captain Majercak's testimony that he "re-synched" the response time system and that he went to "great effort to make sure these records are in synch," implying that Majercak synched the response time system to GPS time, which is the standard to which Revol Wireless synched its system. (Lewis' Brief, p. 73) (quoting R. 494: Trial Tr., Capt. Majercak, PageID 14613).  But that is not what Captain Majercak was referring to; he said that he would synch the response time system to a different computer system, the CAD, not to GPS.  (Id., PageID 14613).  As the district court found, "no evidence was presented that the CAD computer system itself is synched to GPS time."  (R. 523: Order, PageID 16209).  Thus, even if Captain Majercak had synched the response time system to the CAD just before the fire occurred, that does not mean that the response time system was then synched to GPS – it would mean only that it was synched with their CAD system.

62

Lewis' expert Greg Kelley conceded the same point: if the response time system was off 10 minutes from GPS time, then his forensic results regarding the 911 calls were also off by 10 minutes.  (R. 495: Trial Tr., Kelley, PageID 14786).

### 7.    Lewis' Statements To Others

Lewis fails to mention the false alibis he gave to others. The district court noticed.  The Government summarized the numerous statements in the Statement of the Case, but one is worth emphasis.  James Stokes did not testify at the first trial.  In the second trial, he testified that two days after the fire, he and Sharese Williams confronted Lewis with rumors that he set the fire.  Lewis denied setting it and claimed he "was at the fiend house all night."  (R. 446: Trial Tr., Stokes, PageID 11119).  Stokes added that Lewis claimed to learn about the fire from "the fiend."  Id.  The district court specifically found that Lewis' alibi to Stokes was "clearly not true."  (R. 523: Order, PageID 16212).

## II.    THE PROSECUTOR'S COMMENT ABOUT A FALSE ALIBI IS NOT REVERSIBLE PROSECUTORIAL MISCONDUCT.

### A.    Standard Of Review

Where a defendant objects at trial, this Court reviews claims of prosecutorial misconduct de novo.  United States v. Kuehne, 547 F.3d 667, 687 (6th Cir. 2008).  "[T]o determine whether a prosecutor engaged in misconduct, [we first] must consider 'whether the prosecutor's conduct and remarks were improper.' "  Id. (quoting United States v. Carter, 236 F.3d 777, 783 (6th Cir. 2001)).  If the conduct was improper, the Court then determines "whether the improprieties were flagrant such that a reversal is warranted."  Id. at 687-88 (citing Carter, 236 F.3d at 783).  In considering whether a prosecutor's conduct was flagrant, this Court asks whether: (1) the conduct or remarks in question tended to mislead the jury or prejudice the defendant; (2) the conduct or remarks were isolated or extensive; (3) the conduct or remarks were deliberate or accidental; and (4) the evidence against the defendant was strong.  Id. at 688.  If the challenged remarks are not flagrant, reversal is warranted only "if proof of the defendant's guilt was not overwhelming, the defendant objected to the improper remarks, and the court failed to cure the error with an admonishment to the jury."  Id. (quoting United States v. Stover, 474 F.3d 904, 915 (6th Cir. 2007)).

## B.    Discussion

Lewis claims that the prosecutor's reference to a false alibi involving Lewis committing a robbery at the time of the fire was flagrant misconduct that should result in a third trial.  But the prosecutor never said that *Lewis* claimed he was doing a robbery, so the comment was not improper.  Even if it was, it was isolated, it related to one of four issues contained in one of the eight "pillars" of inculpatory evidence, and the district court cured any potential for prejudice with two instructions.

The Government argued to the jury that eight pillars of evidence supported Lewis' guilt: (1) Lewis' statements; (2) Marion Jackson; (3) Samantha Collins; (4) cell phone records; (5) Sharese and Sharay Williams; (6) George Hightower; (7) Carmella Smith and Charise Fraizer; and (8) the inmate witnesses.  (R. 501: Trial Tr. Corts, PageID 15498).  As part of the first pillar, the prosecutor focused on Lewis' statement to Special Agent Illig.  (Id., PageID 15498-502).  The prosecutor then mentioned that another false alibi involved a statement Lewis made to James Stokes, which was a part of that same first pillar.  (Id., PageID 15502).  Then the prosecutor described "Alibi number three, if you remember, he was doing a robbery with Pancho.  Sharese admitted telling the authorities that --" (Id., PageID 15502).  This statement is the sole basis for Lewis' argument.

The prosecutor did not say that Lewis himself crafted the alibi. In fact, he specifically said that Sharese Williams offered the alibi to law enforcement. During trial, Williams testified about these facts. (R. 441: Trial Tr., Williams, PageID 10634). A prosecutor is permitted to refer to witness testimony. Lewis relies on a hypertechnical reading of the word "alibi," assuming that everyone would understand that the term necessarily included within it the notion that the defendant is the one who claimed it. But there is nothing about the word that connotes a personal statement by the defendant – an alibi can be offered on a defendant's behalf by someone else.

The prosecutor clarified before the jury that it was Sharese Williams who offered the alibi on Lewis' behalf: "Sharese testified on direct examination that *she* offered the agents an alibi that the defendant was out on a robbery with Pancho." (Id., PageID 15503) (emphasis added). The district court understood the prosecutor's claim to be that it was Sharese's statement: "You said she offered him an alibi." (Id., PageID 15504). The prosecutor agreed with this characterization: "It is offered on behalf of him by Sharese Williams." (Id., PageID 15505). When the parties left side-bar, the Court clarified this point for the jury: "I think what we are trying to do is just clarify that Miss Williams was talking about something that someone told her, that she wasn't giving him a false alibi herself. She was not participating giving him an alibi that was false, but reporting something she'd

heard." (Id., PageID 15507). The prosecutor then read from the trial transcript containing Sharese Williams' testimony, which included her statement that "someone told [her] that Antun and Pancho – Pancho said that he was doing a robbery at the time." (Id., PageID 15506-07).

The prosecutor never said that Lewis made the false alibi claim. He correctly said that Williams provided that information to police. There was no improper statement. The Court therefore must deny relief. Kuehne, 547 F.3d at 687.

Even if the prosecutor's comments could somehow be interpreted to have attributed the false alibi statement to Lewis, it was not flagrant. The statement had no tendency to mislead the jury or prejudice the defendant as the prosecutor never claimed Lewis made the statement. The prosecutor's comment was brief – Lewis relies exclusively upon part of a single sentence occurring at PageID 15502. Given the prosecutor's subsequent verbatim reading of the trial testimony at issue, the statement (assuming arguendo that it was improper) was accidental. And as recounted under the first argument, the evidence against Lewis was strong. The comment therefore was not flagrant. Kuehne, 547 F.3d at 688.

If there were any potential for prejudice, the district court cured it by twice instructing the jury about what the prosecutor was arguing. Kuehne, 547 F.3d at 688. In addition to the instruction quoted above, the court added at the end of the

67

discussion about the Sharese Williams statement: "We had a discussion, and I ruled on this at side-bar, and there was certain information that Miss Williams shared, but it doesn't indicate that she was saying this herself.  She was sharing information that she had heard, and so she was not providing a false alibi for him in the way that we were talking about.  So we will move forward now from there." (R. 501: Trial Tr., Chief Judge Oliver, PageID 15509).

### III.    LEWIS' ARGUMENT THAT ARSON OF A RENTAL HOUSE SUBSIDIZED WITH FEDERAL FUNDS IS A PURELY LOCAL CRIME IS FORFEITED AND MERITLESS.

#### A.    Standard Of Review

Where, as here, Lewis did not object below to tapplying the federal arson statute to his conduct, this Court may only review for plain error.  United States v. Olano, 507 U.S. 725, 732 (1993).

#### B.    Discussion

Lewis argues that the district court incorrectly applied 18 U.S.C. § 844(i) to a purely local issue and his conviction should be vacated under the Supreme Court's ruling in Bond v. United States, 134 S. Ct. 2077 (2014).  (Lewis' Brief, pp. 81-85).  Lewis failed to raise this claim below, so it is forfeited.  Even if he could raise it now for the first time, it is meritless because Supreme Court precedent demonstrates that this arson may be prosecuted federally.

Lewis admits that he did not raise this claim below.  His excuse is that Bond was not decided until after his sentencing.  But that did not stop Bond herself from raising her federalism claim in the district court.  134 S. Ct. at 2085.  Lewis could have raised his federalism claim below, and his failure to do so renders the claim forfeited.  Olano, 507 U.S. at 732.

Even if he could raise it now for the first time, Lewis' claim lacks merit, and he fails to show plain error.  The Department of Housing and Urban Development

("HUD") Section 8 funding financed the rented house that was located on 1220 E.

87th Street.  The Supreme Court has already definitively addressed the question of

whether Congress intended the federal arson statute to apply to such rental

property.  In Russell v. United States, 471 U.S. 858, 105 S. Ct. 2455 (1985), the

Supreme Court held that the rental of a local apartment unit was "merely an

element of a much broader commercial market in rental properties."  Id.  The court

interpreted legislative history as showing that Congress intended for 18 U.S.C.

§ 844(i) to protect "at least . . . all business property as well as additional property

that might not fit that description."  Id. at 862.  Medeia Carter, the adult victim,

was unquestionably renting the house located at 1220 E. 87th Street when the fire

occurred, and she relied upon federal Section 8 housing funds to pay her rent, thus

increasing the federal interest in the property.

Lewis counters that principals of federalism make this a purely local crime

and Congress failed to demonstrate an intent for the federal arson statute to apply

to a local crime.  He relies upon Bond, but that case did not purport to overrule

Russell v. United States, where the Supreme Court stated that "the rental of real

estate is unquestionably such an activity," referring to interstate commerce.  Id. at

862.  With Russell still good law, there cannot possibly be plain error.

Closer examination of Bond does not compel a different result.  The

Supreme Court held that the chemical weapons statute, 18 U.S.C. § 229,

implementing by the Chemical Weapons Convention, did not include local criminal activity because it was enacted by Congress to punish crimes akin to terrorism.  <u>Bond</u>, 134 S. Ct. at 2090.  The Court said that the federal government had a "substantial interest in enforcing criminal laws against assassination, terrorism, and acts with the potential to cause mass suffering."  <u>Id.</u>  The Court concluded that Congress' intention in creating the statute was to meet "the global need to prevent chemical warfare."  <u>Id.</u> at 2093.  It ruled that the defendant's use of chemicals against her husband's mistress did not fit the statute because there was no clear indication that Congress intended for the statute "to treat a local assault with a chemical irritant as the deployment of a chemical weapon."  <u>Id.</u>  As to Lewis's case, the Supreme court held in <u>Russell</u> that Congress intended 18 U.S.C. § 844(i) to apply to the arson of rental property.

In <u>Bond</u>, a wife obtained two different chemicals and spread them on a rival mistress' car door, mailbox, and door knob hoping the mistress would develop an uncomfortable rash.  <u>Id.</u> at 2085.  The Court decided that the severity of the crime did not warrant the use of the federal chemical weapons statute because the defendant's assault did not result in a crime synonymous with "assassination, terrorism, and acts with the potential of mass suffering."  <u>Id.</u> at 2090.  Bond's plot against the mistress was a "garden-variety assault."  <u>Bond</u>, 134 S. Ct. at 2090.  Here, the fire at 1220 E. 87th Street killed nine people—including eight minor

71

children—and injuries to two others.  This act of fatal violence is directly

addressed by 18 U.S.C. § 844(i), which states, "Whoever maliciously damages or

destroys, or attempts to damage or destroy, by means of fire or an explosive, any

building, vehicle, or other real or personal property…and if death results to any

person…shall also be subject to imprisonment for any term of years, or to the death

penalty or to life imprisonment."  Id.

Moreover, Bond involved a different Constitutional provision.  The Supreme

Court in Bond specifically said that the government had not tried to defend Section

229 under the Commerce Clause.  Thus, the Bond case arose in the field of

legislation implementing an international treaty, an area where Congress would be

least likely to intend to regulate a local assault crime.  The Russell decision is flatly

under the Commerce Clause, meaning that there is no way Bond, decided under a

different clause of the Constitution, could have intended to overrule Russell sub

silentio.

United States v. Toviave, 761 F.3d 623 (6th Cir. 2014), offers Lewis no

more solace.  This Court held that the defendant ordering his four young relatives

to do chores, cook and clean, do laundry and babysit and beat them if they failed to

comply did not violate 18 U.S.C. § 1589, the forced labor statute.  This Court

stated that causing physical harm to a child is child abuse under applicable state

law.  Id. at 626.  This Court also recognized the Supreme Court's previous finding

72

that family relations are "a traditional state concern." Moore v. Sims, 442 U.S. 415 (1979). Because there was applicable state law, precedent by the Supreme Court on the issue, and an uncertainty of Congress' intentions, this Court ruled in defendant's favor.

Here, a traditional federal interest is present, given the involvement of interstate commerce. Commerce issues are not traditionally of exclusive state concern, and Congress' purpose for 18 U.S.C. § 844(i) was clear at its inception, as recognized by the Supreme Court in Russell. This Court should reject Lewis' argument.

## <u>CONCLUSION</u>

The jury's unanimous verdict is supported by strong evidence from multiple sources. The district court properly exercised its discretion in denying Lewis a third trial.

Lewis fails to show that the prosecutor committed misconduct in a brief, isolated reference to a witness (not Lewis) who testified about a possible alibi for Lewis, which the district court addressed with two instructions.

Lewis forfeited his federalism claim by failing to argue it below. Moreover, since the Supreme Court held in <u>Russell</u> that arson of a commercial rental property is a federal crime, there cannot be plain error. This Court should affirm.

Respectfully submitted,

STEVEN M. DETTELBACH
United States Attorney

By:  /s/ Michael L. Collyer
Assistant U.S. Attorney
United States Court House
801 West Superior Avenue, Suite 400
Cleveland, OH 44113
Telephone No: 216-622-3744
Facsimile No: 216-520-2403
E-mail: Michael.Collyer@usdoj.gov

## <u>CERTIFICATION OF COMPLIANCE WITH WORD LIMITATION</u>

I hereby certify that the foregoing contains 15,997 words according to the word counting feature of Word 2010 and complies with this Court's 17,500 word limitation, as extended by order of the court on April 16, 2015, for Appellee's brief.

/s/ Michael L. Collyer
Michael L. Collyer
Assistant United States Attorney

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 22nd day of April, 2015, a copy of the foregoing

Brief of Plaintiff-Appellee, was filed electronically.  Notice of this filing will be

sent to all parties through this Court's electronic filing system.  Parties may access

this filing through the Court's system.

/s/ Michael L. Collyer
Michael L. Collyer
Assistant United States Attorney

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

Pursuant to Sixth Circuit Rule 30(b), the following filings from the district

court's records are designated as relevant to this appeal:

| Record No. | Document Description | Page ID #s |
|---|---|---|
| 1 | Indictment | 1 - 5 |
| 319 | 1st Trial Transcript | 8205 - 8206 |
| 321 | 1st Trial Transcript | 8609 - 8612 |
| 320 | 1st Trial Transcript | 8415 |
| 324 | Motion for New Trial | 8925 - 9022 |
| 327 | Response to Motion for New Trial | 9028 |
| 332 | Second Motion for New Trial | 9177 |
| 338 | Response to Second Motion for New Trial | 9208 |
| 359 | Order | 9741 - 9835 |
| 432 | 2nd Trial Transcript | 10363 - 10482 |
| 440 | 2nd Trial Transcript | 10512 |
| 441 | 2nd Trial Transcript | 10525 - 10722 |
| 442 | 2nd Trial Transcript | 10723 - 10941 |
| 443 | 2nd Trial Transcript | 10976 - 10991 |
| 446 | 2nd Trial Transcript | 11118 - 11119 |
| 447 | 2nd Trial Transcript | 11131 - 11222 |
| 448 | 2nd Trial Transcript | 11312 - 11313 |
| 452 | 2nd Trial Transcript | 11372 - 11447 |
| 454 | 2nd Trial Transcript | 11495 - 11499 |
| 455 | 2nd Trial Transcript | 11506 - 11717 |

| Record No. | Document Description | Page ID #s |
|---|---|---|
| 456 | 2nd Trial Transcript | 11718 - 11856 |
| 458 | 2nd Trial Transcript | 11864 - 12025 |
| 459 | 2nd Trial Transcript | 12026 - 12109 |
| 460 | 2nd Trial Transcript | 12110 - 12232 |
| 468 | 2nd Trial Transcript | 12254 - 12390 |
| 469 | 2nd Trial Transcript | 12391 - 12546 |
| 472 | 2nd Trial Transcript | 13000 - 13406 |
| 482 | 2nd Trial Transcript | 13484 - 13695 |
| 483 | 2nd Trial Transcript | 13696 - 13866 |
| 485 | 2nd Trial Transcript | 14006 - 14183 |
| 487 | 2nd Trial Transcript | 14196 - 14198 |
| 488 | 2nd Trial Transcript | 14252 - 14262 |
| 490 | 2nd Trial Transcript | 14336 |
| 493 | 2nd Trial Transcript | 14463 - 14494 |
| 494 | 2nd Trial Transcript | 14514 - 14696 |
| 495 | 2nd Trial Transcript | 14697 - 14957 |
| 496 | 2nd Trial Transcript | 14958 - 15016 |
| 497 | 2nd Trial Transcript | 15048 - 15057 |
| 498 | 2nd Trial Transcript | 15242 - 15405 |
| 501 | 2nd Trial Transcript | 15430 - 15606 |
| 510 | Response in Opposition | 15855 |
| 523 | Order | 16161 - 16220 |
| 536 | Notice of Appeal | 16387 |
| 550-1 | Trial Exhibit 3d | 17172 |
| 550-2 | Trial Exhibit 27B | 17229 |
| 550-3 | Trial Exhibit 28 | 17243-44 |
| 550-4 | Trial Exhibit 34 | 17247 |